ORIGINAL

BRENDAN CUMMINGS (CA Bar No. 193952)
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Phone: (760) 366-2232
Facsimile: (760) 366-2669
Email: bcummings@biologicaldiversity.org

DAVID R. HOBSTETTER (CA Bar No. 277344)
Center for Biological Diversity
351 California St., Suite 600
San Francisco, CA 94104
Phone: (415) 436-9682
Facsimile: (415) 436-9683
Email: dhobstetter@biologicaldiversity.org

NATHAN MATTHEWS (CA Bar No. 264248)
Sierra Club
85 2nd St., Second Floor
San Francisco, CA 94105
Phone: (415) 977-5695
Facsimile: (415) 977-5793
Email: Nathan.Matthews@sierraclub.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB,<br><br>Plaintiffs,<br><br>v.<br><br>THE BUREAU OF LAND MANAGEMENT and KEN SALAZAR, Secretary of the Department of the Interior,<br><br>Defendants. | Case No. CV11 6174<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

COMPLAINT                                    1

## I. INTRODUCTION

1. Plaintiffs Center for Biological Diversity and the Sierra Club ("Plaintiffs") bring this civil action for declaratory and injunctive relief against the United States Bureau of Land Management and Ken Salazar, Secretary of the Interior (collectively "BLM"), regarding BLM's decision to lease sensitive lands in California for oil and gas development without analyzing the full environmental effects of doing so. This action arises under, and alleges violation of, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*; the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. §§ 181 *et seq.*, as amended; and the statutes' implementing regulations.

2. On September 14, 2011, the Hollister field office of BLM held an oil and gas lease sale of approximately 2,700 acres of land in Monterey and Fresno counties. In so doing, BLM relied upon an environmental assessment ("EA") prepared pursuant to NEPA that failed to analyze many of the significant environmental effects of the oil and gas development that could occur upon development of the leases. Among the numerous deficiencies of the EA, BLM ignored or downplayed the impacts the lease sale and subsequent development would have upon endangered and sensitive species in the area, including the San Joaquin kit fox and the California condor. Additionally, BLM failed to address the impacts to water quality and other resources that result from hydraulic fracturing, or "fracking," a likely method of oil and gas extraction that could be applied to the leased areas. Moreover, by failing to require lessees to capture methane, a potent greenhouse gas often released during oil and gas operations, BLM failed to comply with the mandate of the MLA to protect natural resources and environmental quality, minimize waste, and minimize the adverse effect on the ultimate recovery of mineral resources.

3. Plaintiffs bring this case to overturn BLM's illegal and unwise lease sale and ensure that California's sensitive wildlife and water resources are properly protected, and that any oil and gas leasing and subsequent development be allowed to occur, if at all, following a thorough environmental review that reveals to the public and decisionmakers the full impacts of such action.

COMPLAINT 2

## II. PARTIES

4. Plaintiff Center for Biological Diversity ("the Center") is a non-profit corporation with offices in San Francisco, California and elsewhere in the United States. The Center is actively involved in species and habitat protection issues throughout North America and has more than 37,000 members. One of the Center's primary missions is to protect and restore habitat and populations of imperiled species, including from the impacts of fossil fuel development. The Center's members and staff include individuals who regularly use and intend to continue to use the areas in Monterey and Fresno counties affected by the leasing at issue here. Center members have visited these lands for recreational, scientific, educational, and other pursuits, and intend to continue to do so in the future, and are particularly interested in protecting the many native, imperiled, and sensitive species and their habitats that may be affected by oil and gas leasing and development.

5. The Sierra Club ("the Club") is a nationwide non-profit conservation organization headquartered in San Francisco, with more than 150,000 members in California. The Club's purposes are to explore, enjoy, and protect the wild places of the Earth; to practice and promote responsible use of the Earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. The Sierra Club, including its Ventana and Tehipite Chapters, has many members living in and/or recreating in the affected counties.

6. Plaintiffs' members use and enjoy the wildlife habitat, rivers, streams, and healthy environment in the areas subject to and affected by the oil and gas leases at issue in this case. Plaintiffs' members derive recreation, aesthetic and spiritual benefit from their activities. Plaintiffs' members intend to continue to use and enjoy the wildlife habitat, rivers, streams, and healthy environment of these Salinas and San Joaquin management areas on an ongoing basis in the future. Additionally, Plaintiffs and their members and staff have an interest in ensuring that BLM complies with all applicable laws, including the substantive, procedural and informational provisions of NEPA and the MLA.

7. This suit is brought by Plaintiffs on behalf of themselves and their adversely affected members and staff. The BLM's determination to sell oil and gas leases in the areas subject to this case will harm Plaintiffs and their members' present and future interests in and use of those areas. Negative effects include, but are not limited to: (1) impacts to native plants and wildlife—especially threatened or endangered species—and their habitats within and around the leases due to oil and gas activities; (2) impacts to water quality and riparian habitat; (3) reduction and impairment of recreation opportunities; (4) impaired aesthetic value; (5) loss of scientific study opportunities; (6) contribution to damaging air pollution, including greenhouse gases, which cause climate change; and (7) potential threats to regional seismic stability.

8. Defendant BLM is an agency within the United States Department of the Interior and is responsible for managing federal lands and subsurface mineral estates underlying federal, state, and private lands. Its stated mission is to sustain the health, productivity, and diversity of America's public lands for the use and enjoyment of present and future generations. The BLM is responsible for implementing and complying with federal law, including the federal laws underlying the lease sale challenged in this action.

9. Defendant Ken Salazar is the Secretary of the United States Department of the Interior, and is sued in his official capacity. Mr. Salazar is the official ultimately responsible under federal law for ensuring that the actions and management decisions of BLM comply with applicable laws and regulations.

### III. JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

10. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706. The relief requested is authorized by 28 U.S.C. §§ 2201-2202.

11. Defendants have not remedied their violations of NEPA and the MLA and are in violation of these statutes under the standards of review provided by the Administrative Procedure Act ("APA"). Plaintiffs have exhausted all available administrative remedies to the degree such exhaustion is required. There exists an actual controversy between the parties within the meaning of 28 U.S.C. § 2201 (declaratory judgments).

12. Venue is proper pursuant to 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. The BLM developed the environmental assessment ("EA") at issue here and determined to move forward with the oil and gas lease sale from the BLM's Hollister Field Office, which is in San Benito County, California. Moreover, much of the land subject to the action at issue is located in Monterey County, California.

13. Assignment to the San Jose Division is appropriate because the BLM's Hollister Field office in which the final decision was made is in San Benito County and much of the land subject to the present action is located in Monterey County.

## IV. LEGAL BACKGROUND

### A. The National Environmental Policy Act

14. NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's twin aims are to ensure that federal agencies consider the environmental impacts of their proposed actions and to ensure that agencies inform the public that environmental concerns have been considered.

15. NEPA requires "responsible [federal] officials" to prepare an environmental impact statement ("EIS") to consider the effects of each "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i). To determine whether the impacts of a proposed action are significant enough to warrant preparation of an EIS, the agency may prepare an EA.

16. Under NEPA's implementing regulations, an agency's EA must include "brief discussions of the need for the proposal, of the alternatives . . . , [and] of the environmental impacts of the proposed action and the alternatives." 40 C.F.R. § 1508.9. The EA must take a "hard look" at the impacts, and if the agency decides the impacts are not significant, it must supply a convincing statement of reasons why.

17. Further, NEPA's implementing regulations require that the agency "shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions," and shall ensure the scientific accuracy and integrity of environmental

analysis. *Id.* § 1502.24. The agency must disclose if information is incomplete or unavailable and explain "the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts." *Id.* § 1502.22(b)(1). The agency must also directly and explicitly respond to dissenting scientific opinion. *Id.* § 1502.9(b).

18. An agency must prepare an EIS for any action that has "individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). A cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

19. If, after preparing an EA, the agency determines an EIS is not required, the agency must provide a "convincing statement of reasons" why the project's impacts are insignificant and issue a Finding of No Significant Impact or "FONSI." 40 C.F.R. §§ 1501.4, 1508.9 & 1508.13.

**B.  The Mineral Leasing Act of 1920**

20. Under the MLA, the BLM may grant leases for the development of federal mineral resources, including gas, oil, coal, and a number of other leasable minerals on public lands, as well as on private lands where the federal government has control over the subsurface mineral estate. The MLA establishes the qualifications, limits, and payments processes required for such mineral leases.

21. Among other requirements, the MLA requires that the BLM, in leasing lands containing oil and gas, subject the lessee to the requirement that the lessee will, in conducting its operations, use all reasonable precautions to prevent waste of oil or gas developed in the land. 30 U.S.C. § 225.

22. The BLM's regulations further illuminate this requirement, establishing that the authorizing officer must "require that all operations be conducted in a manner which protects other natural resources and the environmental quality, protects life and property and results in the maximum ultimate recovery of oil and gas with minimum waste and with minimum adverse effect on the ultimate recovery of other mineral resources." 43 C.F.R. § 3161.2. Further, waste is defined as any act or failure to act, not sanctioned by the authorized officer, which results in "(1) [a] reduction in the quantity or

COMPLAINT 6

quality of oil and gas ultimately producible from a reservoir under prudent and proper operations; or (2) avoidable surface loss of oil or gas." 43 C.F.R. § 3160.0-5. Thus, to protect natural resources and minimize waste, BLM must consider, and if appropriate adopt plans and measures to improve the efficiency of oil and gas operations and reduce if not eliminate waste before the leases are sold.

## V. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Species and Habitats of the Lease Areas

23. The areas leased by BLM for oil and gas development under the challenged sale are in Monterey and Fresno counties, within the habitat of threatened and endangered species, and for the Monterey parcel, within designated "watershed areas" that are particularly important due to the location of the San Antonio Reservoir.

24. Among the endangered species affected or potentially affected by BLM's lease sale are the San Joaquin kit fox, the blunt-nosed leopard lizard, steelhead trout and the California condor.

25. The San Joaquin kit fox has been under California and Federal Endangered Species Act protection for four decades. Despite years of conservation efforts, kit fox populations and their habitat continue to decline.

26. In the Recovery Plan for the Upland Species of the San Joaquin Valley, the United States Fish and Wildlife Service ("FWS") noted that the loss of habitat for the kit fox due to oil and gas development remains a threat to the species. Of concern are "habitat loss due to grading and construction for roads, well pads, tank settings, pipelines, and settling ponds. Habitat degradation derives from increased noise, ground vibrations, venting of toxic and noxious gases, and release of petroleum products and waste waters. Traffic-related mortality is also a factor for kit foxes living in oil fields."

27. The FWS's recent 5-year review reconfirmed that only three core areas for the kit fox remain within the species range and that satellite and corridor areas are also critical to future survival. As the review noted, oil and gas production remains a threat to the species: "The most significant effect of oil-field development appears to be lowered carrying capacity for populations of both kit fox and their prey species due to changes in habitat characteristics, and to loss and fragmentation of habitat."

COMPLAINT 7

28. BLM's lease sites in Fresno County—particularly the areas along Jacalitos Creek—are in suitable habitat for the kit fox, and all of the lease sale areas in both Fresno and Monterey counties are in habitat that may be utilized by the species.

29. The blunt-nosed leopard lizard has also been under state and federal Endangered Species Act protections for over 40 years, with oil and gas production long-recognized as a threat to the species.

30. The FWS has noted: "Construction of facilities related to oil and natural gas production, such as well pads, wells, storage tanks, sumps, pipelines, and their associated service roads degrade habitat and cause direct mortality to leopard lizards, as do leakage of oil from pumps and transport pipes and storage facilities . . . [d]umping of waste oil and highly saline wastewater into natural drainage systems also degrades habitat and causes direct mortality." The recent 5-year review by the FWS for the blunt-nosed leopard lizard recognizes the need for affirmative steps to be taken for the recovery of the blunt-nosed leopard lizard.

31. The blunt-nosed leopard lizard occurs within and is affected by BLM's lease sale. The EA notes that leopard lizards have been well documented on Unit 4 (leases 16-19), but does not provide information about any recent surveys for the lizard on this or other lease areas.

32. The South-Central Coast Steelhead population within the South-Central California Steelhead Distinct Population Segment (DPS) has declined dramatically from annual runs totaling an estimated 25,000 adults to less than 500 returning adult fish. Run sizes have been sharply reduced in most watersheds, including the Salinas watershed, which would likely be affected by oil and gas development of the lease sale areas.

33. The primary threat to steelhead comes from urban, agricultural and industrial development that has polluted, degraded and dewatered the fish's habitat.

34. The development of the challenged oil and gas leases could result in the use of millions of gallons of water. Development of the leases could directly, indirectly, or cumulatively affect flows in the Salinas River and its tributaries to the detriment of the steelhead population. Also, wastewater or flowback from the operations could enter the streams and significantly affect the steelhead populations.

35. Historically, California condors ranged from British Columbia to Baja, but because of human activity, their numbers dropped to point where they reached the brink of extinction. Condors were listed as an endangered species in 1967, and are still one of the most endangered vertebrates in California, if not the world. While their numbers are slowly rising, this is due entirely to intensive conservation efforts, and the species still faces numerous human-induced threats and is not currently considered to be self-sustaining.

36. The condor is the subject of one of the largest species recovery efforts in U.S. history, and the FWS has spent upwards of $40 million to stave off its extinction. In a comment letter on a Forest Service leasing proposal in the Los Padres National Forest, the Department of Justice took note of the "superhuman" efforts of the FWS captive condor breeding program and went on to state that "[t]he proposed oil leasing puts the future success of this effort in jeopardy."

37. Currently, there are only 374 California condors left in the world, and 100 in the wild in California. Of these numbers, a substantial portion of remaining condors reside in relative proximity to the proposed leasing sites in Monterey County, and GPS location data for the species confirms that condors have been in the general area of the leases in Monterey County in recent years. Thus, the opportunity for interaction between condors and oil and gas developments in this area is substantial.

38. Oil and gas development resulting from the lease sale could also adversely affect other birds that depend on the San Antonio Valley or the King City Grasslands. The Audubon Society designated these locations as Important Bird Areas ("IBAs") based on data and science.

39. The San Antonio Valley IBA encompasses the area surrounding the San Antonio reservoir which supports breeding bald eagles, American white pelicans in winter and has high densities of riparian obligate species. The King City Grasslands IBA supports populations of birds along the middle Salinas River and the San Antonio River including the last remaining stronghold for burrowing owls in the Central Coast, breeding populations of northern harrier, golden eagle and prairie falcon, and seasonal habitat for ferruginous hawks, loggerhead shrike and other birds.

40. In sum, several endangered species and numerous sensitive species occur in or near the areas offered by BLM for oil and gas leasing under the challenged lease sale.

COMPLAINT 9

B.  **Impacts of Oil and Gas Leasing and Development: Fracking, Oil Spills, and Methane Leakage**

   1. **Hydraulic Fraturing**

   41.    Under BLM's lease sale, lessees may use hydraulic fracturing—or "fracking"—technology to develop the oil and gas on the leases.

   42.    Fracking is a highly controversial and dangerous drilling method. The technique involves injecting pressurized fluid into rock formations to propagate fractures in the rock layers and allow the release of oil and natural gas.

   43.    Fracking can result in the discharge of hazardous waste, including petroleum products, into drinking water. The process involves hundreds of toxic chemicals, which may escape into water supplies either through deep well injection or through more conventional routes, like migration through faulty casing or via surface spills. Recent reports show fracking has resulted in more than 1,000 documented cases of groundwater contamination, either through the leaking of fracking fluids and methane into groundwater or via aboveground spills of contaminated wastewater. In particular, the storage of the hydraulic fracturing fluid in surface pits can be a source of water pollution. For instance, New Mexico data, summarized by the Oil and Gas Accountability Project, shows 743 instances of ground water contamination, almost all of it occurring over the last three decades. 398 of those incidents are linked to faulty pits. Similar incidents are occurring across the country.

   44.    Fracking also requires the use of large amounts of water. The EA notes that two to five million gallons of water may be necessary to fracture one horizontal well in shale formation, which is the same formation found at the Monterey parcel. The use of this amount of water would deplete other sources, and further, pumping this large amount of water will require significant amounts of fuel combustion that will result in a corresponding increase in energy use and air pollution, including greenhouse gas emissions.

   45.    Fracking can pollute the air. In particular, operations can result in the emission of volatile organic compounds, like benzene and tolumene, which have substantial negative health effects.

B.  **Impacts of Oil and Gas Leasing and Development: Fracking, Oil Spills, and Methane Leakage**

   1. **Hydraulic Fraturing**

   41.    Under BLM's lease sale, lessees may use hydraulic fracturing—or "fracking"—technology to develop the oil and gas on the leases.

   42.    Fracking is a highly controversial and dangerous drilling method. The technique involves injecting pressurized fluid into rock formations to propagate fractures in the rock layers and allow the release of oil and natural gas.

   43.    Fracking can result in the discharge of hazardous waste, including petroleum products, into drinking water. The process involves hundreds of toxic chemicals, which may escape into water supplies either through deep well injection or through more conventional routes, like migration through faulty casing or via surface spills. Recent reports show fracking has resulted in more than 1,000 documented cases of groundwater contamination, either through the leaking of fracking fluids and methane into groundwater or via aboveground spills of contaminated wastewater. In particular, the storage of the hydraulic fracturing fluid in surface pits can be a source of water pollution. For instance, New Mexico data, summarized by the Oil and Gas Accountability Project, shows 743 instances of ground water contamination, almost all of it occurring over the last three decades. 398 of those incidents are linked to faulty pits. Similar incidents are occurring across the country.

   44.    Fracking also requires the use of large amounts of water. The EA notes that two to five million gallons of water may be necessary to fracture one horizontal well in shale formation, which is the same formation found at the Monterey parcel. The use of this amount of water would deplete other sources, and further, pumping this large amount of water will require significant amounts of fuel combustion that will result in a corresponding increase in energy use and air pollution, including greenhouse gas emissions.

   45.    Fracking can pollute the air. In particular, operations can result in the emission of volatile organic compounds, like benzene and tolumene, which have substantial negative health effects.

Ancillary equipment, such as diesel trucks and on-site generators, emit a range of air pollutants, such as nitrous oxide and particulate matter.

46. Fracking has also been linked with increased seismic activity. Specifically, the development of the Fayetteville Shale in Arkansas and corresponding development of deep waste injection wells was associated with an increase in earthquake activity in that region, including swarms of micro-earthquakes and significant quakes with magnitudes 3.9 and 4.7. The Arkansas Oil and Gas Commission halted operations at the deep injections wells in response. Although the link between the injection wells and the quakes has not been definitively established, seismic activity has dropped significantly since injection ceased.

47. As BLM noted, "recently, natural gas reserves have gained interest nationally and in California with the possibility of expanding production capacity on public lands using hydraulic fracturing technology." Reports have highlighted this recent nationwide growth in hydraulic fracturing and natural gas development. One report notes that "[a]s a result of hydraulic fracturing and advances in horizontal drilling technology, natural gas production in 2010 reached the highest level in decades," and that "[h]ydraulic fracturing, used in combination with horizontal drilling, has allowed industry to access natural gas reserves previously considered uneconomical, particularly in shale formations." Another points out that "[s]ince 1998 unconventional natural gas production [hydraulic fracturing] has increased nearly 65%."

48. The U.S. Department of Energy's Energy Information Administration also forecasts a massive surge in oil and gas development, and in particular shale gas and shale oil from formations like the Monterey Shale. As the EIA explains in a review of shale gas resources dated July 8, 2011, "[t]he use of horizontal drilling in conjunction with hydraulic fracturing has greatly expanded the ability of producers to profitably recover natural gas and oil from low-permeability geologic plays—particularly, shale plays." *Id.* As the EIA further explains, "only in the past 5 years has shale gas been recognized as a 'game changer' for the U.S. natural gas market." With specific regard to shale oil, the EIA notes that "[t]he largest shale oil formation is the Monterey/Santos play in southern California, which is estimated to hold 15.4 billion barrels . . . of . . . total shale oil resources." *Id.*

COMPLAINT 11

**2. Oil Spills and Habitat Contamination**

49. Regardless of whether fracking is employed, oil and gas development under the lease sales can have numerous negative impacts of wildlife and other resources. Among the most significant such impacts are from spills of oil, gas, or brine. Such spills can injure or even kill wildlife by destroying the insulating capacity of feathers and fur and by depleting the oxygen availability in water. The effects of exposure to these toxic substances can lead to reduced fertility, organ damage, immune suppression, and cancer.

50. The impact of such spills has lasted for decades in some areas.

51. Exposure to brine (a mixture of water, salts, other minerals, and oil commonly used in oil production) can be lethal to young waterfowl, including damaging feathers, killing needed vegetation, and decreasing needed nutrients in their water supply.

52. The harmful impacts of oil spills are true for even small spills; for instance, a study of National Wildlife Refuges in Louisiana found that levels of oil contamination near oil and gas facilities were lethal to most species of wildlife despite the lack of occurrence of any large spills. Additionally, spills are not an infrequent occurrence in oil and gas production. In one report, nearly 20 percent of oil and gas production facilities examined reported spills. The report also noted the response to spills tends to vary, and that agency staff are often ill equipped and ill trained in how to deal with such spills. One review of official spill reports indicates that there have been nearly a dozen oil spills in the Las Padres National Forest area in the last three years alone.

**3. Methane Leakage**

53. One of the significant consequences of oil and gas development is methane release into the atmosphere. Methane, a greenhouse gas, is at least 25 times more potent than carbon dioxide over a 100 year period and at least 72 times as potent over a 20 year period in its contribution to global warming

54. Citing to a decade-old report, the EA claims that one new well would only result in .01 tons of methane emissions per year. EPA, however, has provided updated emissions factors and has

determined that the old ones underestimate natural gas production emissions at various steps in the exploration and production process by a very large amount in many cases.

55. In Monterey County, where the majority of the acres included in the lease sale are, most of the oil and gas potential comes from the Monterey Shale. Due to the significantly larger production emissions of shale gas, shale gas can lose much of its greenhouse gas emissions advantage against coal-based generation. This is especially true if a 20-year global warming potential is used to calibrate methane's relative radiative forcing against that of carbon dioxide in order to emphasize the influence of methane emissions on near-term climate change. Notably, recent peer-reviewed science teaches that methane is even more powerful at warming the atmosphere than previously thought, and specifically that it may be 33 times as potent as $CO_2$ over 100 years and 105 times as potent as $CO_2$ over 20 years. In short, when near-term warming impacts are considered, upstream methane emissions can erode any climate advantage that natural gas may have as a fuel.

56. Emissions of methane from oil and gas development reflect waste and inefficiencies in the production process. EPA's "Natural Gas STAR" program encourages oil and natural gas companies to cut methane waste to reduce climate pollution and recover value. These measures are applicable, notably, to both natural gas and oil development (in fact, many wells produce both natural gas and oil). EPA has already identified 150 proven technologies and practices to reduce methane waste and make operations more efficient; many of these measures cost less than $10,000 and would pay back the purchaser within a year. EPA's Natural Gas STAR and other evidence programs suggest there are opportunities to cumulatively and significantly reduce GHG emissions from many small federal actions that approve oil and gas development if the identified technologies and practices are implemented at the proper scale and are properly analyzed by federal agencies.

**C.  BLM's Lease Sale and Environmental Assessment**

57. On April 1, 2011, the BLM notified the public of the availability of a draft EA for a proposed sale of oil and gas leases. The EA presents an analysis for the sale parcels covering approximately 2,605 acres of oil of land in the BLM's Salinas Management Area and San Joaquin Management Area in Monterey and Fresno counties.

58. The BLM made the draft EA available for a 36-day public comment period. During the public comment period BLM received comments from numerous individuals or groups, including Plaintiffs, who filed comments on May 6, 2011.

59. In response to comments, BLM made only minor changes to the draft EA, and on June 16, 2011, issued a final EA and FONSI. BLM announced that it would hold a sale of the parcels on September 14, 2011.

60. Plaintiffs filed a protest with the BLM on July 15, 2011, arguing, *inter alia*, that the EA failed to take a hard look at environmental impacts of the oil and gas leases, that clear significant impacts demanded that the BLM prepare an EIS, and that the BLM had violated the MLA by failing to require lessees to take actions to prevent the waste of oil and gas, specifically methane. Plaintiff's Protest requested that the BLM cancel the lease sale and prepare an EIS as required by NEPA.

61. On September 9, 2011, the BLM dismissed the Plaintiffs' protest and offered the parcels at a September 14, 2011, oil and gas lease sale.

62. At the September 14, 2011, lease sale, the BLM successfully auctioned a 2,343 acre parcel in Monterey County, within the BLM's Salinas Management Area, and a 200 acre parcel and a 40 acre parcel in Fresno County, within the BLM's San Joaquin Management Area. Additional acres were sold after the initial sale.

63. BLM's EA failed to analyze numerous impacts associated with and flowing from its lease sale.

64. Among the biggest flaws of the EA is the scope of its analysis. The EA looks at the environmental impacts associated with only a single well on one acre of habitat, even though a much larger number of wells on the roughly 2,700 acres of land actually leased reasonably could be expected to occur.

65. BLM also justifies its limited analysis upon the assertion that future activity on the leases will require subsequent environmental review. However, in its EA, the BLM also states that, as a general matter, it "cannot deny a lessee the right to drill once a lease is issued unless the action is in direct conflict with another existing law."

66. Notwithstanding the requirements of the MLA, BLM failed to include any restrictions on methane flaring or leakage, even though measures to capture methane are readily available.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**[Violation of NEPA and the APA; Preparation of an Unlawful EA and FONSI]**

67. Each and every allegation set forth in the Complaint is above incorporated herein, by reference.

68. Pursuant to NEPA, Defendants must take a "hard look" at the consequences, environmental impacts, and adverse effects of the proposed actions. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9.

69. The BLM arbitrarily assumed for the purposes of the EA that only one well on one acre of habitat would result from the lease sale, and as a result minimized potential environmental impacts and failed to analyze the nature, intensity, and extent of the lease sale's actual effects. The BLM's assumption is arbitrary because the agency unlawfully relied on unrepresentative information and ignored more recent data regarding increases in oil and gas activity both nationally and regionally. Further, the BLM minimized impacts by unlawfully determining that few environmental effects result from the lease sale stage because the BLM could prohibit harm to the environment at the exploration and development stages.

70. The BLM failed to take a hard look at the impacts of the sale of the oil and gas leases in Monterey and Fresno counties because it ignored the cumulative impacts of other oil and gas activities in conjunction with this lease sale.

71. The BLM failed to take a hard look at the air pollution that will occur as a result of the leasing, including the greenhouse gas emissions and the lease sale's impact on climate change, despite available methods of doing so. The agency should have considered methane releases due to exploration and production, and greenhouse gas emissions generated by the addition of more fossil fuels to the economy.

72. The BLM failed to take a hard look at impacts to water quality as it did not consider water usage or waste storage.

73. The BLM failed to take a hard look at potential impacts to threatened, endangered, and sensitive species and their habitats, including impacts to the San Joaquin kit fox, the blunt-nosed leopard lizard, the South-Central Coast steelhead, and the California condor.

74. The BLM failed to take a hard look at impacts to species and their habitats resulting from oil spills and contamination.

75. The BLM failed to take a hard look at impacts resulting from hydraulic fracturing, including the risk it poses to water quality and air quality, and its effect on seismic activity.

76. For each of the above reasons, and others, the BLM's adoption of an inadequate EA and a FONSI for the lease sale is arbitrary, capricious, and not in accordance with law as required by NEPA, its implementing regulations, and the APA, and is subject to judicial review under the APA. 5 U.S.C. §§701-706, 706(2).

## SECOND CLAIM FOR RELIEF

### [Violation of NEPA and APA; Failure to Prepare an EIS]

77. Each and every allegation set forth in the Complaint above is incorporated herein, by reference.

78. BLM violated NEPA in approving the lease sale without preparing an EIS. NEPA requires the preparation of an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. The BLM's lease sale is a major federal action significantly affecting the quality of the human environment. The BLM's conclusion that preparation of an EIS prior to holding of the lease sale was not required was arbitrary, capricious, and inconsistent with the law.

79. Numerous factors requiring the preparation of an EIS are triggered by the BLM's lease sale. The CEQ regulations list ten factors that must be considered in determining the significance of an action's environmental effects. 40 C.F.R. § 1508.27. Among these are that the action affects "ecologically critical areas," is "highly controversial," involves possible effects that are "highly

COMPLAINT 16

uncertain or involve unique or unknown risks," is related to other actions with "cumulatively significant impacts," and "may adversely affect an endangered or threatened species." 40 C.F.R. §§ 1508.27(b)(3)(4), (5), (7) & (9). The presence of any or all of these factors renders the BLM's decision to not prepare an EIS arbitrary, capricious, and inconsistent with the law.

80. For each of the above reasons, and others, the BLM's sale of the oil and gas leases without preparing an EIS is arbitrary, capricious, and not in accordance with law as required by NEPA, its implementing regulations, and the APA, and is subject to judicial review under the APA. 5 U.S.C. §§701-706, 706(2).

## THIRD CLAIM FOR RELIEF

### [Violation of the MLA and APA]

81. Each and every allegation set forth in the Complaint above is incorporated herein, by reference.

82. The MLA requires that the BLM, in leasing lands containing oil and gas, subject the lessee to the requirement that the lessee will, in conducting its operations, use all reasonable precautions to prevent waste of oil or gas developed in the land. 30 U.S.C. § 225.

83. The MLA's implementing regulations require the BLM and oil and gas operators to protect natural resources and environmental quality, minimize waste, and minimize the adverse effect on the ultimate recovery of other mineral resources. 43 C.F.R. § 3161.2; *see also* 43 C.F.R. §§ 3160.0-5, 3162.1(a), 43 C.F.R. § 3162.1, 3162.7-1(a), (d).

84. The BLM violated the MLA by allowing lessees to flare or emit large amounts of methane gas in violation of the requirement that they protect natural resources and environmental quality, minimize waste, and minimize the adverse effect on the ultimate recovery of mineral resources.

85. For each of the above reasons, and others, the BLM's lease sale was arbitrary, capricious, and not in accordance with law as required by the MLA and APA, and is subject to judicial review thereunder. 5 U.S.C. §§ 701-706.

## VII. PRAYER FOR RELIEF

Therefore, Plaintiffs respectfully request that this Court:

1. Declare that the BLM violated NEPA and the APA in issuing its EA and FONSI for the lease sale;

2. Declare that the BLM violated NEPA and the APA by failing to prepare an EIS before holding the lease sale;

3. Declare that the BLM violate the MLA and the APA by failing to ensure that the lessee will prevent waste;

4. Issue an order setting aside as unlawful the lease sale, the underlying EA and FONSI, and any leases issued pursuant to such sale;

5. Award Plaintiffs the costs of this action, including reasonable attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

6. Grant such other relief as the Court deems just and proper.

Dated: December 8, 2011              Respectfully submitted,

                                     /s/ [signature]

                                     Attorneys for Plaintiffs

                                     BRENDAN CUMMINGS (CA Bar No. 193952)
                                     Center for Biological Diversity
                                     P.O. Box 549
                                     Joshua Tree, CA 92252
                                     Phone: (760) 366-2232
                                     Facsimile: (760) 366-2669
                                     Email: bcummings@biologicaldiversity.org

DAVID R. HOBSTETTER (CA Bar No. 277344)
Center for Biological Diversity
351 California St., Suite 600
San Francisco, CA 94104
Phone: (415) 436-9682
Facsimile: (415) 436-9683
Email: dhobstetter@biologicaldiversity.org

NATHAN MATTHEWS (CA Bar No. 264248)
Sierra Club
85 2nd St., Second Floor
San Francisco, CA 94105
Phone: (415) 977-5695
Facsimile: (415) 977-5793
Email: Nathan.Matthews@sierraclub.org