Benjamin G. Shatz (Cal. Bar. No. 160229)
MANATT, PHELPS & PHILLIPS LLP
11355 W. Olympic Blvd.
Los Angeles, CA  90064
Email: BShatz@manatt.com
Telephone: 310-312-4353
Facsimile: 310-312-4000

Ezekiel J. Williams (Colo. Bar. No. 24844)*
Steven K. Imig (Colo. Bar No. 39016)**
DUCKER, MONTGOMERY, LEWIS & BESS, P.C.
1560 Broadway, Suite 1400
Denver, CO  80202
Email: zwilliams@duckerlaw.com; simig@duckerlaw.com
Telephone:  303-861-2828
Facsimile:  303-861-4017
*Attorneys for Amicus Curiae* California Independent Petroleum Association

*  Admission Pending
** Pro Hac Vice Admission Pending

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB, <br><br> Plaintiffs, <br><br> v. <br><br> THE BUREAU OF LAND MANAGEMENT and KEN SALAZAR, Secretary of the Department of the Interior, <br><br> Defendants. | Case No.: CV-11-06174-PSG <br><br> BRIEF OF *AMICUS CURIAE* CALIFORNIA INDEPENDENT PETROLEUM ASSOCIATION |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     INTEREST OF AMICUS CURIAE ................................................................... 2

III.    LEGAL ARGUMENT ........................................................................................ 3

    A.    Plaintiffs Misstate What NEPA Requires, Overlook the Propriety of
        Incorporating Information by Reference, and Demand an Inappropriate
        Level of Detail at This Early Leasing Stage ............................................. 3

        1.    Plaintiffs Misstate NEPA's Requirements ................................... 3

        2.    Incorporation of Material by Reference is Encouraged ................ 6

        3.    The Level of Detail of NEPA Analysis Required at the Leasing
            Stage is Appropriately Limited ................................................... 7

    B.    The BLM's Projections Regarding the Level of Anticipated Development
        Are Reasonable ........................................................................................ 8

        1.    The Reasonably Foreseeable Development Scenario and 2011 EA
            Contain Extensive Analysis of Likely Oil and Gas Activity on the
            Leases .......................................................................................... 9

        2.    The BLM's Development Projections Are Reasonable ............... 10

        3.    Extrapolation From Other Shale Plays, or Even Other Areas of the
            Monterey Shale, is Improper ...................................................... 12

    C.    Plaintiffs Misrepresent Both the Likelihood and Impact of Hydraulic
        Fracturing ............................................................................................... 13

        1.    What is Hydraulic Fracturing? ................................................... 14

        2.    Hydraulic Fracturing is Used Sparingly in Development of the
            Monterey Shale .......................................................................... 14

        3.    The BLM Reasonably Concluded That Hydraulic Fracturing is Safe ...... 15

    D.    Requiring the BLM to Impose Plaintiffs' Preferred Completion and
        Operation Technologies as Lease Stipulations Does not Comport with the
        Mineral Leasing Act and is Bad Policy ................................................. 15

IV.     CONCLUSION .................................................................................................. 18

i

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Table of authorities

## CASES

*Balt. Gas & Elec. Co. v. NRDC*,
   462 U.S. 87 (1983) .................................................................................. 4, 6, 7

*Envtl. Prot. Info. Ctr. v. Blackwell*,
   389 F. Supp. 2d 1174 (N.D. Cal. 2004) ........................................................ 6

*Forest Guardians v. U.S. Forest Serv.*,
   329 F.3d 1089 (9th Cir. 2003)..................................................................... 4, 5

*Izaak Walton League of Am. v. Marsh*,
   655 F.2d 346 (D.C. Cir. 1981) ........................................................................ 5

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) .......................................................................... 3

*Marsh v. Or. Natural Res. Council*,
   490 U.S. 360 (1989)..................................................................................... 7, 10

*N. Plains Res. Council v. Lujan*,
   874 F.2d 661 (9th Cir. 1989)........................................................................... 8

*New York v. Nuclear Regulatory Com'n*,
   681 F.3d 471 (D.C. Cir. 2012) ..................................................................... 5, 6

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Com'n*,
   449 F.3d 1016 (9th Cir. 2006)...................................................................... 5, 6

*Seattle Audubon Soc'y v. Espy*,
   998 F.2d 699 (9th Cir. 1993).......................................................................... 5

*Selkirk Conservation Alliance v. Forsgren*,
   336 F.3d 944 (9th Cir. 2003).......................................................................... 4

*Sierra Club v. Bosworth*,
   510 F.3d 1016 (9th Cir. 2007)......................................................................... 3

*Tribal Village of Akutan v. Hodel*,
   869 F.2d 1185 (9th Cir. 1988)........................................................................ 8

*Winter v. NRDC*,
   555 U.S. 7 (2008) ............................................................................................ 3

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

i

BRIEF OF AMICUS CURIAE CALIFORNIA INDEPENDENT PETROLEUM ASSOCIATION
CV-11-06174-PSG

1
2

## TABLE OF AUTHORITIES
### (continued)

3

## STATUTES

4       5 U.S.C. § 706 ................................................................................................ 17
5       5 U.S.C. § 706(2)(A) .................................................................................. 4, 6
6       30 U.S.C. §§ 181–287 ...................................................................................... 2
        30 U.S.C. § 225 .............................................................................................. 15
7       30 U.S.C. § 226(a)-(b) ................................................................................... 16
8       30 U.S.C. § 226(g) ......................................................................................... 16
9       42 U.S.C. § 4332 ...................................................................................... 2, 16
10      43 U.S.C. § 1712 ............................................................................................ 16
        Cal. Pub. Res. Code § 3203 (2011) .......................................................... 14, 15
11

12

## REGULATIONS

13      40 C.F.R. § 1500.4(j) ....................................................................................... 6
14      40 C.F.R. § 1502.20 ......................................................................................... 3
15      40 C.F.R. § 1502.21 ......................................................................................... 6
        40 C.F.R. § 1508.9 ........................................................................................... 7
16      43 C.F.R. pt. 1600 .......................................................................................... 16
17      43 C.F.R. § 3103.4-4 ........................................................................................ 8
18      43 C.F.R. § 3162.3-1(c) ................................................................................. 16
19      43 C.F.R. § 3162.3-1(g) ................................................................................. 17
20      43 C.F.R. § 3162.3-1(h) ................................................................................. 17
        43 C.F.R. § 3162.7-1(a) ................................................................................. 17
21      Cal. Code Regs. Title 14, § 1722.2 ............................................................... 15

22
23

## OTHER AUTHORITIES

24      A BLM "Reasonably Foreseeable Development Scenario" .......................... 9
25      BLM NEPA Handbook, H-1790-1 § 5.1 ...................................................... 16
        Onshore Order Number 1, 72 Fed. Reg. 10,308, 10,334 (Mar. 7, 2007) ..... 16
26      *Wyoming Outdoor Council*, 164 IBLA 84 (2004) .................................. 9, 10

27
28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

**EXHIBITS**

1.  Hydraulic Fracturing – White Paper From the California Independent Petroleum Association

2.  United States Government Accountability Office, *Oil and Gas Leasing: Interior Could Do More to Encourage Diligent Development*, GAO-09-74 (2008)

3.  Nabil EL Shaari, W.A. Minner, & R.F. LaFolette, *Is There a "Silver Bullet Technique" for Stimulating California's Monterey Shale?*, SPE 144526 (2011)

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

iii

BRIEF OF AMICUS CURIAE CALIFORNIA INDEPENDENT PETROLEUM ASSOCIATION
CV-11-06174-PSG

The California Independent Petroleum Association ("CIPA") submits this *amicus curiae* brief in support of the Defendants, the Bureau of Land Management ("BLM") and Ken Salazar.

## I.
## INTRODUCTION

This case involves Plaintiffs' attempt to substitute fear, hype, and hyperbole regarding hydraulic fracturing (often known as "fracking") for the BLM's reasoned analysis and expert opinions regarding the likely development of four leases overlying one small portion of the extensive Monterey Shale. Plaintiffs' arguments ignore bedrock principles of judicial review and agency deference, and ignore the geological and technical realities of exploring for and developing hydrocarbons in an undeveloped "wildcat" area.

Plaintiffs argue that because shale plays in North Dakota, Texas, and the Eastern United States have been developed utilizing certain technology, development of the Monterey Shale will proceed along the same lines, use the same drilling and stimulation technology, and achieve the same success. Plaintiffs' Motion for Summary Judgment and Memorandum of Points and Authorities in Support ("Plaintiffs' MSJ") at 1. This Court should not be swayed by such unsupported reasoning. Each shale play is unique. Oil and gas development thousands of miles away proves little or nothing about the validity of the BLM's conclusions that development on these specific leases in California will likely be limited. The Monterey Shale is geographically extensive — covering a 50-mile wide band running the length of California's San Joaquin Valley and a similar width band along the Pacific Coast between Santa Barbara and Orange County. Extrapolating the likelihood of success of oil and gas development from even one area of the Monterey Shale to another is fraught with peril, and experience with shale plays thousands of miles away is even less relevant.

CIPA supports, incorporates, and will not repeat the arguments made in Defendants' Cross-Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment ("Defendants' XMSJ"). CIPA submits this brief to bring certain issues to the Court's attention that are of critical importance to the oil and gas industry in California as a whole, that are based on CIPA's unique perspective, and that have ramifications beyond the parties directly involved.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

*First*, Plaintiffs misrepresent what is required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, discount the propriety of techniques to streamline NEPA review that are critical to CIPA's members, and demand a level of analysis at the early leasing stage that is improper and impossible to complete.  *Second*, Plaintiffs argue that development of the leases will be much more extensive than what the BLM predicts.  Plaintiffs' argument ignores technical and geological realities of oil and gas development, and improperly extrapolates from other oil and gas plays thousands of miles away.  *Third*, Plaintiffs' scare tactics regarding hydraulic fracturing misstate the likelihood of fracking on these leases, inflate the environmental effects of fracking, and ignore the BLM's reasoned discussion of the issue.  *Fourth*, Plaintiffs ask this Court to require the BLM to impose Plaintiffs' preferred mitigation technologies for oil and gas development at the leasing stage, years before any development is likely to occur.  This is not required by the Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 181–287, is technically and legally unworkable, and usurps the role of other regulatory bodies.

## II.
## INTEREST OF AMICUS CURIAE

CIPA is a non-profit, non-partisan trade association representing approximately 450 independent crude oil and natural gas producers, royalty owners, and service and supply companies operating in California.  CIPA members are involved in all aspects of oil and gas exploration, production, marketing, and transportation, including the drilling and operation of wells on federal mineral estate managed by the BLM throughout California.  CIPA educates the public and elected officials regarding a number of aspects of the oil and gas industry.  For example, CIPA recently published a white paper on hydraulic fracturing in California (attached hereto as Exhibit 1), and frequently weighs in on legislative and regulatory issues affecting its members.

CIPA members are subject to extensive federal, state, and local regulation of multiple aspects of their operations.  CIPA members frequently acquire and develop oil and gas leases covering federal mineral estate managed by the BLM.  CIPA members have an interest in ensuring that analysis prepared pursuant to NEPA is efficiently and accurately completed.  CIPA

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

2

1   members also have an interest in ensuring that any conditions or stipulations placed in leases are

2   reasonable, reflect technical and economic realities, and appropriately reflect that the suitable

3   mitigation and equipment to be employed at a given well depends on a number of factors.

**III.**
**LEGAL ARGUMENT**

4
5
**A.      Plaintiffs Misstate What NEPA Requires, Overlook the Propriety of Incorporating**
6   **Information by Reference, and Demand an Inappropriate Level of Detail at This**
    **Early Leasing Stage**
7
**1.      Plaintiffs Misstate NEPA's Requirements**
8

9          Plaintiffs inappropriately fly-speck and second-guess the expert conclusions reached by

10  the BLM in the BLM's Environmental Assessment for the September 14, 2011 Oil and Gas

11  Competitive Lease Sale ("2011 EA"), Administrative Record ("AR") 964–1080, and the

12  underlying Environmental Impact Statement for the Resource Management Plan for the Southern

13  Diablo Mountain Range & Central Coast of California ("RMP EIS"), AR 1-668, to which the

14  2011 EA is tiered.  AR 969 ("In accordance with 40 CFR 1502.20 this Environmental Assessment

15  (EA) is tiered to the Proposed Resource Management Plan and Final Environmental Impact

16  Statement …."); AR 960 ("implementation of the Proposed Action will not have significant

17  environmental impacts beyond those already addressed in the Record of Decision (ROD) for the

18  Hollister Field Office Resource Management Plan ….").

19          NEPA is a purely procedural statute that does not "impose any substantive requirements

20  on federal agencies …." *Lands Council v. McNair*, 537 F.3d 981, 1000–01 (9th Cir. 2008) (en

21  banc) (internal quotation marks omitted), *overruled in part on other grounds by Winter v. NRDC*,

22  555 U.S. 7 (2008).  All that NEPA requires is that the agency takes a "hard look" at the

23  environmental consequences of its actions.  *See, e.g.*, *Sierra Club v. Bosworth*, 510 F.3d 1016,

24  1018 (9th Cir. 2007); *McNair*, 537 F.3d at 1000–01.  In reviewing whether an agency's NEPA

25  analysis satisfies the "hard look" requirement, courts apply the deferential standard of review

26  under the Administrative Procedure Act ("APA"), and will set aside an agency's decision only if

27  it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

28  U.S.C. § 706(2)(A); *McNair*, 537 F.3d at 987.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

3

BRIEF OF AMICUS CURIAE CALIFORNIA INDEPENDENT PETROLEUM ASSOCIATION
CV-11-06174-PSG

Plaintiffs seek to substitute this deferential standard of review with an impossibly stringent one. Plaintiffs attack the 2011 EA's reasoned conclusions regarding the likely level of oil and gas activity on the issued leases.[1] Plaintiffs argue that the 2011 EA must contain detailed discussions of every conceivable development scenario resulting from the lease sale that is not so "remote and speculative as to reduce the effective probability of its occurrence to zero." Plaintiffs' MSJ at 22, 25. Plaintiffs argue that the Court should require the BLM to then carry Plaintiffs' inflated development assumptions through the 2011 EA in assessing impacts of the development on other resources (such as wildlife).[2] Plaintiffs MSJ at 25. This contention fails for three reasons.

First, as explained below, prediction regarding future oil and gas development requires the balancing of numerous technical considerations, including geologic and economic factors, access to markets, and the success of past development in the area. As a forward looking statute that requires the prediction of uncertain future outcomes, NEPA necessarily requires agencies to exercise judgment in evaluating conflicting and incomplete information. It is in these scientific and technical areas that judicial deference is at its apex. *See, e.g.*, *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983) (a court should be "at its most deferential" when reviewing scientific judgments and technical analyses); *McNair*, 537 F.3d at 994 ("as non-scientists, we decline to impose bright-line rules on the Forest Service regarding particular means that it must take in every case to show us that it has met the [National Forest Management Act] requirements."); *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 954 (9th Cir. 2003) (courts should defer to agency determinations in areas involving a "high level of technical expertise"); *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003) (courts are to be "most deferential" when an agency is "making predictions, within its [area of] special expertise, at the frontiers of science").

Second as Plaintiffs note, certain cases have faulted agencies for failing to "address

---

[1] As explained below, the BLM's conclusions regarding the likely level of development are reasonable.

[2] Plaintiffs never actually say what level of development BLM should have assumed. Instead, Plaintiffs state only that "BLM's authorized leasing may result in the drilling of more than one well across the 2,703 acres." Plaintiffs' MSJ at 25.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

4
BRIEF OF AMICUS CURIAE CALIFORNIA INDEPENDENT PETROLEUM ASSOCIATION
CV-11-06174-PSG

1    uncertainties relating to a project 'in any meaningful way' in an EIS." *McNair*, 537 F.3d at 981

2    (*quoting Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993)).  That is not what

3    happened here.  The 2011 EA appropriately acknowledged and addressed the necessary

4    uncertainty regarding the level of future development of the leases.  AR 1036, 1045.

5            "[N]one of NEPA's statutory provisions or regulations requires [an agency] to

6    affirmatively present every uncertainty in its EIS." *McNair*, 537 F.3d at 1001.  The court in

7    *McNair* appropriately described the impossibility of implementing the onerous requirement

8    Plaintiffs seek to impose on the BLM here:

9                    to affirmatively present every uncertainty in its EIS would be an
                    onerous requirement, given that experts in every scientific field
10                   routinely disagree; such a requirement might inadvertently prevent
                    the Forest Service from acting due to the burden it would impose.
11

12   *McNair*, 537 F.3d at 1001.  All that is required under NEPA is that agencies identify areas of

13   scientific uncertainty.  *Id.*; *see also Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 377

14   (D.C. Cir. 1981) (holding that "[s]o long as the environmental impact statement identifies areas of

15   uncertainty, the agency has fulfilled its mission under NEPA").

16           The BLM fulfilled NEPA's requirements here.  The BLM used its expertise to make what

17   CIPA believes to be the conservative prediction that "one exploration well would result from the

18   proposed lease sale."  AR 1046.  But the BLM nevertheless acknowledged in the 2011 EA the

19   uncertainty of that prediction, and disclosed and evaluated development under other scenarios,

20   including "the operations and effects associated with field development."  AR 1045 (disclosing

21   the potential surface disturbance associated with "10 development wells"); *see also* AR 1036

22   ("Impact analysis based on incomplete or unavailable information is identified where applicable

23   in this chapter").  NEPA requires no more.  *E.g.*, *Izaak Walton League*, 655 F.2d at 377.

24           Third, Plaintiffs' reliance on *New York v. Nuclear Regulatory Com'n*, 681 F.3d 471 (D.C.

25   Cir. 2012) and *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Com'n*, 449 F.3d 1016

26   (9th Cir. 2006) is misplaced.  Each case addressed situations where an agency completely failed

27   to consider the impact of its decision on a particular resource or issue.  *See New York*, 681 F.3d at

28   482 (failure to consider impact of failure to find permanent nuclear storage facility, leak at

5

1    temporary storage pools, and fires at temporary storage facility); *Mothers for Peace*, 449 F.3d at

2    1029 (failure to consider impact of terrorist attack).  Here, Plaintiffs do not contend that the BLM

3    failed to consider the impacts of the leasing decision, but rather simply take issue with the BLM's

4    conclusions regarding those impacts.  This is exactly the type of second guessing that the APA

5    prohibits.  5 U.S.C. § 706(2)(A); *Balt. Gas & Elec. Co.*, 462 U.S. at 103; *New York*, 681 F.3d at

6    482 (overturning EA because "the Commission did not undertake to examine the consequences of

7    pool fires at all.  Depending on the weighing of probability and consequences, an EIS may or may

8    not be required, *and such a determination would merit considerable deference*." [emphasis

9    added]).

###              2.        Incorporation of Material by Reference is Encouraged

11            Plaintiffs fault the 2011 EA's extensive discussion of hydraulic fracturing because the

12   analysis incorporates certain materials by reference rather than containing the analysis in the EA

13   itself.  Plaintiffs' MSJ at 30.  Among other things, Plaintiffs fault the 2011 EA because it:

14   (1) "reference[s] and quote[s] a 2004 EPA study," (2) "acknowledges ongoing studies being

15   performed by other agencies," and (3) "provides links to a congressional report on the chemicals

16   used in fracking [but] does not describe the report's findings."  Plaintiffs' MSJ at 30.  Plaintiffs'

17   criticisms are misplaced because describing and incorporating relevant studies by reference is

18   exactly what applicable legal authority directs the BLM to do.  Agencies are expressly directed to

19   "reduce excessive paperwork," including by "[i]ncorporating by reference" other studies and

20   analyses.  40 C.F.R. § 1500.4(j).  *See also* 40 C.F.R. § 1502.21 ("Agencies shall incorporate

21   material into an environmental impact statement by reference when the effect will be to cut down

22   on bulk without impeding agency and public review of the action."); *Envtl. Prot. Info. Ctr. v.*

23   *Blackwell*, 389 F. Supp. 2d 1174, 1204 (N.D. Cal. 2004) ("By covering the issue of impacts on

24   late-successional wildlife and wildlife habitat in the EA, with a fuller discussion of the issue

25   being provided in the wildlife specialists' reports that were incorporated by reference into the EA,

26   the FS made reasonably diligent efforts to involve the public during the NEPA process, especially

27   since an EA is designed to be a 'concise public document.'") (*quoting* 40 C.F.R. § 1508.9).  The

28   use of incorporation by reference and other techniques to reduce unnecessary and duplicative

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

6

1  paperwork is of critical importance to CIPA members, which depend on timely and accurate

2  NEPA analyses of federal actions.

3      Plaintiffs' complaint that the 2011 EA contains a "total of three pages discussing

4  fracking," ignores the appropriate incorporation of other studies by reference, and is a subterfuge

5  to hide the fact that Plaintiffs simply disagree with the conclusions in the incorporated studies.

6  Plaintiffs' MSJ at 30 (attacking Environmental Protection Agency study incorporated by

7  reference and arguing that the BLM "completely ignores" other studies).  But Plaintiffs'

8  disagreement with the BLM's expert conclusions regarding available scientific evidence does not

9  render the 2011 EA arbitrary and capricious.  *See, e.g.*, *Marsh v. Or. Natural Res. Council*, 490

10  U.S. 360, 378 (1989) (holding that deference is particularly appropriate "where the challenged

11  decisions involve technical or scientific matters within the agency's area of expertise."); *Balt. Gas*

12  *& Elec. Co.*, 462 U.S. at 103 (a court should be "at its most deferential" when reviewing scientific

13  judgments and technical analyses).

14      **3.     The Level of Detail of NEPA Analysis Required at the Leasing Stage is
          Appropriately Limited**

15

16      Plaintiffs demand a level of detail in the 2011 EA's analysis that is inappropriate at this

17  intermediate leasing stage.  Plaintiffs' MSJ at 27-31.

18      The BLM appropriately notes that NEPA analysis was not required at all because of the

19  NSO stipulations on certain leases, and the extremely stringent stipulations in other leases.

20  Defendants' XMSJ at 14-18.  But even if NEPA analysis in some form was required, the scope of

21  that analysis is necessarily constrained by the practical reality that often no or very little

22  development is foreseeable at the leasing stage, and there is little information about any

23  development that may occur.  When lands are offered for lease, the BLM often has no or very

24  little information regarding whether the lands will actually be leased, whether the leases will ever

25  be developed, where that development will occur, what surface and drilling equipment will be

26  utilized, the well type to be drilled, the target depth, completion techniques, the operator drilling

27  the well, what mitigation measures will be imposed by other regulators (such as the California

28  Division of Oil, Gas, and Geothermal Resources or "CDOGGR"), and numerous other issues.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

7

BRIEF OF AMICUS CURIAE CALIFORNIA INDEPENDENT PETROLEUM ASSOCIATION
CV-11-06174-PSG

1   *See, e.g.*, AR 1051 ("At the leasing stage, it is extremely difficult to generate a meaningful

2   estimate of emissions associated with an unknown well type, target depth, in an unknown

3   location, with an unknown lessee, operator, drilling contractor, etc. …. modeling at this time

4   would be hypothetical.").

5          Federal leases are issued for 10 year terms, and may be extended for a variety of reasons.

6   *See, e.g.,* 43 C.F.R. § 3103.4-4 (circumstances under which a suspension of operations and/or

7   production may be granted).  Plaintiffs ask the BLM to make detailed findings regarding

8   speculative development that may or may not occur at all (or in any particular form) for a decade

9   or more.  Numerous courts have rejected Plaintiffs' claims, and have recognized the practical

10  realities of NEPA analyses at the leasing stage. *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185,

11  1192 (9th Cir. 1988) (analyzing NEPA document for offshore lease sale and holding that "[w]e

12  are the least troubled by what might be incomplete or speculative data at the lease sale stage.");

13  *N. Plains Res. Council v. Lujan*, 874 F.2d 661, 666 (9th Cir. 1989) (site-specific discussion of

14  impacts of proposed coal lease at leasing stage "would, at this stage, be too speculative").  The

15  2011 EA contains an appropriately detailed analysis of the types of impacts that oil and gas

16  development of the leases in question likely would have.  AR 1041-46.  The level of detail

17  demanded by Plaintiffs would require the BLM to predict what is inherently unpredictable.

18  NEPA does not require a crystal ball.

19  **B.      The BLM's Projections Regarding the Level of Anticipated Development Are
            Reasonable**

20

21         The 2011 EA appropriately notes that the level of oil and gas development on the leases at

22  issue is likely to be "relatively minimal."  AR 1041.  Plaintiffs fault this conclusion, and claim

23  that this "[o]ne fundamental flaw infects BLM's entire NEPA analysis …."  Plaintiffs' MSJ at 21.

24  Plaintiffs are wrong because the BLM conducted a detailed analysis of foreseeable oil and gas

25  activity in 2007, confirmed that the analysis was still valid in 2011, and reasonably concluded that

26  it is unlikely that intensive development of the leases would occur.  *See, e.g.*, AR 816–23 (2007

27  Reasonably Foreseeable Development Scenario); AR 1041–46 (2011 EA oil and development

28  assumptions).

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

8

BRIEF OF AMICUS CURIAE CALIFORNIA INDEPENDENT PETROLEUM ASSOCIATION
CV-11-06174-PSG

1.   **The Reasonably Foreseeable Development Scenario and 2011 EA Contain Extensive Analysis of Likely Oil and Gas Activity on the Leases**

A BLM "Reasonably Foreseeable Development Scenario" is "[a] tool prepared by an interdisciplinary group of technical and scientific specialists [that] serves as an analytical baseline for identifying direct, indirect, and cumulative impacts …." *Wyoming Outdoor Council*, 164 IBLA 84, 98 (2004). The Interior Board of Land Appeals has explained that an RFD is:

> based on a review of geologic factors that control the potential for oil and gas resource occurrence and past and present technological factors that control the type and level of oil and gas activity. The RFD also takes into account petroleum engineering principles and practices and economics associated with discovering and producing oil and gas.

*Id.* at 100. Recognizing the technical and practical realities of oil and gas exploration and development, the "RFD projection can range from speculative estimates in unexplored frontier areas to estimates with higher levels of confidence in maturely developed producing areas." *Id.*

As part of "step one" of the oil and gas development process described in Defendants' XMSJ at 11-13, the BLM analyzed in detail projected oil and gas activity within the planning area, and documented that analysis in the "Hollister Field Office Area Reasonably Foreseeable Development Scenario for Oil and Gas" ("RFD"). The RFD is attached as Appendix F to the Southern Diablo RMP. AR 816–23. As part of the RFD process, the BLM synthesized known geologic and economic data and evaluated past development activity. AR 816. The BLM "took into statistical account historical drilling and development activity throughout the region and within the [Hollister Field Office] specifically." AR 8063. Based on this analysis, the BLM then prepared a projection of various types of development activities that are likely to occur over the 15–20 year life of the Southern Diablo RMP (covering an administrative area of 188,000 acres — AR 817). *Id.* The RFD projected that:

> Overall, within the next 15-20 years, we project total surface disturbance due to all oil and gas activities on federal mineral estate to be no more than 74 acres. This estimate includes geophysical exploration (seismic), 5 exploration wells, 10 development wells and associated facilities, road, and a transmission pipeline that could be linked to existing transmission lines within the area. One third of this disturbance, 26 acres, will be temporary, and would be

1

> mostly to totally reclaimed within a few months to a couple of
> years.

2

3   AR 816.

4          The 2011 EA then built upon the analysis in the RFD, and updated it to reflect activity

5   since its issuance.  AR 1044.  The 2011 EA notes that, to date, the RFD appears to be an

6   overestimation because not a single well has been drilled on any federal lease in the RFD area in

7   the six years since the RFD was developed.  AR 1044.  The 2011 EA notes that the proposed

8   lease sale covers a land mass dwarfed by the undrilled acreage already under federal lease.

9   AR 1044.  The 2011 EA examines the geographic proximity of the leases to be issued to other

10  producing fields.  AR 1044.  The 2011 EA examines the lack of development on neighboring

11  leases during periods of high commodity prices.  *Id.*  The 2011 EA then synthesizes all of this

12  information, concludes that the level of development on the leases in question is likely to be

13  "relatively minimal," AR 1041, and predicts the drilling of "no more than one well total on all of

14  these parcels, with no particular area being more likely than another to be drilled."  AR 1044.

15  This conclusion is well reasoned, supported by the record, and merits deference.  *E.g.*, *Marsh*,

16  490 U.S. at 378.

17         **2.**     **The BLM's Development Projections Are Reasonable**

18         Plaintiffs attack the BLM's development conclusions based on conclusory statements that

19  lack record evidence.  Plaintiffs assume that, simply because land is leased, the lease will be

20  developed, surface disturbance will occur, wells will be drilled and fracked, and those wells will

21  produce oil and gas.  *See, e.g.*, Plaintiffs' MSJ at 26 ("Each lease was successfully auctioned

22  (with prices as high as $180,000 for a 200-acre parcel) and presumably oil and gas companies

23  fully intend to develop the leases acquired.").

24         That is not the case.  Oil and gas exploration is a speculative business.  There is no

25  guarantee that exploration will yield a productive target worthy of drilling an exploratory well

26  and, if drilled, that the exploratory well will demonstrate that hydrocarbons can be economically

27  recovered.  Leasing is a bet that more often than not does not pan out.  An oil and gas company

28  wishing to develop an area must first lease up enough contiguous land to allow economic

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

10

BRIEF OF AMICUS CURIAE CALIFORNIA INDEPENDENT PETROLEUM ASSOCIATION
CV-11-06174-PSG

1   exploration for oil and gas.  It must find financial partners to fund the project.  It must conduct

2   seismic or other surveys to test the geological suitability for production of hydrocarbons.  *See*

3   AR 1042–1043 (describing gravity and magnetic field surveys, seismic reflection surveys, and

4   other exploratory techniques).  If the surveys are favorable, the company may decide to drill a test

5   well.  *See* AR 1043 (describing exploratory drilling process).  It then will evaluate the results of

6   this test well and decide to proceed with further exploration or tests.  Only after clearing all of

7   these hurdles would the play ever move into the development stage.  Put simply, oil and gas

8   development is a risky business and the purchase of a speculative lease in an unproven area in no

9   way predicts the ultimate development of that area.

10          The speculative nature of oil and gas development holds true when it comes to leasing of

11   federal minerals.  The Government Accountability Office ("GAO") recently conducted a

12   comprehensive analysis of the utilization of federal oil and gas leases.  The 2008 GAO report is

13   attached as Exhibit 2.  The GAO analyzed the percentage of onshore and offshore leases issued

14   between 1987 and 1996 that had been developed as of 2007.  The GAO report concludes that:

> of the leases issued from 1987 through 1996, offshore leases were
> substantially more likely than onshore leases to have been
> developed up through 2007. Specifically, about 1,891 leases, or
> about 26 percent of the 7,285 offshore leases were drilled, and
> about 888 leases, or about 12 percent of the offshore leases
> achieved production. By comparison, *about 2,904 leases, or 6
> percent of the nearly 47,925 onshore leases issued, were drilled
> during the sample period, and about 2,386 leases, or 5 percent of
> the total leases, produced oil and gas by 2007.*

20   Ex. 2 at 23 (emphasis added).  *See also* AR 1043 ("historically, a large majority of leases are

21   relinquished without ever having any actual surface disturbance"); AR 1044 ("From the lease

22   sales conducted in the HFO boundary during the past 20 years, *none* of the leases have had *any*

23   wells drilled on them." [emphasis added]).  This data demonstrate that, far from being a low

24   projection, the 2011 EA's prediction that "it is reasonable to project that only one exploratory

25   well would result from the proposed lease sale" (AR 1046) is actually a very reasonable estimate.

26   With only 6% of federal onshore leases drilled, the most likely result here is that no development

27   will occur at all.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

11

BRIEF OF AMICUS CURIAE CALIFORNIA INDEPENDENT PETROLEUM ASSOCIATION
CV-11-06174-PSG

### 3. Extrapolation From Other Shale Plays, or Even Other Areas of the Monterey Shale, is Improper

Lacking any real evidence for why the BLM's expert development projections are improper, Plaintiffs must make two arguments by analogy: (1) because shale plays have been successful thousands of miles away, the Monterey Shale will experience similar levels of development (*see, e.g.*, Plaintiffs' MSJ at 7 (stating that: "Significant shale oil extraction has already occurred in the Bakken play in North Dakota and Eagle Ford play in Texas")); and (2) because certain areas of the Monterey Shale have been successfully developed, the lease areas at issue here will be extensively developed also (*see, e.g.*, Plaintiffs' MSJ at 9 (stating that: "The importance of the Monterey Shale Formation to the oil industry in California cannot be overestimated. According to a senior geologist from the oil company Venoco Inc.: 'Almost all the oil in California has been sourced by the Monterey. . . . Only a small percentage has come from other source rocks.' AR 07893")).

Every oil and gas play is different. For example, certain members of the Society of Petroleum Engineers prepared a study of well stimulation technologies for the Monterey Shale in 2011 (the "SPE Paper"). The SPE Paper, attached as Exhibit 3, notes that: "One of the lessons learned from other unconventional shale developments (King, 2010) is that no two shales are alike. This holds true with the Monterey siliceous shale, which has large variations in properties both laterally and with depth." Ex. 3 at 3. The SPE Paper continues: "The variations in mineralogy, lithology, and quartz phase make the Monterey substantially different from other unconventional resource shales currently being produced." Ex. 3 at 4. The productivity of one shale play cannot be extrapolated to a different play, such as the Monterey Shale. Extrapolation from results from even one area of the Monterey Shale to another area is very difficult. *See* Ex. 3 at 1 ("There are large variations in reservoir properties and general interval behavior [of the Monterey Shale] due to differences in the lithology, diagenetic state, mechanical properties, and stress state.").

As Plaintiffs' acknowledge on page nine of their brief, even the largest oil and gas operator in the area — Venoco — is still at the very early stages of testing its prospect in the

Manatt, Phelps & Phillips, LLP
Attorneys At Law
Los Angeles

Monterey Shale:

> [W]e were able to double the Monterey Shale budget and not only drill additional vertical wells, but also drill our first horizontal wells in the play. *We are very early in the process of applying new drilling, coring, logging, completion and petrophysics to the Monterey.* Before 2010, we'd invested five years to identify the resource, to build a solid lease position and to hire key personnel to pursue this play. We have made very good progress in 2010 by getting the bit into the ground.

AR 7983 (emphasis added and internal quotation marks omitted).

The speculative nature of oil and gas development is especially acute where, as here, a lease is issued in a wildcat area. *See, e.g.*, AR 1044 (stating that a "wildcat well" is one that is "outside the productive boundary of existing oil and gas fields"). The critical aspect of a wildcat well is that, by definition, little about the subsurface geology and the prospect for hydrocarbons in commercial quantities are known with certainty before it is drilled. This means both that the well is often more difficult to drill (because the drilling crew knows little about the formations they are drilling through) and far less likely to be productive (because the well is essentially an educated guess) than wells drilled in established fields.

As the BLM explains in the 2011 EA:

> Historically in the San Joaquin Valley, only about 10-15% of wildcat wells have been successful in finding commercial quantities of oil and gas …. The remaining 85-90% of the wells are non-commercial which are immediately plugged and abandoned (P&A'd), so any disturbance associated with the drilling of these P&A'd wells would be temporary.

AR 1047–48. Given the unexplored and wildcat nature of the leases in question, Plaintiffs' unsupported assertion that the leases will be extensively developed simply because they were purchased is not convincing.

## C.     Plaintiffs Misrepresent Both the Likelihood and Impact of Hydraulic Fracturing

Plaintiffs make two interrelated arguments, both based on faulty assumptions: (1) any wells drilled on the leases will be fracked (*see, e.g.*, Plaintiffs' MSJ at 2, describing the "looming fracking boom" in California); and (2) once the wells are fracked, significant adverse environmental effects will occur (Plaintiffs' MSJ at 15, outlining Plaintiffs' parade of horribles

13

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1    about fracking).  CIPA supports the use of hydraulic fracturing technology, and is hopeful that it

2    can eventually be more extensively used in California.  But despite the fact that hydraulic

3    fracturing has been utilized in California since the 1950s, the geological nature of the Monterey

4    Shale means that the technology may not be as extensively utilized as Plaintiffs' suggest.

5    **1.      What is Hydraulic Fracturing?**

6    Contrary to popular belief, hydraulic fracturing is not a drilling technique.  Ex. 1 at 1.

7    Rather, it is one of many "completion" or "well stimulation" techniques that are employed to

8    encourage hydrocarbon production after a well is drilled and cased.  *Id.*  The well is fracked only

9    after a permit has been issued by the State Division of Oil, Gas, and Geothermal Resources

10   (DOGGR) that ensures the wellbore contains the requisite barriers of protection between the

11   inside of the well (where the fluid flows) and the outer casing of the well.  Ex. 1 at 1; CAL. PUB.

12   RES. CODE § 3203 (2011).  The hydraulic fracturing process generally takes 1–2 days, and

13   involves injecting high pressure water, sand, and chemicals thousands of feet below the surface

14   into low permeability rock to create tiny fractures that then allow trapped oil and gas to migrate to

15   the wellbore.  Ex. 1 at 1.

16   **2.      Hydraulic Fracturing is Used Sparingly in Development of the Monterey
17           Shale**

18   CIPA is very hopeful that hydraulic fracturing will prove successful in the Monterey

19   Shale.  But Plaintiffs make unsupported assumptions about the use of the practice in California

20   that do not comport with geologic reality or the current state of technology.  The 2011 EA

21   concludes that less than 20% of wells drilled in the area are hydraulically fractured.  AR 1039.

22   This is a reasonable estimate.  The SPE Paper explains that:  "In the non-traditional

23   ('unconventional') Monterey targets, conventional hydraulic fracture placement can be

24   challenging, due to the combination of stress state and natural fracture planes that complicate

25   fracture geometry and leakoff by opening under fracturing conditions.").  Ex. 3 at 3.  The biggest

26   operator in the area — Venoco — has determined that it's forthcoming "exploration drilling will

27   involve vertical wells and acid, not the more expensive hydraulic fracturing."  AR 516.  The

28   bottom line is that hydraulic fracturing will likely be a piece of the puzzle for oil and gas

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

14

BRIEF OF AMICUS CURIAE CALIFORNIA INDEPENDENT PETROLEUM ASSOCIATION
CV-11-06174-PSG

1    development in California, but assuming it has fundamentally reshaped oil and gas development

2    in the Monterey Shale is untrue.

3    **3.      The BLM Reasonably Concluded That Hydraulic Fracturing is Safe**

4    The 2011 EA contains a reasonable discussion of hydraulic fracturing, including

5    summaries of relevant recent studies and analysis.  AR 1037–40.  Plaintiffs' fault this analysis,

6    and argue that "more recent studies show harm, or at least risk, from fracking."  Plaintiffs' MSJ

7    at 30.  As described above, Plaintiffs' argument fails because it is the BLM, and not Plaintiffs or

8    this court, which is tasked with weighing competing scientific and technical information.  But

9    Plaintiffs' arguments that fracking is a risky and dangerous practice fails also because it is untrue.

10   Fracking does not occur until a well is already drilled.  As a well completion technology

11   that involves pumping fluid into a wellbore, the safety of fracking is entwined with regulation of

12   wellbore integrity.  Pursuant to DOGGR regulations, no well in California may be drilled until a

13   state engineer confirms that the well contains multiple barriers of cement and steel casing that

14   form an impermeable barrier between the well and the surrounding geological environment.

15   Ex. 1 at 1; CAL. PUB. RES. CODE § 3203; CAL. CODE REGS. Tit. 14, § 1722.2 (each well shall be

16   designed to "seal off fluids and segregate them for the protection of all oil, gas, and freshwater

17   zones" and must include "the appropriate design factor provided to obtain a safe operation.").

18   Where groundwater reservoirs are generally several hundred feet below the surface, hydraulic

19   fracturing occurs in impermeable zones several thousand feet below the surface.  Ex. 1 at 5.

20   Thousands of feet of impermeable rock generally separate the fracturing zone from the

21   groundwater zone.  Not surprisingly then, there has been no known case of groundwater

22   contamination due to hydraulic fracturing found in the United States.  Ex. 1 at 5 (citing recent

23   testimony and reports stating the same).

24   **D.      Requiring the BLM to Impose Plaintiffs' Preferred Completion and Operation
     Technologies as Lease Stipulations Does not Comport with the Mineral Leasing Act
25   and is Bad Policy**

26   Plaintiffs argue that the MLA, 30 U.S.C. § 225, obligated the BLM to impose stipulations

27   in the leases requiring that future site-specific development utilize Plaintiffs' preferred

28   technology, including:  (1) "requiring state of the art rod-packing technology"; (2) techniques to

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

15

BRIEF OF AMICUS CURIAE CALIFORNIA INDEPENDENT PETROLEUM ASSOCIATION
CV-11-06174-PSG

1   "separate[] mud and debris to capture the gas or condensate"; (3) utilizing "zero emission

2   dehydrators"; and (4) utilizing other specific technologies and drilling and completion techniques

3   advocated by Plaintiffs.  Plaintiffs' MSJ at 38–41.  CIPA agrees with Defendants' legal

4   arguments on this point, and will not repeat them here.  Defendants' XMSJ at 38–43.  But the

5   Court should also be aware of the terrible policy and practical effects that would result from

6   adoption of Plaintiffs' legal theories.

7         Plaintiffs ignore that the issuance of an oil and gas lease is an intermediate step in the

8   federal oil and gas development process.  As explained in Defendants' XMSJ at 12–13, the BLM

9   conducts a three phase decision-making process in authorizing oil and gas development on federal

10  lands:  (1) land use planning (*see* 43 U.S.C. § 1712; 43 C.F.R. Part 1600, Subpart 1601);

11  (2) leasing decisions (*see* 30 U.S.C. § 226(a)–(b).); and (3) site specific development decisions

12  (*see* 30 U.S.C. § 226(g); Onshore Order Number 1, 72 Fed. Reg. 10,308, 10,334 (Mar. 7, 2007)).

13  This case concerns phase two.  Plaintiffs attempt to force the BLM to impose its preferred well

14  technology and mitigation measures at this intermediate stage.  That is inappropriate and ignores

15  the significant process still to come.

16        If an operator ever seeks to develop the leases in question, the BLM and project proponent

17  will prepare a site-specific proposal to minimize, mitigate and avoid impacts to other resource

18  values.  Before commencing "drilling operations" or "surface disturbance preliminary thereto," an

19  oil and gas lessee must submit a surface use plan to the BLM, and obtain BLM approval of an

20  Application for Permit to Drill ("APD").  30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-1(c).  The BLM

21  conducts a site-specific NEPA review of the proposal, and prepares an Environmental Impact

22  Statement or Environmental Assessment to analyze the reasonably foreseeable effects of the

23  development proposal, as well as alternatives.  *See* 42 U.S.C. § 4332; Onshore Order Number 1,

24  72 Fed. Reg. 10,308, 10,334 (Mar. 7, 2007).  The BLM determines if existing NEPA analysis

25  covers the project and whether the analysis enables them to approve the proposal without further

26  review.  *See* BLM NEPA Handbook, H-1790-1 § 5.1 (relevant excerpts attached as Exhibit 2).

27  The BLM's decision on an APD is subject to administrative appeal within the agency, and

28  thereafter to judicial review under the APA, 5 U.S.C. § 706.  The BLM must make information

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

16

BRIEF OF AMICUS CURIAE CALIFORNIA INDEPENDENT PETROLEUM ASSOCIATION
CV-11-06174-PSG

1   concerning each APD public, and must consult with other agencies before approving an APD.

2   43 C.F.R. § 3162.3-1(g); § 3162.3-1(h).  In California, the state CDOGGR regulates the

3   development of the well "to prevent surface and groundwater contamination and ensure

4   protection of sensitive resources."  AR 1040 (referencing a 2008 Memorandum of Understanding

5   between the BLM and CDOGGR).

6       This extensive site-specific development process is the appropriate time at which to

7   impose particular drilling, completion, and other mitigation requirements.  The BLM retains the

8   authority under the issued leases to do so.  *See, e.g.*, AR 9368 (providing that the lease is "subject

9   to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of

10  Interior's regulations and formal orders in effect as of lease issuance"); 43 C.F.R. § 3162.7-1(a)

11  ("[t]he operating rights owner or operator, as appropriate, shall comply with applicable laws and

12  regulations; with the lease terms, Onshore Oil and Gas Orders, NTL's; and with other orders and

13  instructions of the authorized officer").  Pushing the decision regarding specific mitigation

14  technology to the leasing stage will require the BLM to act without the benefit of site specific

15  information, will usurp the extensive body of law and regulations regarding site-specific

16  development decisions, and will lock the BLM into a decision today that may make no sense in a

17  decade or more when a site-specific development application is actually submitted.

18

19                                  **IV.**
                                **CONCLUSION**

20      For all the foregoing reasons, and the reasons stated in Defendants' cross-summary

21  judgment motion, the Court should dismiss Plaintiffs' claims with prejudice.

22      Respectfully submitted this 14th day of September, 2012

23                  By: *s/Benjamin G. Shatz*
                    MANATT, PHELPS & PHILLIPS LLP
24
                    Ezekiel J. Williams
25                  Steven K. Imig
                    DUCKER, MONTGOMERY, LEWIS & BESS PC
26                  *Attorneys for Amicus Curiae*
                    California Independent Petroleum Association
27

28   304597545.2

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

17