Brendan Cummings (CA Bar No. 193952)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252
Phone: (760) 366-2232
Facsimile: (760) 366-2669
Email: bcummings@biologicaldiversity.org

David R. Hobstetter (CA Bar No. 277344)
CENTER FOR BIOLOGICAL DIVERSITY
351 California Street, Suite 600
San Francisco, CA 94104
Phone: (415) 436-9682 x321
Facsimile: (415) 436-9683
Email: dhobstetter@biologicaldiversity.org

Nathan Matthews (CA Bar No. 264248)
SIERRA CLUB
85 2nd St., Second Floor
San Francisco, CA 94105
Phone: (415) 977-5695
Facsimile: (415) 977-5793
Email: Nathan.Matthews@sierraclub.org

Attorneys for Plaintiffs
CENTER FOR BIOLOGICAL DIVERSITY
and SIERRA CLUB

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

CENTER FOR BIOLOGICAL
DIVERSITY and SIERRA CLUB,

      Plaintiffs,

   v.

THE BUREAU OF LAND
MANAGEMENT and KEN SALAZAR,
Secretary of the Department of the Interior,

     Defendants.

Case No. CV-11-06174-PSG

**Plaintiffs' Reply in Support of Motion for Summary Judgment and Response in Opposition to Defendants' Cross-Motion for Summary Judgment**

Hearing on Cross-Motions for Summary Judgment Scheduled for
10:00 a.m. on January 15, 2013

The Honorable Paul S. Grewal

1

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................... 1

II. ARGUMENT ........................................................................................................... 1

  A. BLM Failed to Comply with NEPA .................................................................. 1

     1. NEPA Applies to the Lease Sale and Plaintiffs' Claims Are Ripe for Review ................ 2

     2. BLM's Reliance on an Outdated RFD Scenario was Arbitrary and Unlawful ................ 7

        a. BLM Misstates the Standard ................................................................... 7

        b. BLM Ignored Clear Evidence of a Fracking Boom ................................ 9

           i. The Very Real Fracking Boom ................................................... 9

           ii. BLM Never Analyzed the Implications of Fracking on the RFD ............ 12

     3. BLM's EA Failed to Take a Hard Look at Environmental Impacts ............................... 14

     4. BLM Violated NEPA by Refusing to Prepare an EIS .................................................... 17

  B. Defendants Violated the MLA ........................................................................ 19

     1. The MLA Requires BLM to Include Lease Provisions Specifying All Reasonable Precautions to Prevent the "Waste" of Gas ......................................................................... 19

     2. BLM Failed to Include Lease Provisions Preventing Waste ......................................... 21

     3. Plaintiffs' MLA Claim is Cognizable under the APA .................................................. 24

  III. CONCLUSION ................................................................................................... 25

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>

3

*Al Tech Specialty Steel Corp. v. United States*,

4

    28 C.I.T. 1468 (Ct. Int'l Trade 2004) ................................................................................ 9

5

*Alaska Wilderness Recr. & Tourism Ass'n v. Morrison*, 67 F.3d 723 (9th Cir. 1995) ............................ 8

6

*Amoco Oil Co. v. EPA*,

7

    501 F.2d 722 (D.C. Cir. 1974) .......................................................................................... 9

8

*Blue Mtns. Biodiversity Project v. Blackwood*,

9

    161 F.3d 1208 (9th Cir. 1998) .................................................................................. 14, 17

10

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) .................................................... 5, 6, 18, 19

11

*Earth Island Inst. v. U.S. Forest Serv.*,

12

    442 F.3d 1147 (9th Cir. 2006) ........................................................................................ 7

13

*EME Homer City Gen., L.P. v. EPA*,

14

    2012 U.S. App. LEXIS 17535 (D.C. Cir. 2012) .......................................................... 23

15

*Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) ........................... 8

16

*Greer Coal., Inc. v. U. S. Forest Serv.*,

17

    2007 U.S. Dist. LEXIS 15283 (D. Ariz. Feb. 28, 2007) ............................................. 13

18

*Kern v. U.S. BLM*,

19

    284 F.3d 1062 (9th Cir. 2002) .................................................................................. 2, 17

20

*Malama Makua v. Rumsfeld*,

21

    163 F. Supp. 2d 1202 (D. Haw. 2001) ..................................................................... 5, 16

22

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) ........................................................... 2, 5

23

*N. Alaska Envtl. Ctr. v. Kempthorne*,

24

    457 F.3d 969 (9th Cir. 2006) .......................................................................... 2, 3, 4, 5, 18

25

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 106 (9th Cir. 2011) ...................... 7, 13, 15

26

*N.M. ex rel. Richardson v. BLM*,

27

    565 F.3d 683 (10th Cir. 2009) .................................................................................. 17, 18

28

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
   241 F.3d 722 (9th Cir. 2001) .................................................................................... 17, 18

*New Mexico v. EPA*,
   14 F.3d 290 (D.C. Cir. 1997) ....................................................................................... 23

*New York v. Nuclear Reg. Comm'n*,
   681 F.3d 471 (D.C. Cir. 2012) ........................................................................................ 7

*Norton v. S. Utah Wilderness Alliance*,
   542 U.S. 55 (2004) ....................................................................................................... 25

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
   477 F.3d 668 (9th Cir. 2007) ....................................................................................... 20

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998) ....................................................................................................... 2

*Or. Natural Desert Ass'n v. BLM*,
   531 F.3d 1114 (9th Cir. 2008) ..................................................................................... 25

*Or. Natural Res. Council Fund v. Brong*,
   492 F.3d 1120 (9th Cir. 2007) ................................................................................ 15, 16

*Pac. Rivers Council v. U.S. Forest Serv.*,
   689 F.3d 1012 (9th Cir. 2012) ........................................................................... 5, 15, 16

*Pearson v. Shalala*,
   164 F.3d 650 (D.C. Cir. 1999) ..................................................................................... 23

*Pennaco Energy, Inc. v. U.S. DOI*,
   377 F.3d 114 (10th Cir. 2004) ....................................................................................... 3

*Pit River Tribe V. United States Forest Service*
   469 F.3d 768 (9th Cir. 2006) ..................................................................................... 3, 5

*Pub. Lands for the People, Inc. v. USDA*,
   733 F. Supp. 2d 1172 (E.D. Cal. 2010).......................................................................... 25

*San Luis Obispo Mothers for Peace v. Nuclear Reg. Comm'n*,
   449 F.3d 1016 (9th Cir. 2006) .................................................................................... 7, 8

Plaintiffs' Response and Reply                                    CV-11-06174-PSG

*See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .................................................................................................. 24

*Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983) ........................................ 3

*Ursack, Inc. v. Sierra Interagency Black Bear Grp.*,
   639 F.3d 949 (9th Cir. 2011) .................................................................................. 9

*W. Watersheds Project v. Kraayenbrink*,
   620 F.3d 1187 (9th Cir. 2010) .............................................................................. 17

## **Statutes**

16 U.S.C. § 1536(a)(2) ................................................................................................ 4

30 U.S.C. § 225 .......................................................................................... 19, 20, 24

30 U.S.C. §§ 181 *et seq.* ............................................................................................ 1

30 U.S.C.§ 187 ............................................................................................ 19, 20, 24

42 U.S.C. §§ 4321 *et seq.* ........................................................................................... 1

5 U.S.C. § 551(13) .................................................................................................... 24

5 U.S.C. § 706(1) ...................................................................................................... 25

5 U.S.C. § 706(2) ...................................................................................................... 25

5. U.S.C.§ 551(8) ...................................................................................................... 24

## **Regulations**

40 C.F.R. § 1501.2 .................................................................................................... 17

40 C.F.R. § 1508.8 ................................................................................................... 6, 7

43 C.F.R. § 3101.1-2 ............................................................................................. 3, 4, 6

43 C.F.R. § 3160.0-5 ................................................................................................ 19

## **Federal Register**

77 Fed. Reg. 27,691 (May 11, 2012). ................................................................... 9, 10

# I.  INTRODUCTION

The Center for Biological Diversity and Sierra Club ("Plaintiffs") respectfully submit this Reply in Support of Plaintiffs' Motion for Summary Judgment and Response in Opposition to Defendants' Cross-Motion for Summary Judgment. As detailed in Plaintiffs' opening brief, the Bureau of Land Management's ("BLM") decision to hold a sale of publicly owned oil and gas in Monterey and Fresno counties, and subsequent issuance of leases for oil development, was unlawful in two distinct respects. First, BLM downplayed or ignored significant impacts to air, water, and wildlife, and in particular impacts related to new hydraulic fracturing, or "fracking" techniques, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, which requires an agency to disclose and analyze all reasonably foreseeable impacts of its actions. Second, in issuing the leases without requiring lessees to minimize the escape of methane gas from well development, BLM failed to comply with the Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 181 *et seq.*, which mandates the agency condition leases to ensure that lessees take all reasonable precautions to prevent the waste of oil and gas.

Defendants, in their Cross-Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment, fail to rebut Plaintiffs' claims or otherwise justify the unlawful lease sale. Instead, BLM asserts that it was somehow exempt from complying with NEPA in regard to the lease sale, that the agency's cursory and contradictory cut-and-paste "analysis" of fracking satisfies NEPA's "hard look" requirements, that the MLA's clear command of "shall" should be read as "may," and that this Court must ignore the evidence in the record and uncritically defer to the agency's irrational and unsupported conclusions. The Court should reject BLM's arguments.

# II.  ARGUMENT

## A.  BLM Failed to Comply with NEPA

Plaintiffs' opening brief explains that BLM violated NEPA in leasing over 2700 acres of federal land in California for oil and gas development.[1] In response, BLM first claims the Court need not

---

[1] While the Environmental Assessment and Decision Record describe the lease sale as including eight parcels, AR 00953, 00986, BLM ultimately consolidated these parcels so the final sale included only four parcels, but comprised the same lands. AR 05538. The two leased parcels in Monterey Country total approximately 2463 acres, while the two in Fresno County total 240 acres. AR 05538.

address the sufficiency of its NEPA documentation because BLM believes it is *entirely exempt* from NEPA compliance at the lease stage. This ignores Ninth Circuit precedent, the agency's own practice and policies, and the real-world consequences of BLM's leasing decision. Further, BLM fails to justify the inadequate NEPA analysis it did undertake, and instead, clings to its outdated "Reasonably Foreseeable Development" ("RFD") scenario which assumes no more than a single acre of land will ever be disturbed on the 2700 acres leased away for drilling. Moreover, the agency fails to reconcile the environmental assessment's ("EA") unambiguous statement that fracking would not be analyzed in the EA with its new-found litigation position that it *did* in fact analyze fracking in its EA. In any event, the agency's "analysis" of fracking falls far short of NEPA's hard look requirements and should not be countenanced by this Court.

## 1. NEPA Applies to the Lease Sale and Plaintiffs' Claims Are Ripe for Review

BLM begins its argument by absurdly asserting that NEPA does not apply *at all* at the leasing stage. Defs. Br. at 15-18. BLM first asserts this purported NEPA exemption as a jurisdictional "ripeness" barrier to the Court's review of Plaintiffs' claims. *Id*. at 18. However, both the Supreme Court and the Ninth Circuit have clearly addressed the ripeness issue, holding that a person "who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, *for the claim can never get riper*." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1998) (emphasis added); *Kern v. U.S. BLM*, 284 F.3d 1062, 1071 (9th Cir. 2002) (same); *see also N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006) (in a NEPA challenge to BLM lease sale, "plaintiffs are entitled to raise a challenge to the sufficiency of the EIS at this stage"). Plaintiffs' NEPA claims are clearly ripe for judicial review, and BLM's attempt to import inapposite out-of-circuit caselaw to shield itself from that review must fail. This Court can and must review Plaintiffs' NEPA claims.

Next, substantively, BLM asserts that a blanket exemption from NEPA applies at the lease sale stage due to BLM's various lease stipulations, but this argument also fails. As the Ninth Circuit has long-held, "any irreversible and irretrievable commitment of resources" by an agency triggers NEPA. *See, e.g.*, *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000). More specifically, the Ninth Circuit has repeatedly held that BLM lease sales are irreversible commitments of resources that trigger NEPA

obligations. For example, in *Kempthorne*, the Ninth Circuit found "no question" that BLM's decision to open land in Alaska for oil and gas leasing "represent[ed] an irretrievable commitment of resources" and thus NEPA clearly applied. 457 F.3d at 976-77. The court explained that, after leasing, the government could not "forbid all oil and gas development" in the area and thus resources were irretrievably committed. *Id.* at 976. The fact that the government retained partial or limited authority to restrict drilling did not defeat this conclusion. Thus, notwithstanding the government's post-leasing authority to "condition permits for drilling on implementation of environmentally protective measures," and even to "deny a specific application [for permit to drill] altogether if . . . mitigation measures are not available," absent the broader authority to deny drilling altogether, the Court held that "[a]n EIS is undeniably required."[2] *Id.*

The leases here do not provide BLM an absolute right to prohibit drilling. Under BLM's regulations, once granted a lease, a "lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold." 43 C.F.R. § 3101.1-2. This right to drill is subject only to "[s]tipulations attached to the lease."[3] *Id.*; *see also* AR 09368 (Monterey County lease granting an "exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas . . . in the [leased] lands . . . together with the right to

---

[2] Similarly, in *Pit River Tribe v. United States Forest Service*, the Ninth Circuit held that NEPA review was required before the agency granted geothermal leases on public lands. 469 F.3d 768, 783-84 (9th Cir. 2006). The court explained the leases did "not reserve to the agencies an *absolute right* to deny exploitation of [geothermal] resources. All that is reserved to the agencies is the right to limit development . . . ." *Id.* at 782-83 (emphasis added); *see also Sierra Club v. Peterson*, 717 F.2d 1409, 1411-12 (D.C. Cir. 1983) (finding an "irreversible, irretrievable commitment of resources" when leases "d[id] not authorize the [agency] to *preclude* any activities which the lessee might propose"); *Pennaco Energy, Inc. v. U.S. DOI*, 377 F.3d 1147, 1162 (10th Cir. 2004) (rejecting BLM's decision to lease without proper NEPA analysis).

[3] BLM may also require "reasonable measures . . . to minimize adverse impacts to other resource values" in the lease. 43 C.F.R. § 3101.1-2. However, such "reasonable measures" are only permitted "[t]o the extent consistent with lease rights" and are only "consistent" with those rights "provided that they do not: require relocation of proposed operations by more than 200 meters; require that operations be sited off the leasehold; or prohibit new surface disturbing operations" for more than 60 days. *Id.*; *see also* AR 00977 (EA stating that "[t]he regulations at 43 CFR 3101.1-2 define the reasonable measures which BLM can require of a lessee"). Clearly, BLM cannot deny the right to drill generally under the "reasonable measures" provision.

build and maintain necessary improvements . . . subject to . . . the terms, conditions, and attached stipulations of this lease"). Here, the stipulations included in the leases simply do not provide the broad power to "forbid all oil and gas development" that would allow BLM to postpone its NEPA obligation. *See Kempthorne*, 457 F.3d at 977.

Nevertheless, BLM argues that the stipulations it attached to the leases here somehow exempt the lease sale from NEPA's purview. Defs. Br. at 15-18. For the two Monterey County leases, which make up 2463 of the total 2703 acres leased, AR 09368, 09376, BLM asserts it has authority to deny all development activity under its "Endangered Species Stipulation" included in the leases. Defs. Br. at 16-17 (also referred to as "Special Stipulation No. 1"). However, BLM entirely overstates the Stipulation's limitations, as it only allows BLM to forbid activity in narrow and rare circumstances. Specifically, the Stipulation requires BLM approval "prior to any surface disturbance activities" so that BLM may conduct site-specific surveys for threatened and endangered species ("T&E species") in the area. *See, e.g.*, AR 09383. But, "[i]f no T&E species are found . . . , then . . . the action will be processed using the standard . . . procedures" provided under BLM's regulations, *id.*, which include "the right to use so much of the leased lands as is necessary" for drilling. 43 C.F.R. § 3101.1-2. And even "if T&E species are found," surface disturbing activities "may be prohibited . . . , *unless* an alternative is available" that does not "jeopardize the continued existence" of the species. AR 09383 (emphasis added).

Thus, the Endangered Species Stipulation allows BLM to prohibit development activities *only*: (1) if T&E species are documented in the area, *and* (2) the proposed development activity will jeopardize that species' very existence.[4] AR 09383. In other words, this Stipulation exists to prevent BLM from violating its separate obligations under the ESA to ensure that any action it authorizes does not jeopardize any T&E species, *see* 16 U.S.C. § 1536(a)(2), but does nothing to prevent impacts to other resources. In fact, the Ninth Circuit in *Conner v. Burford* explicitly rejected BLM's argument here, finding that while the authority to protect T&E species is clearly important for the species, it does not exempt an agency from NEPA compliance with regard to broader impacts from leasing. 848 F.2d

---

[4] BLM overstates its actual authority under the Stipulation in both its brief and its Decision Notice, stating that under the Stipulation, "BLM reserves . . . the authority to prevent proposed activities if the environmental consequences are unacceptable." Defs. Br. at 16 (underlining removed); AR 00955.

1441, 1449 n.18 (9th Cir. 1988) ("Because that authority[, the ESA,] does not extend to the myriad of significant environmental effects outside the narrow issue of species survival, we do not consider it here.").[5]

At bottom, whereas prior to leasing, BLM had authority to prohibit activity on the basis of any number of concerns, after leasing, BLM only has authority to prohibit activity that will jeopardize T&E species. If later NEPA analysis at the Application for Permit to Drill ("APD") stage finds drilling will cause serious impacts to water, air, or other non-endangered wildlife species, the Endangered Species Stipulation does not allow BLM to deny the right to drill based on those impacts. Accordingly, because the leases remove BLM's authority to "preclude" or "forbid" lease activities on the basis of these concerns, BLM's decision to grant the leases is clearly an "irretrievable commitments of resources" and therefore subject to NEPA. *See Kempthorne*, 457 F.3d at 976-77; *see also Pit River Tribe*, 469 F.3d at 782-83. Allowing the agency to perform its NEPA analysis only at the APD stage, after BLM has limited its ability to alter its decision, would be an empty formality, as NEPA's purpose is to inform agency decisionmaking. *Metcalf*, 214 F.3d at 1143-44.

For the remaining two leases in Fresno County, which comprise only 240 acres, BLM argues that the included "No Surface Occupancy" ("NSO") stipulation prohibits all activity with environmental impacts, citing *Conner*. Defs. Br. at 16. This case is factually distinct from *Conner*. First, *Conner* only evaluated whether *an EIS* was required at the lease stage – not, as BLM now argues, whether NEPA applied at all. *Conner*, 848 F.2d at 1445 (finding that, despite the issuance of an EA, "the government violated NEPA when it sold non-NSO leases without an EIS"); *see also* Defs. Br. at 16 n.9, 19 n.11 (noting this distinction).[6] *Conner* does not create a blanket exemption from NEPA.

---

[5] Moreover, compliance with one statutory obligation (the ESA) does not absolve BLM of complying with another (NEPA). *See, e.g.*, *Pac. Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012, 1032 (9th Cir. 2012 (rejecting agency's reliance on ESA consultation to satisfy NEPA requirements because consultation was done outside of NEPA analysis and was not available for public review); *Malama Makua v. Rumsfeld*, 163 F. Supp. 2d 1202, 1218 (D. Haw. 2001) (rejecting agency's reliance on ESA "no jeopardy" determination for its NEPA analysis because ESA and NEPA apply different standards).

[6] The very fact that BLM prepared an EA is strong evidence that the agency never believed it was exempt from NEPA, and its new-found interpretation of *Conner* is nothing more than a post hoc litigation position.

Second, and most importantly, in *Conner*, the court accepted BLM's contention that "the sale of an NSO lease has *no* effect on the environment." 848 F.2d at 1447 (emphasis in original).[7] Here, conversely, the stipulation BLM describes as NSO prohibits drilling on the immediate surface of land, but allows the operator to "directionally drill" into the federal mineral estate below from offsite, which may even involve hydraulic fracturing.[8] AR 00415 (BLM acknowledging "directional drilling could occur off-site" of, but directly adjacent to, an NSO lease area). BLM has not retained authority to limit directional drilling here because BLM processes directional drilling applications "in the same manner as an application on leased lands," AR 00977, and no stipulations in the pertinent leases grant BLM "absolute" authority to forbid directional drilling into the leased area. *See* 43 C.F.R. § 3101.1-2. Yet the record reveals potential harmful environmental effects resulting from such directional drilling. *See, e.g.*, AR 00938 (EA acknowledging that NSO leases will have indirect effects).[9] Thus, the NSO stipulation does not preserve BLM's absolute authority to forbid environmentally harmful activity, and BLM was required to perform a NEPA analysis at the lease sale stage.[10]

---

[7] BLM wants this Court to read *Conner* as creating a blanket rule that *all* NSO leases are completely exempt from NEPA, while also disregarding language in *Conner* that indicates an EIS is *always required* for non-NSO leases. Defs. Br. at 15, 19 n.11. BLM cannot have it both ways. Moreover, the Ninth Circuit in *Conner* remanded to the district court for further analysis as to whether every lease labeled as "NSO" actually included terms that completely precluded environmental impacts. 848 F.2d at 1447 n. 15. *Conner* therefore cannot be read to have created a bright-line rule that all leases labeled "NSO" are always exempt from NEPA.

[8] Although *Conner* acknowledged in passing that directional drilling could access the leased resources without further agency action, the court did not discuss possible environmental effects resulting from such drilling. 848 F.2d at 1447. Moreover, the environmental effects at issue in *Conner* were impacts to surface resources such as potential wilderness areas, and thus NSO provisions would protect those resources. Here, while surface impacts are important, Plaintiffs are equally concerned about the impacts to groundwater and air resources, harms that would flow even if only directional drilling were allowed.

[9] Indirect effects are sufficient to trigger NEPA review. *See* 40 C.F.R. § 1508.8(b) (effects to be analyzed under NEPA include "[i]ndirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable").

[10] Even if the Court were to find the two NSO leases to be exempt from NEPA, it would not alter in any meaningful way Plaintiffs' claims, as the non-NSO leases in Monterey Country comprise the vast majority of lands at issue in the instant litigation, and all the deficiencies Plaintiffs have identified in BLM's actions would remain.

### 2. BLM's Reliance on an Outdated RFD Scenario was Arbitrary and Unlawful

As Plaintiffs explained in their opening brief, BLM's entire EA is predicated on its outdated "Reasonably Foreseeable Development" scenario ("RFD") in which the agency unlawfully assumes that only *one* well will ultimately be drilled and only a single acre of land out of the 2703 acres leased will be permanently disturbed. Pls. Br. at 21; AR 01069. BLM's RFD ignores the nationwide shale oil boom that has resulted from new fracking technology and industry's consequent increased interest in the Monterey Shale, and thus BLM arbitrarily and unrealistically constrains its analysis of fully foreseeable – and significant – impacts of leasing.

### a. BLM Misstates the Standard

NEPA requires that BLM evaluate all "reasonably foreseeable" direct and indirect impacts of the lease sale. 40 C.F.R. § 1508.8. "Reasonably foreseeable" scenarios are not only those an agency considers most likely to occur. Instead, agencies must analyze the effects of all reasonably possible scenarios, and may exclude scenarios only when they are highly "remote and speculative." *See San Luis Obispo Mothers for Peace v. Nuclear Reg. Comm'n*, 449 F.3d 1016, 1031 (9th Cir. 2006); *New York v. Nuclear Reg. Comm'n*, 681 F.3d 471, 482 (D.C. Cir. 2012) (agency may only avoid impacts "so 'remote and speculative' as to reduce the effective probability of its occurrence to zero"). Because the drilling of additional wells due to the fracking boom is hardly "remote and speculative" and is instead entirely foreseeable, the agency may not rely on its outdated RFD to discount additional impacts.

Attempting to avoid this standard, BLM first contends that the Court must grant the highest deference to its decision to rely on its stilted RFD scenario because the agency is "making a prediction." Defs. Br. at 21. However, a court need not blindly uphold the agency's analysis. The Ninth Circuit has repeatedly held that, while some deference is due for agency predictions, "[a]t the same time, courts must independently review the record in order to satisfy themselves that the agency has made a reasoned decision based on its evaluation of the evidence." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1160-67 (9th Cir. 2006) (overruled on other grounds; internal quotation marks omitted) (closely reviewing and rejecting agency's tree mortality predictions); *see also N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075, 1078 (9th Cir. 2011) (holding "while we afford deference to the judgment and expertise of the agency, the agency must, at a minimum, . . .

1   explain the conclusions it has drawn from its chosen methodology, and the reasons it considered the

2   underlying evidence to be reliable" and rejecting agency's NEPA analysis for failing to consider

3   foreseeable future drilling) (internal quotation marks omitted); *Greater Yellowstone Coal., Inc. v.*

4   *Servheen*, 665 F.3d 1015, 1026-27 (9th Cir. 2011) (rejecting agency decision because it was "not

5   rational . . . to rely on . . . trend data" that pre-dates decline in species' food source "in order to predict

6   the effect" on bears).

7          Additionally, contrary to BLM's claim that the Court must always grant it the highest level of

8   deference, "the issue [of] whether NEPA requires consideration of the environmental impacts of a

9   [consequence of an agency action] is primarily a legal one," and thus courts review an agency

10  determination not to evaluate a consequence "for reasonableness." *San Luis Obispo*, 449 F.3d at 1028.[11]

11  The Ninth Circuit established this rule because "it makes sense to distinguish the strong level of

12  deference [courts] accord an agency in deciding factual . . . matters from that to be accorded in disputes

13  involving predominantly legal questions." *Alaska Wilderness Recr. & Tourism Ass'n v. Morrison*, 67

14  F.3d 723, 727 (9th Cir. 1995). Here, whether BLM should have analyzed the effects of additional wells

15  is primarily a legal question and is thus reviewed for reasonableness, and BLM does not deserve

16  heightened deference.

17         Finally, BLM's entire argument, and the unremarkable cases it cites finding that the agency's

18  technical determinations should be afforded deference, might be relevant to the *hypothetical* EA BLM

19  *wishes* it had prepared, but not to the one it *actually* relied upon for the challenged lease sale. If BLM

20  had carefully reviewed the evidence in the record regarding fracking and concluded based on its

21  technical expertise that fracking could not, for example, economically be applied due to the Monterey

22  Shale's specific geology and therefore no such drilling would ever occur on the lands leased (i.e. that

23  such drilling was completely unforeseeable), a determination that fracking was irrelevant to the RFD

24  would be entitled to deference. Of course, BLM never made such a determination, nor could it have

25  ───────────────

26  [11] BLM's attempts to distinguish *San Luis Obispo* by arguing the case addressed only environmental
    "impacts" that must be considered but not agency "assumptions" used to determine those impacts fail.
27  Defs. Br. at 25. The agency raises a distinction without a difference – the direct and intended result of
    BLM's lease sale is well drilling and oil and gas development. Whether one labels the number of wells
28  drilled and acres disturbed an "impact" or an "assumption," NEPA requires its consideration.

rationally done so based on the evidence in the record. Instead, BLM simply pointed to its outdated RFD that the agency knew was of dubious continued utility, and steadfastly asserted that it would only analyze the impacts of a single well. Such a result is impermissible: no matter what level of deference is afforded to BLM's determinations, its decision to completely ignore the role of fracking in predicting the lease sale's effects was arbitrary as the agency "entirely failed to consider an important aspect of the problem." *Ursack, Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 956 (9th Cir. 2011).

### b. BLM Ignored Clear Evidence of a Fracking Boom

BLM's decision to rely on its RFD scenario and limit its impact analysis to the development of a single well and the disturbance of a single acre of land arbitrarily ignores the growing impact of fracking in California. Pls. Br. at 22-24. BLM first attempts to defend its reliance on the RFD by dismissing clear record evidence that fracking is happening and will only grow over the terms of the leases. BLM then wrongly claims it did in fact consider the full and substantial impacts of fracking and nonetheless chose to retain its RFD predictions. Both arguments are belied by the record.

#### i. The Very Real Fracking Boom

In its brief, BLM attempts to characterize fracking and horizontal drilling as decades-old processes that will have minimal, if any, effect on drilling location or intensity in California. Defs. Br. at 21-23. But earlier this year, BLM issued a draft rule to regulate certain aspects of fracking on its lands, and in its preamble to that rule, BLM describes the rapid spread of fracking across the country.[12]

---

[12] Pursuant to 44 U.S.C. § 1507 the "contents of the Federal Register shall be judicially noticed." While BLM issued its proposed fracking rule after it issued the leases here, the rule raises serious questions regarding the reasonableness of BLM's predictions. *See Amoco Oil Co. v. EPA*, 501 F.2d 722, 729 n.10 (D.C. Cir. 1974) ("Rule-making is necessarily forward-looking, and by the time judicial review is secured events may have progressed sufficiently to indicate the truth or falsity of agency predictions. We do not think a court need blind itself to such events . . . ."); *Al Tech Specialty Steel Corp. v. United States*, 28 C.I.T. 1468, 1503 (Ct. Int'l Trade 2004) (while "many agency decisions are inherently predictive," for the court to "ignore all events that occur after an agency determination (no matter how direct their bearing on the agency's predictions) would be to risk 'converting the reviewing process into an artificial game'"). Moreover, as the Federal Register notice itself notes, BLM recognized the need to update its fracking regulations following a November 2010 forum on the issue and again after a report produced by the Secretary of Energy's Advisory Board in August 2011, both of which predate the lease sale. 77 Fed. Reg. at 27,693. As this document, along with other documents indisputably within BLM's administrative record, all demonstrate, BLM's assertion that fracking has not altered likely development scenarios on its lands is simply not credible.

Oil and Gas; Well Simulation, Including Hydraulic Fracturing, on Federal and Indian Lands, 77 Fed. Reg. 27,691, 27,691-93 (May 11, 2012). BLM recognized that fracking increases access to shale oil, and just as Plaintiffs argue here, BLM stated that the combination of horizontal drilling with fracking "has led to production from geologic formations in parts of the country that previously did not produce significant oil or gas." *Id*. at 27,693; *id.* at 27,691 ("new horizontal drilling technology has allowed increased access to shale oil and gas resources" not previously heavily developed).

BLM further notes that these developments are new: "[u]ntil quite recently, shale formations rarely produced oil or gas in commercial quantities," *id.* at 27,692, and fracking has been a "growing practice in recent years," *id.* at 27,691. And while BLM's brief insists that the agency reasonably assumed that fracking is relatively rare in California, in its draft fracking rule, "BLM estimates that about 90 percent (approximately 3,400 wells per year) of wells currently drilled on Federal . . . lands are stimulated using hydraulic fracturing techniques." *Id*. at 27,693.

Similarly, the administrative record is replete with evidence that fracking has fundamentally transformed the landscape of the American oil and gas industry and clearly contravenes BLM's claim that Plaintiffs are making up the "impending" "tidal wave of new oil development in the Monterey shale . . . ." Defs. Br. at 21; *id.* at 25 (calling evidence cited directly from the agency's record regarding fracking in the Monterey Shale "unsupported speculation"). As Plaintiffs noted in their opening brief, the practice of fracturing wells with water has been around for decades, but very recent technological developments in fracking, including horizontal drilling and the addition of chemical-laced slickwater, have made it possible to economically extract oil and gas from formations that were previously impossible to exploit. *See, e.g.*, AR 02530, 09028, 09034, 09075; *see also* 77 Fed. Reg. at 27,692. Today, fracking is occurring all across the country, and production rates are soaring for both shale oil and shale gas, *including on BLM lands*. AR 09229; AR 09345 ("In most years during the 1990s, there were less than four thousand [APDs] filed with the BLM [nation-wide]. BLM has stated that [s]ince 1996, the number of new APDs has risen dramatically. BLM received more than ten thousand APDs in 2010." (internal quotation omitted)); AR 09143 ("Over the past 6 years, the total number of drilling

permits approved by BLM nationwide has more than tripled from 1,803 to 6,399.").[13]

Importantly for the purposes of this case, California has not been left out of the national shale oil and gas boom. California is home to the nation's largest shale oil deposit – the Monterey Shale, over which BLM's leases lie. According to the federal Energy Information Administration ("EIA"), the Monterey Shale play holds 15.4 billion barrels of technically recoverable shale oil, or 64 percent of the nation's shale oil. AR 09230. While the oil extracted so far has primarily been "easy" oil, *see* AR 02532, modern fracking techniques promise better access to the remaining oil. AR 09026. As Plaintiffs demonstrated at length in their opening brief, industry has shown an avid interest in the Monterey Shale and the new technologies to exploit the oil there. Pls. Br. at 9 (citing AR 08572-73, AR 07983).

More specifically, development and fracking of the Monterey Shale is already likely occurring in the area of the leases, notwithstanding BLM's claim to the contrary. For example, the company Venoco requested, and appears to have been granted, permits to drill up to six exploratory wells on private lands near the leases at issue. AR 09084-97; AR 09098-111. Venoco had been undertaking exploratory drilling and testing activities on another well in the area, and it requested permission from Monterey County to continue operations to "determine whether or not the well in question can yield commercial quantities of petroleum and/or natural gas," suggesting the company may have been hoping to stimulate the wells using fracking. AR 09112. A local citizen also submitted evidence that Venoco has been fracking in the area, noting that based on his "observation of participating companies, well rig size, number of sump trucks leaving, etc" that "at least four . . . wells" have already been fracked in the relevant area of Monterey County. AR 05862; AR 07608-09 (describing other possible wells drilled by Venoco and others); *see also* AR 07903-04 (Plaintiffs' comments describing Venoco's program).

Importantly, BLM staff was well aware of the relevance of Venoco's activity in the areas and how it called the RFD into question. As the State Office noted "where Venoco nominated a couple

---

[13] *See also, e.g.*, AR 09229 (indicating that due to horizontal drilling in conjunction with hydraulic fracturing, oil production from shale plays has "grown rapidly in recent years"); AR 08577 (2010 report noting "rapidly increasing and widespread oil and gas development across the country"); AR 09220 ("Thanks in large part to hydraulic fracturing, natural gas drilling has vastly expanded across the United States. In 2007, there were 449,000 gas wells in 32 states, thirty percent more than in 2000. By 2012 the nation could be drilling 32,000 new wells a year . . . .").

thousand acres in a small strip of land in Monterey County, [a Master Leasing Plan] might be a better choice because the level of activity now foreseen with all the potential Monterey Shale drilling (and the level of perceived potential for environmental damage from fracking) will eventually surpass what was analyzed in the Hollister RFD."[14] AR 04493. Moreover, unlike some past lease sales that BLM seemed to hold as if by rote despite a lack of industry interest, in this case each of the leases at issue was specifically nominated by industry. AR 05538, 05542; AR 08089. The reason for the increased interest of course, as acknowledged by another BLM official, was that "industry indications point to employing hydraulic fracturing in areas where there is leasing interest." AR 04443; *see also* AR 04472 (BLM officer stating that BLM needed more time for the EA "to gather and address environmental information . . . . This was the case primarily because of industry indications of employing hydraulic fracturing in some areas proposed for the lease sale.").

In sum, despite BLM's attempt to dismiss the growing potential for fracking and the resulting highly foreseeable increase in oil and gas development on BLM land as Plaintiffs' "overstated" "speculation," BLM's own statements and the record in this case clearly demonstrate otherwise. Accordingly, BLM's blind reliance on an outdated RFD is arbitrary.

### ii.  BLM Never Analyzed the Implications of Fracking on the RFD

After arguing fracking and increased oil and gas development are too speculative and unimportant for consideration, BLM changes tack and argues that it actually *did* fully analyze fracking and its impacts in relation to the RFD. Defs. Br. at 23. However, neither the EA's discussion of BLM's reliance on the RFD scenario, nor the 2006 RFD scenario itself, mention fracking or the increased oil development fracking may facilitate in the lease sale area. AR 01041-46; AR 00468-75. And while BLM insists it fully "assessed whether [its] RFD's projection remained valid" in light of current trends, the record lacks any indication BLM actually made such an assessment. *See* Defs. Br. at 24 (providing no record cite for its claim); *id.* at 23 (citing the EA's vague description of hydraulic fracturing to

---

[14] BLM takes issue with Plaintiffs' characterization of this passage, contending it does not show the amount of drilling has already surpassed the RFD scenario, but only that it might eventually surpass it. Defs. Br. at 23 n.14. However, BLM's response ignores that the very point of an RFD scenario is to *foresee future activity*.

support its claim); AR 01041-46 (EA's description of the 2006 RFD, without questioning its continued validity). *See also* AR 04869 (email from Hollister Field Office's Field Manager stating without explanation that BLM should "stick with we know and . . . what we have analyzed in the EIS regarding reasonable foreseeable development").

In its brief, BLM now claims the missing analysis is in its dismissal of Plaintiffs' protest, Defs. Br. at 23 (citing AR 08064); however, this dismissal again shows BLM did not consider whether fracking calls into question the agency's RFD prediction. Instead, BLM dismisses the substantive evidence regarding fracking submitted in Plaintiffs' comments as merely "introductory in nature" and not sufficiently "site specific" for real consideration. AR 08064 (noting Plaintiffs failed to demonstrate "exactly where and how these resources would be developed"). However, reasonable forecasting and "speculation is . . . implicit in NEPA," and the agency may not "shirk [its] responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry." *N. Plains Res. Council*, 668 F.3d at 1079; *see also Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975) ("[t]hat the exact type of development [anticipated] is not known is not an excuse . . . . Uncertainty about the pace and direction of development merely suggests the need for exploring in the EIS[ ] alternative scenarios"); *Greer Coal., Inc. v. U. S. Forest Serv.*, 2007 U.S. Dist. LEXIS 15283, at *16-17 (D. Ariz. Feb. 28, 2007) (agency failed to take a "hard look" at "scenarios that would potentially deviate from the [its] development scenario" by recognizing, but "failing to attempt any meaningful investigation into the resulting impact" of, the development of wells as a result of land exchange).

In fact, it appears that BLM punted entirely on fracking and its impacts, simply refusing to consider the issue until the exploration stage. As BLM notes in its brief, the agency plainly was aware of the significance of the issue. Defs. Br. at 23. AR 04263; 04438-40; AR 04493; *see also* AR 04809 (Hollister Field Office Field Manager stating that "I believe our main issue with the public and the County is the Frac wells."). However, BLM discouraged discussion and analysis of fracking as it related to the lease sale because the agency had already decided to ignore the issue until the exploration stage. AR 04869-71 (HFO Field Manager describing fracking as "political football [BLM] w[ould] have to set aside until the APD stage"). BLM's complete refusal to consider fracking until the exploration stage does not constitute the analysis the agency now claims it undertook in the EA.

BLM now seems to suggest that, because various agency personnel noted fracking was an important issue with significant potential impacts, BLM sufficiently "consider[ed] . . . the implications" of fracking under NEPA. Defs. Br. at 23. However, NEPA requires the agency to present its analysis *in a NEPA* document subject to public review and comment, not scattered across internal agency emails. *Blue Mtns. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (NEPA "ensures that the agency . . . will carefully consider[ ] detailed information concerning significant environmental impacts" *and* "guarantees that the relevant information will be made available to the larger public audience"). In light of the substantial evidence showing that fracking is increasing industry activity on the Monterey Shale, BLM's failure to consider fracking was arbitrary and renders its reliance on the RFD scenario invalid.

**3. BLM's EA Failed to Take a Hard Look at Environmental Impacts**

As noted above, Plaintiffs' NEPA claims turn largely on whether it was reasonable for BLM to project that only a single well impacting a single acre would ever be drilled as a result of the lease sale. This determination by BLM infects every subsequent step of the analysis contained in the EA, as obviously the impacts of one well on air, water, and wildlife are significantly less than the impacts of the dozens of wells that would be drilled under a full development scenario. Put another way, if the Court finds BLM's one-well scenario to be invalid, the Court need never reach the question of whether BLM's truncated discussion of the impacts of fracking on water, or drilling activities on wildlife, was sufficient, or even whether an EIS rather than an EA should have been prepared, as each of these "analyses" by BLM was premised on this faulty scenario. The Court could and should simply vacate the leases and the underlying decision and remand to the agency for a proper analysis premised on a realistic development scenario.

Nevertheless, even if the Court ultimately defers to BLM's reliance on the RFD, the inquiry does not end. For even if only a single well might be drilled, due to the intense public and scientific interest and controversy over the risks of fracking, NEPA's "hard look" requirement dictates that BLM should have provided a far more detailed discussion of fracking's known and potential impacts in its EA. As with its defense of the RFD scenario, in its briefing BLM simultaneously asserts that it need not look at fracking at all because fracking is too speculative, but that it somehow took the requisite hard

look and determined the impacts of fracking were not significant. Defs. Br. at 28, 32. Although BLM cites to the pages of the EA that refer to fracking, the agency cannot point to any actual *analysis* of potential impacts of fracking resulting from the lease sale.[15] In fact, in its EA BLM actually states that "[t]he incomplete or unavailable information related to . . . hydraulic fracturing . . . described below is *not relevant* to the analysis of impacts from BLM's competitive oil and gas lease sale . . . ." AR 01036 (emphasis added). After summarily dismissing the relevance of fracking to its decision the agency cannot now make a straight-faced claim it took the hard look NEPA requires. *See, e.g.*, *Pac. Rivers Council*, 689 F.3d at 1024 (a "hard look" requires "considering all foreseeable direct and indirect impacts" and "discuss[ing] . . . adverse impacts"). The Ninth Circuit has observed multiple times that "general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1134 (9th Cir. 2007).

And while BLM asserts "pertinent unknown information . . . [including] details about the well type, target depth, location, lessee, operator, etc." prevents it from carrying out a meaningful analysis at the lease sale stage, the agency does not and cannot claim that more detailed information regarding the *impacts* is not available. Defs. Br. at 34. BLM does not explain why reasonable speculation cannot fill in these blanks, or why knowing these details with specificity (e.g., knowledge of the specific operator or lessee) *is even necessary* to analyze the impacts of fracking in the four discrete and clearly known areas offered up for leasing. In carrying out such an analysis BLM could have chosen representative well sites, or worst-case locations, or employed any other manner of reasonable analysis. Instead, the agency simply asserts in its briefs that such an analysis can only occur at the APD stage. *Id.* The law requires more, as "NEPA is not designed to postpone analysis . . . to the last possible moment"; instead, an agency must perform an analysis "as soon as it can reasonably be done." *Pac. Rivers Council*, 689 F.3d at 1026 (emphasis removed). Reasonable forecasting and "speculation is . . . implicit in NEPA,"

---

[15] As described in Plaintiffs' opening brief, BLM's EA contains a total of three pages discussing fracking, about half of which BLM cut and pasted directly from EPA's webpage about the mechanics of fracking. Pls. Br. at 30. BLM describes a superceded 2004 EPA study but otherwise completely ignores important more recent studies and data on the fracking boom. *Id.*

and BLM could and should have analyzed the potential impacts of fracking on the lands offered for leasing when making the lease sale decision. *N. Plains Res. Council*, 668 F.3d at 1079. Its failure to do so was arbitrary and unlawful.

As with its fracking analysis, BLM's treatment of impacts to threatened and endangered species is also flawed, and its defense of its deficient EA similarly uncompelling. Again, the arbitrary RFD scenario of one exploratory well limits consideration of the range and intensity of impacts to sensitive species that might result from the lease sale, and unsurprisingly, the agency's analysis based on this limited scope is cursory, spanning less than two pages. AR 01061-62. It completely fails to analyze impacts for the steelhead, is dismissive of the potential for harms to the kit fox or leopard lizard, and provides an inaccurate analysis for the California condor. *Id.* The general and conclusory statements in the EA do not satisfy NEPA's hard look requirement. *Brong*, 492 F.3d at 1133-34.

BLM acknowledges that the EA does not even mention the steelhead. Defs. Br. at 36. Instead, BLM points to the Hollister RMP, and a previous conclusion by the National Marine Fisheries Service ("NMFS") that impacts *from the RMP* were not sufficient to trigger ESA consultation obligations. Neither of these documents excuses BLM's current failure, as the RMP, the RMP's accompanying FEIS, and the NMFS letter all fail to provide any analysis of potential impacts to the species from oil activities carried out under the RMP, and certainly do not analyze impacts from fracking.[16] With regard to condor, BLM's defense of the EA's truncated analysis is also lacking. BLM's background section on the condors fails to mention the dangers oil operations pose to the species, AR 01020, and the impacts section simply dismisses record evidence that oil operations have harmed the species. AR 01062. As noted in Plaintiffs' opening brief, other federal agencies and the State of California have recognized oil development poses a significant risk to the species. Pls. Br. at 32. Rather than responding to the substance of the information Plaintiffs cite, BLM instead criticizes the source of the information in order to justify is foreordained conclusion that oil development and condors are compatible. Defs. Br. at 38. NEPA forbids summary dismissal of conflicting evidence, as the agency's "'hard look' 'must be

---

[16] Additionally, as discussed *supra* at 4-5, compliance with the ESA does not substitute for analysis under NEPA. *Pac. Rivers Council*, 689 F.3d at 1032; *Malama Makua*, 163 F. Supp. 2d at 1218.

1   taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge

2   designed to rationalize a decision already made.'" *W. Watersheds Project v. Kraayenbrink*, 620 F.3d

3   1187, 1205 (9th Cir. 2010). BLM's failure to consider information before it regarding potential harmful

4   – even deadly – impacts on condors from oil operations falls short of NEPA's standards.

5   **4. BLM Violated NEPA by Refusing to Prepare an EIS**

6            In addition to failing to take a "hard look" at environmental impacts, BLM violated NEPA by

7   refusing to produce an EIS for the lease sale. As with Plaintiffs' other NEPA claims, if the Court finds

8   that BLM's reliance on the one-well scenario was unreasonable, it may vacate and remand the lease

9   sale decision without ever reaching the question of whether an EIS should have been prepared.

10  However, as detailed in Plaintiffs' opening brief, several factors trigger BLM's obligation to prepare an

11  EIS here. Pls. Br. at 33-37. If an "EA establishes that the agency's action '*may* have a significant effect

12  upon the . . . environment,' an EIS must be prepared." *Nat'l Parks & Conservation Ass'n v. Babbitt*,

13  241 F.3d 722, 730 (9th Cir. 2001) (emphasis in original); *Blue Mtns*, 161 F.3d at 1213-14 (when an

14  agency gives "cursory and inconsistent treatment" to an issue, "substantial questions" are raised, and an

15  EIS is required).

16           BLM devotes twelve pages of its brief in an attempt to defend its decision not to prepare an EIS.

17  Defs. Br. at 18-30. However, BLM's lengthy argument can be distilled to one statement, reworded

18  slightly but repeated multiple times in the brief:

19           Until a hydraulic fracturing project is proposed, and BLM has the information about the
             when, where, and how, BLM cannot hope to make any rational analysis of the potential

20           impacts of the project, and indeed, the result would be the very type of speculation that an
             EIS is meant to avoid.

21  *Id.* at 28. BLM's position is at odds with the law, as well as common sense.

22           NEPA requires that all analysis must be conducted at "the earliest possible time." 40 C.F.R. §

23  1501.2; *N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 718 (10th Cir. 2009) (in oil and gas leasing,

24  "assessment of all 'reasonably foreseeable' impacts must occur at the earliest practicable point, and

25  must take place before an 'irretrievable commitment of resources' is made"). As the Ninth Circuit has

26  noted, "NEPA is not designed to postpone analysis of an environmental consequence to the last

27  possible moment" but "require[s] such analysis as soon as it can reasonably be done." *Kern*, 284 F.3d at

28  1072.

Yet BLM's position here is that a detailed analysis of drilling impacts cannot be done until a specific well is proposed for drilling. If that were the case, then lease sales would never trigger the duty to prepare an EIS; yet the Ninth and other circuits have repeatedly held that lease sales can and do trigger the duty to prepare an EIS. *See, e.g.*, *Kempthorne*, 457 F.3d at 977; *Conner*, 848 F.2d at 1448-49. As with its "ripeness" argument discussed *supra*, BLM's EIS argument really just repackages the agency's assertion that it should be categorically exempted from NEPA at the lease sale stage. That argument must fail.

Moreover, as discussed in the "hard look" section above, BLM has provided no convincing explanation of why it "cannot hope to make any rational analysis" of potential fracking impacts on the leased lands. Defs. Br. at 28. BLM certainly has the expertise to predict and analyze the type of impacts that would likely flow from fracking on one or more of the leases. And this is not the case where the agency is opening up millions of acres of diverse and varied lands to leasing and therefore site-specific analysis of every potential drilling location would be clearly impossible. Here, BLM leased four discrete parcels in two well-studied and accessible areas of California. It is not a great leap in foresight to predict what drilling impacts could occur on these lands. *N.M. ex rel. Richardson*, 565 F.3d at 718-19. And even if the agency lacks some information it felt it needed for a full NEPA analysis, that is a reason to prepare an EIS, not a reason to forego an EIS. *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 733 (the agency's "lack of knowledge does not excuse the preparation of an EIS; rather it requires the [agency] to do the necessary work to obtain it").

Rather than perform the analysis that it could and should have done, an analysis that – as detailed in Plaintiffs' opening brief – would have likely led to the conclusion that significant impacts were sufficiently probable to require an EIS, BLM simply kicked the can (or "political football" in the agency's terms) down the road, in violation of NEPA.[17]

In *Conner*, the Ninth Circuit faced an identical argument and rejected it out of hand:

---

[17] BLM also argues that even if the EIS duty were triggered, it either complied when it issued the EIS for the Hollister RMP or properly tiered the EA to that EIS. Defs. Br. at 29. However, since the rather dated RMP EIS is utterly devoid of any discussion of fracking or its impacts, that EIS does not absolve the agency of its duty to prepare an EIS for its current lease sale decision.

> Appellants also complain that the uncertain and speculative nature of oil exploration makes preparation of an EIS untenable until lessees present precise, site-specific proposals for development. The government's inability to fully ascertain the precise extent of the effects of mineral leasing in a national forest is not, however, a justification for failing to estimate what those effects might be before irrevocably committing to the activity. Appellants' suggestion that we approve now and ask questions later is precisely the type of environmentally blind decision-making NEPA was designed to avoid.

848 F.2d at 1450-51 (internal citations omitted). This Court should do likewise.

## B. Defendants Violated the MLA

In addition to violating NEPA, BLM also violated the substantive provisions of the Mineral Leasing Act ("MLA") by failing to include binding lease terms that require lessees to "use all reasonable precautions to prevent waste of . . . gas." 30 U.S.C. § 225; *see also id.* § 187. As Plaintiffs explained in their opening brief, oil and gas operations emit massive amounts of natural gas into the air, including both methane and volatile organic compounds ("VOCs"). Pls. Br. at 37-38, 40. In addition to causing serious human health impacts, AR 08580, the release of these gases represents a substantial loss of the very federal resource operators are being permitted to collect under their leases, constituting prohibited "waste."[18] AR 08566 (estimating up to 7.9 percent of gas produced from a shale-gas well is emitted to the atmosphere).

However, notwithstanding the existence of widely available technologies that can greatly reduce – or even eliminate – this waste, Pls. Br. at 38-39, BLM wrongly argues that it has no obligation to require lease terms to control these waste emissions, and that even if it did, the agency's current, vague lease terms satisfy statutory requirements. BLM's argument ignores the language and purpose of the statute and relevant caselaw. Also, Plaintiffs' MLA claim challenges BLM's lease sale decision, which constitutes a "final agency action" and is actionable under the Administrative Procedure Act ("APA").

### 1. The MLA Requires BLM to Include Lease Provisions Specifying All Reasonable Precautions to Prevent the "Waste" of Gas

The MLA clearly demands that BLM include lease terms that require lessees to take all

---

[18] BLM's regulations define "waste" as "any act or failure to act by the operator that is not sanctioned by the authorized officer as necessary for proper development and production and which results in: (1) A reduction in the quantity . . . of oil and gas . . .; or (2) avoidable surface loss of oil or gas." 43 C.F.R. § 3160.0-5.

reasonable measures to prevent the waste of natural gas. Section 225 of the MLA requires that "[a]ll leases of lands containing oil or gas . . . shall be subject to the condition that the lessee will, in conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas developed in the land . . . ." 30 U.S.C. § 225. Similarly, Section 187 states that "[e]ach lease shall contain . . . a provision that such rules . . . for the prevention of undue waste as may be prescribed by [the] Secretary shall be observed . . . ." *Id.* § 187. Accordingly, under the statute's plain and unambiguous terms, BLM must include lease terms requiring operators to "prevent" avoidable loss of gas during development. Pls. Br. at 41-42 (citing MLA's legislative history regarding intent to prevent waste).

BLM responds by asserting that the MLA "does not require BLM to do anything." Defs. Br. at 40. BLM contends that Section 225 only broadly "impos[es] a specific condition on lessees," but "does not impose a requirement that [BLM's] leases issued under [the MLA] contain any particular provision." *Id.* at 39. To the contrary, Section 225 expressly establishes a requirement for what "leases" must contain, not a general requirement on lessees. 30 U.S.C. § 225 ("[a]ll *leases* . . . shall be subject to the condition that" lessees take all reasonable precautions to avoid waste). Thus, Section 225 creates obligations for *BLM* during leasing, and the agency's attorneys' interpretation would essentially strike every word in the provision up to "lessee."[19]

Further, in addition to the agency's obligations under Section 225, MLA Section 187 requires that "[e]ach lease shall contain . . . a provision" implementing undue waste regulations prescribed by BLM. 30 U.S.C. § 187. Clearly, Section 187 requires that BLM include a lease term regarding waste. BLM even appear to admit this in their brief when they compare Sections 225 and 187, noting that, in contrast to Section 225, Section 187 "specifically <u>does</u> address provisions that should be included in each lease." Defs. Br. at 39 (emphasis in original). Reading the provisions together, the MLA's statutory scheme as a whole requires BLM to include lease provisions preventing the waste of natural gas.

---

[19] BLM deserves no deference for a statutory interpretation presented for the first time in its briefing. *See Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 688 (9th Cir. 2007) (court simply "may not accept . . . counsel's post hoc rationalizations for agency action").

### 2. BLM Failed to Include Lease Provisions Preventing Waste

BLM next argues that, even if the MLA did impose an obligation to include a lease provision preventing waste of oil or gas, "the leases at issue in this case" do impose conditions sufficient to meet the statutory command. Defs. Br. at 40-41. However, the lease "conditions" cited by BLM only vaguely require compliance with the law generally or repeat the statute's requirement almost verbatim, providing no guidance, direction, or context. At the same time, as noted below, BLM has elsewhere acknowledged these provisions are insufficient. The challenged leases consequently do not satisfy BLM's statutory requirements.

First, as Plaintiffs explained in their opening brief, BLM could easily require measures to prevent the waste of natural gas. Technologies are widely available to economically control excess emissions. Pls. Br. at 38-39; AR 08582-630 (describing technology such as reduced emission completions, plunger lift systems, vapor recovery units, optimized circulation rates for dehydrators, and low bleed pneumatic devices). Yet operators continue to unnecessarily emit substantial amounts of uncontrolled natural gas during oil and gas drilling through venting and flaring. *See, e.g.*, AR 08566 (Cornell researchers estimating that shale gas operations emit up to 7.9 percent of all gas produced).

Further, the Government Accountability Office's ("GAO") 2010 report also establishes that substantial emission reductions are feasible. AR 09233-89. After examining rates of natural gas loss on federal leases and the potential to capture this lost gas, the report concludes that oil and gas operators are not employing economically viable technologies to reduce emissions. AR 09269; AR 09234 (GAO estimating "that around 40 percent of natural gas estimated to be vented and flared on onshore federal leases could be economically captured with currently available control technologies"). The report contains a lengthy description of available technology and techniques to avoid such waste, including many of the techniques detailed in Plaintiffs' opening brief. AR 09256-61.

The GAO report also finds that, while BLM has both the statutory authority and duty to demand the reduction of wasteful emissions, the agency has not taken action. AR 09269. The report states that "BLM [is] charged with minimizing the waste of federal resources," AR 09263, but BLM's "oversight does not ensure that operators minimize venting and flaring [i.e., natural gas emissions] on federal leases . . . ." *Id.* (title of section; capitalization removed). According to the GAO, BLM's regulation of

waste has serious flaws:

> namely (1) [BLM] regulations and guidance do not address new capture technologies or all sources of lost gas; (2) the agenc[y] *do[es] not assess options for reducing venting and flaring* in advance of oil and gas production for purposes other than addressing air quality; and (3) the agenc[y] *ha[s] not developed or do[es] not use information regarding available technologies* that could reduce venting and flaring.

AR 09263-64 (emphasis added). The GAO further states that "BLM guidance is 30 years old and therefore does not address venting and flaring reduction technologies that have advanced since it was issued." AR 09264. BLM has ignored "technologies [that] have been developed to economically reduce emissions from well completions and liquid unloading – namely the use of reduced emission completion and automated plunger lift technologies respectively," and as a result, "the use of such technologies where it is economic to do so is not covered in BLM's current guidance." *Id.* (also stating that BLM's guidance does not cover "pneumatic valves or gas dehydrators – two sources that contribute to significant lost gas"). Thus, the GAO explicitly acknowledges that BLM has not assessed reasonable and available control technologies or otherwise required compliance with the MLA's anti-waste provisions.

Importantly, the GAO report states that BLM agreed with the GAO's conclusions. Specifically, when consulted, BLM concurred that "BLM should revise its guidance to operators to make it clear that technologies should be used where they can economically capture sources of vented and flared gas," and that "BLM . . . should assess the potential use of venting and flaring reduction technologies to minimize the waste of natural gas in advance of production where applicable, and not solely for purposes of air quality." AR 09283-84. The GAO also noted that BLM "staff acknowledged that existing guidance was outdated given current technologies and said that they were planning to update it." AR 09264.[20]

Yet despite widely available control technologies and BLM's express recognition that its current requirements are inadequate, the agency now claims that, here, its vague, existing lease provisions are sufficient to meet the MLA's standards. Defs. Br. at 40. For example, BLM claims its standard lease form 3100-11, which states simply that "[r]ights granted are subject to applicable laws,

---

[20] To Plaintiffs' knowledge, BLM has yet to update this guidance.

the terms, conditions, and attached stipulations of this lease, [and] the Secretary of the Interior's regulations," satisfies the MLA's requirements. AR 09368. However, the lease provision does not mention "waste," much less require that waste be prevented, nor does the lease provision identify which widely available "reasonable precautions" must be implemented. 30 U.S.C. § 225.

Similarly, the second lease provision cited by BLM merely parrots the general statutory obligation to prevent waste, without further specification. Defs. Br. at 41 (citing AR 09378 (lease term directing lessee to "prevent unnecessary damage to, loss of, or waste of leased resources")); *compare* 30 U.S.C. § 225 (lease provision must require lessee to "use all reasonable precautions to prevent waste of oil or gas developed"). BLM's simplistic repetition of the statutory requirement fails to delineate what "reasonable precautions" are actually required of lessees, 30 U.S.C. § 225, and is so vague it is effectively meaningless.[21] Because neither the public nor the lessee can determine what is actually required by the provision, BLM's lease terms fail to meet statutory requirements. *See, e.g.*, *New Mexico v. EPA*, 114 F.3d 290, 293 (D.C. Cir. 1997) (noting "it seems inescapable that as a general matter Congress intended that the [regulatory] criteria would add specificity to the disposal regulations. If they contributed no extra specificity or clarity on any aspect of the disposal regulations, it would be hard to believe EPA had done the intended job."); *EME Homer City Gen., L.P. v. EPA*, 2012 U.S. App. LEXIS 17535, at *72 (D.C. Cir. 2012) (rejecting EPA's failure to quantify statutory prohibition because an entity's obligation "remains impossible . . . to determine *until EPA defines* it" and likening the agency's regulation to "a road sign that tells drivers to drive 'carefully'"); *Pearson v. Shalala*, 164 F.3d 650, 660-61 (D.C. Cir. 1999) (rejecting regulation under APA and noting "we are quite unimpressed with the government's argument that the agency is justified in employing [its] standard without definition because Congress used the same standard").

Further, BLM appears to argue that several regulatory provisions satisfy the MLA's direction to include lease provisioning waste. Defs. Br. at 40 (citing 43 C.F.R. § 3162.1(a) (requiring operators

---

[21] Contrary to BLM's assertions, Plaintiffs do not ask the Court to direct BLM to include "certain measures Plaintiffs believe appropriate" in its leases. Defs. Br. at 41. Instead, Plaintiffs challenge BLM's decision to issue leases where BLM completely failed to require *any* specific "reasonable precautions," much less "all reasonable precautions" as required by the MLA. 30 U.S.C. §§ 225, 187.

"shall comply with applicable laws and regulations . . . These [laws and regulations] include . . . conducting all operations in a manner . . . which results in maximum ultimate economic recovery of oil and gas with minimum waste")); *id.* § 3162.7-1(a), (d). However, the existence of these referenced regulations does not satisfy the MLA's requirements, because the regulations are not *terms of the lease*, as required by the statute and as described in detail above.

Finally, BLM's argument that its lease provisions fully identify and require all reasonable precautions to avoid waste directly contradicts the agency's concurrence with the GAO report's conclusions. AR 09283-84. BLM specifically concurred that it "should revise its guidance" to ensure better control of flaring and venting of excess natural gas and that "BLM . . . should assess the potential [existing] . . . technologies to minimize the waste . . . ." *Id.* Yet the agency's record entirely fails to demonstrate that BLM actually performed *any* analysis to determine whether reasonable precautions are even available and instead simply adopted its standard lease provisions verbatim. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("agency must . . . articulate a satisfactory explanation for its action"); *Beno v. Shalala*, 30 F.3d 1057, 1074 (9th Cir. 1994) (record must "show that the agency has considered the relevant factors"). BLM's argument that its vague lease conditions somehow require the "use [of] *all* reasonable precautions to prevent waste of . . . gas," 30 U.S.C. §§ 225, 187, is belied by its frank admission that the agency's current standards are inadequate based on new technology. BLM must satisfy the MLA by identifying "reasonable measures" within its leases that actually minimize the waste of gas.

### 3. Plaintiffs' MLA Claim is Cognizable under the APA

BLM wrongly argues that Plaintiffs' MLA claim is not "actionable" under the Administrative Procedure Act ("APA"). Defs. Br. at 41. However, Plaintiffs are challenging "BLM's lease sale" that authorized four oil and gas leases as "arbitrary, capricious, and not in accordance with" the MLA's requirements. *See* Am. Compl. ¶ 86. BLM's decision to issue the leases clearly constitutes a final "agency action" under the APA, and BLM does not, nor could it, argue otherwise. 5 U.S.C. § 551(13) (APA defining "agency action" to "include[ ] . . . an agency rule, order, license, . . . or the equivalent . . . thereof"); *id.* § 551(8) (defining "license" as "an agency permit, . . . approval, . . . or other form of permission"); *id* § 551(6) (defining "order" as "a final disposition . . . of an agency in a matter").

Because BLM's lease sale decision falls under one of the categories outlined in the APA, it constitutes a "circumscribed, discrete agency action[ ]," and Plaintiffs' challenge to that decision is clearly cognizable under Section 706(2) of the APA. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) ("*SUWA*"); 5 U.S.C. § 706(2) (court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

BLM attempts to mischaracterize Plaintiffs' straightforward claim by asserting "Plaintiffs' claim is ultimately that BLM failed to take an action – the inclusion in the leases of certain measures . . . – and therefore the claim sounds under" APA Section 706(1). Defs. Br. at 41 (arguing the MLA's directive is insufficiently "discrete" to be reviewed under APA Section 706(1), pursuant to *SUWA*); *see* 5 U.S.C. § 706(1) (authorizing suits challenging actions "withheld or unreasonably delayed" by the agency). However, Plaintiffs' claim clearly arises under Section 706(2) because it challenges a discrete agency action – BLM's decision to issue unlawful oil and gas leases – not Section 706(1), and thus BLM's lengthy argument is simply irrelevant. *See Or. Natural Desert Ass'n v. BLM*, 531 F.3d 1114, 1140 (9th Cir. 2008) (in challenges to agency's decision documents, the court is "reviewing the validity of the final agency action that *was* taken, not—as in *SUWA*—[reviewing whether] the agency [must] take some action that it has *not* taken"); *see also Pub. Lands for the People, Inc. v. USDA*, 733 F. Supp. 2d 1172, 1183-84 (E.D. Cal. 2010) (noting "a NEPA analysis could be arbitrary and capricious under section 706(2) for failing to analyze specific factors even though the omitted analysis could not separately be compelled under § 706(1) as an action that the agency was 'required to take'").

## III.  CONCLUSION

Plaintiffs are entitled to summary judgment on their NEPA and MLA claims, and this Court should vacate and remand BLM's decision to hold the September 2011 lease sale, along with the EA and FONSI underlying that decision and any leases issued pursuant to that sale.

Dated: October 15, 2012                    Respectfully submitted,

                                           /s/David R. Hobstetter
                                           David R. Hobstetter (CA Bar No. 277344)
                                           CENTER FOR BIOLOGICAL DIVERSITY
                                           351 California Street, Suite 600
                                           San Francisco, CA 94104

Phone: (415) 436-9682 x321
Facsimile: (415) 436-9683
Email: dhobstetter@biologicaldiversity.org

Brendan Cummings (CA Bar No. 193952)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252
Phone: (760) 366-2232
Facsimile: (760) 366-2669
Email: bcummings@biologicaldiversity.org

Nathan Matthews (CA Bar No. 264248)
SIERRA CLUB
85 2nd St., Second Floor
San Francisco, CA 94105
Phone: (415) 977-5695
Facsimile: (415) 977-5793
Email: Nathan.Matthews@sierraclub.org

Attorneys for Plaintiffs
CENTER FOR BIOLOGICAL DIVERSITY and SIERRA
CLUB