1
2
3
4
5
6
7
8
9
10

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB, <br><br> Plaintiffs, <br><br> v. <br><br> THE BUREAU OF LAND MANAGEMENT and KEN SALAZAR, Secretary of the Department of Interior, <br><br> Defendant. | Case No.: C 11-06174 PSG <br><br> **ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** <br><br> **(Re: Docket No. 28, 32)** |

Plaintiffs Center for Biological Diversity and Sierra Club bring their claims for declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. § 701-706.  They challenge the decision of Defendants Bureau of Land Management ("BLM") and Interior Secretary Ken Salazar to sell four oil and gas leases for approximately 2,700 acres of federal land in Monterey and Fresno counties.  Plaintiffs now seek summary judgment that the leases were sold in violation of the National Environmental Policy Act and the Mineral Leasing Act of 1920.  Defendants oppose the motion and seek a summary judgment of their own.  The court has jurisdiction under 28 U.S.C. § 1331.  On January 15, 2013, the parties appeared for hearing.

Having considered the evidence of record and the arguments of counsel, the court holds that the BLM violated NEPA in its environment assessment of the leases by unreasonably relying on an

1

earlier single-well development scenario. That scenario did not adequately consider the

development impact of hydraulic fracturing techniques popularly known as "fracking" when used

in combination with technologies such as horizontal drilling. Not only was the environment

assessment erroneous as a matter of law, the BLM's finding of no significant impact based on the

assessment and resulting decision not to prepare an environmental impact statement also was

erroneous as a matter of law. The court further holds that although the leases were issued in

violation of NEPA, the lease terms do not separately violate the MLA. Accordingly, the court

GRANTS-IN-PART and DENIES-IN-PART the parties' motions.

## I. BACKGROUND

**A.      The Monterey Shale Formation and Hydraulic Fracturing**

Central California's Monterey Shale Formation is a massive sedimentary rock formation

estimated to contain over 15 billion barrels of oil, equal to 64 percent of the nation's total shale oil

reserve, most of which is not retrievable through conventional drilling techniques.[1]  Oil previously

produced from the formation was dubbed "easy" oil, because it was released from the shale into

other permeable formations and then pooled near the surface, where it could be extracted with

conventional drilling techniques.[2]  What largely remains of the shale oil remains locked deep

within the impermeable shale itself, which is currently only economically accessible through

fracking.[3]

Fracking is the artificial propagation of fractures in a rock layer by injecting large quantities

of water and fracturing fluids at high volume and pressure.[4]  This fractures the geological

---

[1] *See* AR 09230.

[2] *See id.* at 02532.

[3] *See id.* at 09230.

[4] *See id.* at 09045.

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

formation, creating passages through which gas and liquids can flow and an overall increased permeability.[5]  Fracking typically uses "slick water," which is a mixture of water, sand, and a cocktail of chemical ingredients with a number of purposes, including increasing viscosity of the fluid and impeding bacterial growth or mineral deposition.[6]  Although fracking itself is not a new technology, it did not become a feasible means of deep shale gas production until the late 2000s.[7]  Whereas before fracking only increased permeability in a limited zone radiating from the well bore, more recently engineers have honed the fracking process by incorporating horizontal drilling, multi-stage fracturing, slick-water, and improved equipment to allow the operator to fracture and extract resources from a larger volume from a single well.[8]  Modern fracking involves drilling vertically into shale formations up to hundreds of thousands of feet deep, and horizontally from 1000 to 6000 feet away from the well.[9]

The effect of fracking on the oil and gas economies has been tremendous.  An April 2011 Congressional report notes that "[a]s a result of hydraulic fracturing and advances in horizontal drilling technology, natural gas production in 2010 reached the highest level in decades."[10]  In some areas, the rate of drilling increased by more than an order of magnitude.  For example, in the Marcellus Shale, "[d]rilling companies were issued roughly 3,300 Marcellus gas-well permits in Pennsylvania [in 2010], up from just 117 in 2007."[11]

---

[5] *See id.* at 09033.

[6] *See id.* at 09038.

[7] *See id.* at 09229.

[8] *See id.* at 090229, 09033.

[9] *See id.* at 01038.

[10] *See id.* at 09044-45.

[11] *See id.* at 09208.

3

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

Whatever one view's of the virtue and vices of fracking, it is undisputed that fracking's potential – both good and bad – has not gone unnoticed.  Advocates herald the technology as an economic method to meet our nation's energy needs by extracting vast amounts of formerly inaccessible hydrocarbon supplies.[12]  Opponents, however, warn of devastating environmental impacts, including contamination of ground water, deteriorating air quality, the flowbacks of gases and slick water, and surface pollution from spills.  The Congressional Committee on Energy and Commerce launched an investigation to examine the chemicals used in hydraulic fracturing from 2005 to 2009 and identified 29 chemicals that are known or possible human carcinogens, regulated under the Safe Drinking Water Act as risks to human health, or listed as hazardous air pollutants under the Clean Air Act.[13]  In recent years, fracking has come under scrutiny in federal, state, and local governments alike, with some states contemplating enacting, or having already enacted, laws banning fracking altogether.[14]

**B.      Resource Management Plan for the Hollister Field Office Area (June 2006)**

BLM manages federal onshore oil and gas resources subject to the requirements of the MLA and the Federal Land Policy and Management Act ("FLPMA").[15]  Under the FLPMA, BLM is required to undergo a "three phase decision-making process" in granting access to public lands for oil and gas development.[16]  In the first phase, BLM must prepare a Resource Management Plan

---

[12] *See id.* at 09045.

[13] *See id.* at 09044.

[14] *See id* at 09302, 09306, 09314.

[15] 43 U.S.C. §§ 1701 *et seq.*

[16] *See Pennaco Energy, Inc. v. U.S. Dept. of Int.,* 377 F.3d 1147, 1151 (10th Cir. 2004).

4

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

("RMP") covering a general regional area.[17]  In the second phase, BLM leases specific parcels.[18]
In the third phase, lessees submit applications for drilling permits to BLM.[19]

In June 2006, BLM's Hollister Field Office ("HFO") prepared a Proposed Resource
Management Plan/Final Environmental Impact Statement ("PRMP/FEIS") to govern management
of the Southern Mountain Diablo Range and Central Coast of California.[20]  The PRMP/FEIS
outlined the HFO's plan for managing the lands surveyed within the "planning area," consisting of
approximately 274,000 acres of lands and 588,197 acres of "split estate"[21]  within twelve counties
in central California, including the leases at issue in this litigation.[22]

The PRMP/FEIS included a Reasonably Foreseeable Development Scenario for Oil and
Gas ("RFD") for the HFO area, which projected that no more than 15 wells would be drilled within
the next 15-20 years, based on a survey of past oil and gas activities within the boundaries of the
HFO and the very small amount of federal mineral estate within the areas of high development
potential.[23]  The RFD analysis further concluded that "[t]his trend is not likely to change much,"
and as a result predicted 10 development wells to be drilled over the next 15 to 20 years across the
entire "planning area."[24]

---

[17] *See* Pub. L. No. 94–579, 90 Stat. 2743 (1976); 43 U.S.C. §§ 1701 *et seq.  See also Gardner v.
U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1220 (9th Cir. 2011) (citing 43 C.F.R. § 1610.2).  *See
also* AR 00003.

[18] *See id.*

[19] *See id.*

[20] *See* AR 00001-00668.

[21] "Split estate" refers to the land in which the surface rights are owned by private owners, while
the subsurface mineral rights are owned by the United States and administered by the BLM.  *See
id.* at 00176, 00987.

[22] *See id.* at 00028, 00032-33, 00850.

[23] *See id* at 00468-75.

[24] *See id.*

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

HFO also analyzed the environmental impacts of proposed leasing in the HFO area.[25] Specifically, the PRMP/EIS addressed potential impacts of oil and gas development on surrounding air quality, water resources, wildlife habitat, and special status species (including the California condor, Central Coast Steelhead, the blunt-nosed leopard lizard, and the San Joaquin Kit fox).[26]

After publishing the report and receiving comments from the public, BLM adopted the PRMP/FEIS in September 2007 in its Record of Decision ("ROD").[27] The ROD, based on the findings in the PRMP/FEIS, established certain management requirements for activities and projects expected to take place on the lands at issue, including mitigation requirements and oil and gas stipulations that would be applied to new leases issued.[28] These stipulations and conditions included measures to protect endangered, threatened, and other special status species, as well as water and air quality.[29]

**C.      Environmental Assessment (June 2011)**

Several years later, in response to expressions of interest from members of the oil and gas industry, BLM proposed a competitive oil and gas lease sale for approximately 35,000 acres in the HFO area.[30] In April 2011, BLM announced a decidedly scaled down proposed lease sale for approximately 2,700 acres and issued a corresponding draft Environmental Assessment ("EA").[31] During the 36-day public comment period for the EA, BLM received comments from several

---

[25] *See id.* at 00001-668.

[26] *See id.* at 00086-90, 00096-104, 00112-121, 00122-142, 00437, 00447, 00453-54, 00464.

[27] *See id.* at 00670-73.

[28] *See id.* at 00699-703, 00714-16, 00725-26, 00760-68.

[29] *See id.*

[30] *See id.* at 00824, 00990.

[31] *See id.* at 00844-952.

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

individuals, agencies, and organizations, including Sierra Club, Center for Biological Diversity, Monterey County, United States Fish and Wildlife Service Ventura Field Office, Ventana Conservation and Land Trust, Grassroots Coalition, and the National Resources Defense Council (NRDC).[32] Many comments centered on the potential effects of fracking as well as climate change, but BLM noted "these issues are outside the scope of this EA because they are not under the authority or within the jurisdiction of the BLM."[33] In June 2011, having considered and addressed the public comments it received, BLM issued its final EA.[34]

The final EA consists of a 125-page assessment of the proposed lease sale. After describing the purpose and need for the lease sale, the EA discussed environmental issues, including: (1) the oil and gas resources in the HFO area;[35] (2) air quality in the San Joaquin and North Central Coast Air Basins;[36] (3) water quality concerns, including the fact that none of the parcels proposed for sale contained any permanent surface waters;[37] and (4) special status species occurring or possibly occurring in the vicinity of the parcels proposed for sale.[38]

The EA evaluated the environmental impacts of three alternatives.[39] Under the first alternative, the proposed action, BLM would hold a competitive oil and gas lease sale for 2,605 acres of federal mineral estate, including 360 acres of split estate.[40] Under the second alternative,

---

[32] *See id.* at 01080.

[33] *See id.* at 01080-81.

[34] *See id.* at 00953-1089.

[35] *See id.* at 00992-94.

[36] *See id.* at 00999-1006.

[37] *See id.* at 01013-15.

[38] *See id.* at 01015-29.

[39] *See id.* at 00986.

[40] *See id.* at 00987.

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

BLM would hold a lease sale at which it offered 6,401 acres of federal minerals for sale, comprising the same acres as in first alternative plus an additional 3,796 acres of split-estate federal minerals.[41]  The third alternative is a "no action" alternative, under which BLM would not offer any of the proposed acres of federal mineral estate for sale.[42]

Critically, the EA also provided a projection on the extent of drilling activity to be conducted and the impact of such drilling activity.[43]  BLM assumed that no more than one exploratory well would be drilled in total on the land within the leases.[44]  This assumption was based on the RFD 2006 projection in the PRMP/FEIS, that 15-20 wells would be drilled across the entirety of the HFO lands.[45]  The EA noted that not a single well had been drilled on any HFO lands in the five years since the issuance of the RFD.[46]  At the same time, the noted that mineral development has occurred in the general geographic area,[47] the great majority of which was development of private mineral estates on privately-owned acres.[48]  As the PRMP/FEIS explained, most of the active oil and gas development had occurred almost completely within a 188,000 acre "administrative field" area—and only 5,400 of these acres are federal mineral estate.[49]  The EA further indicated that while the lands considered in the EA are all within five miles of some of

---

[41] *See id.*

[42] *See id.* at 00989.

[43] *See id.* at 01044.

[44] *See id.*

[45] *See id.* at 00469.

[46] *See id.* at 01044.

[47] There are 30 active oil fields and gas fields totally or partially within the HFO geographic management area.

[48] *See id.* at 01044.

[49] *See id.* at 00469.

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

these existing oil fields, and are classified as "high potential," "virtually all of the lands that were leased in the past also met the same criteria and yet were never developed."[50]

The EA did not discuss fracking in great detail beyond noting that it was "not relevant to the analysis of impacts… because the reasonable foreseeable development scenario anticipates very little (if any) disturbance to the human environment."[51]  BLM reserved its analysis of the impacts of fracking until applications for a permit to drill ("APD") were submitted because as it saw it, analyzing site-specific impacts would be more feasible.[52]

The EA did, however, briefly discuss "existing credible scientific evidence" concerning fracking.[53]  The EA noted that the EPA studied the issue of fracking in 2004, predicting that by 2020 shale gas would comprise over 20% of the total U.S. gas supply.[54]  The EA also quoted a 2010 U.S. House of Representatives Appropriation Conference Committee, which identified the need for a focused study on the potential impact of fracking on "drinking water, human health, and the environment."[55]  The EPA announced in March 2010 that it would study the potential impacts of fracking on drinking water,[56] and that although so far there was no direct evidence of contamination of drinking water due to fracking, there is potential risk for contamination because fracking brings certain fluid chemicals and naturally occurring materials in the geologic formation to the surface where it could mix with water sources.[57]

---

[50] *See id.* at 01044.

[51] *See id.* at 01036.

[52] *See id.* at 01037.

[53] *See id.*

[54] *See id.* at 01040.

[55] *Id.*

[56] *See id.*

[57] *See id.* at 01039-40.

9

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

**D.      Finding of No Significant Impact (June 2011)**

Also on June 16, 2011, relying on the analysis contained within the EA, BLM's Acting California State Director executed a Finding of No Significant Impact ("FONSI"), announcing his determination that the proposed action would not result in any significant environmental impact requiring further analysis under NEPA.[58]  BLM analyzed the context and intensity of the proposed action under the factors set forth in the Council on Environmental Quality's ("CEQ") criteria for significance, but found that none of the factors warranted further NEPA review.[59]  Following issuance of the final EA and FONSI, BLM issued its final Decision Record ("Decision Record"), documenting BLM's decision to offer for competitive oil and gas lease auction eight parcels encompassing the 2,703 acres of federal mineral estate.[60]  In the Decision Record, BLM again emphasized that a further NEPA review would be conducted at the APD stage and "[a]lthough a lessee generally has the right to develop a lease, BLM retains the authority to require proposals to be relocated or redesigned in such a way as to protective sensitive resources."[61]

**E.      Protests Against the Sale**

Before the lease sale took place, environmental groups and nearby municipalities expressed concern over the potential impacts of the lease sale.  The lease areas within Monterey County are part of the Salinas River watershed and "play an important role in recharging fresh water aquifers."[62]  One lease is directly adjacent to the San Antonio Reservoir while another is near the

---

[58] *See id.* at 00959-63.

[59] *See id.*; *see also* 40 C.F.R. § 1508.27.

[60] *See* AR 00953-58, 07865.

[61] *See id.* at 00955.

[62] *See id.* at 01013.

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

Nacimiento Reservoir and Salinas River.[63]  While the Fresno leases are not as close to sensitive water resources as the Monterey ones, BLM acknowledges that they are on largely "undeveloped lands with environmental resources important" to the region, including "[l]imited quantities of high quality water."[64]

The planning area of the lease sale is also a habitat for many species protected under the Endangered Species Act.  Among those are the endangered San Joaquin kit fox, blunt-nosed leopard lizard, and California condor, and threatened South Central Coast steelhead.[65]  BLM's EA confirmed that leopard lizards have been spotted on the leased acres[66] and that all the leases in Monterey County are within the range of the California condor.[67]

Given the increasing applications of and the growing concerns over fracking's impact on the environment, numerous groups, including Plaintiffs, as well as the Monterey County government itself, publicly protested the lease sale.[68]  On July 22, 2011, the Monterey County sent BLM the following:

> In our May 6, 2011 letter to the Bureau of Land Management, we expressed our concerns with deficiencies in the environmental review for the proposed Competitive Oil and Gas Lease Sale pending September 14, 2011. That letter expressed that Monterey County had not been consulted in the preparation of the EA, and that there were substantive deficiencies in the Environmental Assessment.[69]

_____

[63] *See id.* at 08094.

[64] *See id.* at 00980.

[65] *See id.* at 01018, 01023, 07958.

[66] *See id.* at 00934, 07996.

[67] *See id.* at 01020.

[68] *See id.* at 05961-06207, 06221-07494, 08021-23.

[69] *Id.* at 08021.

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

In the letter, the Monterey County voiced its concerns on "the potential to induce seismic activity and the lack of scientific study related to potential impacts to drinking water and groundwater."[70] Moreover, "Monterey County [was] very concerned for the potential changes in Aesthetics and Water Quality and [did] not believe that the EA provides sufficient protections for these resources."[71]

After the issuance of the Decision Record, Plaintiffs filed a protest of the lease sale, asserting that BLM's EA was inadequate and that a detailed environmental impact statement ("EIS") was required.[72]  On September 9, 2011, BLM issued a 16-page decision dismissing the protest and providing its rationale for its decision.[73]

## F.    Lease Sales

On September 14, 2011, BLM successfully auctioned leases in three parcels: a 2,343-acre parcel in Monterey County, a 200-acre parcel in Fresno County, and a 40-acre parcel in Fresno County.[74]  On September 20, 2011, BLM sold the remaining 120-acre parcel in Monterey County "over the counter."[75]   The four parcels, covering approximately 2,700 acres of land, were labeled Parcel CA 9-11-1, Parcel CA 9-11-2, Parcel CA 9-11-3, and Parcel CA 3-114.[76]  BLM issued all four leases with its "standard" stipulations as well as three Special Stipulations.[77]  All four parcels contain Special Stipulation No. 1 (Endangered Species Stipulation) and Special Stipulation No. 2

---

[70] *Id.*

[71] *Id.*

[72] *See id.* at 07898.

[73] *See id.* at 08062.

[74] *See id.* at 08089.

[75] *See id.* at 05542.

[76] *See id.* at 03591-03600.

[77] *See id.* at 09368-9404.

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

(Cultural Resource Stipulation).[78]  Parcels CA 9-11-3 and CA 3-11-4 contain Stipulation No. 3, a "No Surface Occupancy" ("NSO") stipulation, which precludes the lessee from using, or even occupying the surface of the leased land without additional specific authorization from BLM.[79] Parcels CA 9-11-1 and CA 9-11-2 do not contain this stipulation.[80]

## II. LEGAL STANDARDS

Summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure is appropriate where "there is no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law."  Where the district court is reviewing an agency determination under the Administrative Procedures Act ("APA"),[81] the scope of the court's review is "confined to the administrative record" and the court generally does not engage in fact finding.[82]  As there are no disputes of material fact, summary judgment is the appropriate vehicle for resolution of this case. The court must determine, based on the administrative record, whether BLM's "decision was based on consideration of the relevant factors, or whether its actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."[83]

With the goal of "declar[ing] a national policy which will encourage productive and enjoyable harmony between man and his environment," the National Environmental Policy Act ("NEPA")[84] establishes two concrete mandates for federal agencies such as the BLM.  First, it

---

[78] *See id.*

[79] *See id.* at 09394, 09404.

[80] *See id.* at 09368-75, 09380-84.

[81] 5 U.S.C. § 706.

[82] *Sierra Forest Legacy v. U.S. Forest Serv.*, 652 F. Supp. 2d 1065, 1074 (N.D. Cal. 2009).

[83] *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (internal quotation marks and citation omitted).

[84] 42 U.S.C. §§ 4321 *et seq.*

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

places an obligation on federal agencies to take a "hard look" at "every significant aspect of the environmental impact of a proposed action."[85]   Second, it requires the agency to inform the public that it indeed has taken environmental considerations into account before taking action.[86]  This is accomplished by requiring federal agencies to prepare a detailed EIS for all proposals of major federal actions "significantly affecting the quality of the human environment."[87]

The Mineral Leasing Act of 1920 ("MLA")[88] allows BLM to grant leases for the "economically sound and stable" development of federal mineral resources, including gas and oil, on public or private lands where the federal government controls subsurface mineral estates.[89] Leases of this kind must follow the procedures set forth in the MLA and accompanying regulations.  Among other things, the MLA requires that "[a]ll leases of lands containing oil or gas… shall be subject to the condition that the lessee will, in conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas developed in the land."[90]

### III. DISCUSSION

At the outset, the court must emphasize what lies before it, and what does not.  What is before it is the legal question of whether the BLM actions at issue in this case were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[91]  What is not is the policy question of whether fracking in the Monterey Shale or anywhere else is a good thing or a

---

[85] *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 97 (1983).

[86] *See id.*

[87] 42 U.S.C. § 4332(C).

[88] 30 U.S.C. §§ 181 *et seq.*

[89] 30 U.S.C. § 21(a).

[90] 30 U.S.C. § 225.

[91] 5 U.S.C. § 706.

14

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

bad thing.  At all times in its review of the pending motions, the court bears in mind that it is the

BLM that is the recognized expert in this field, not the court.  At the same time, while this review

is deferential to the agency's recognized expertise in the field, the court must not "rubber-stamp"

agency decisions.[92]  Instead, the court must ensure that the agency has taken a "hard look" at the

environmental consequences, "carefully reviewing the record to ascertain whether the agency

decision is founded on a reasoned evaluation of the relevant factors."[93]

A.      **National Environmental Policy Act**

Plaintiffs' first challenge to the disputed leases focuses on BLM's obligations under NEPA.

BLM argues that its obligation to conduct NEPA analysis had not yet accrued, and even if it did, it

satisfied this obligation by conducting an EA and finding the proposed action carried no significant

environmental impact requiring a full EIS.

1)      **BLM Was Required To Conduct A NEPA Analysis for the Non-NSO Leases**

As a preliminary matter, BLM argues that at least for two of the parcels, the need for

preparing any NEPA analysis at all had not ripened.  The federal regulations explicitly require that

review under the NEPA process be timely.[94]  Agencies are required to conduct this review at the

"earliest possible time" to allow for proper consideration of environmental values and "head off

potential conflicts."[95]  This ensures that the statement can make an "important contribution to the

decisionmaking process" and will not merely be used to justify a decision that has already been

---

[92] *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 859 (9th Cir. 2005).

[93] *Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105, 1115 (9th Cir. 2000) (abrogated on other grounds by *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011)).

[94] *See Pit River Tribe v. U.S. Forest Serv.,* 469 F.3d 768, 785 (9th Cir. 2006).

[95] 40 C.F.R. § 1501.2.

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

made.[96]  A review should be prepared at a time when the decisionmakers "retain a maximum range of options."[97]  Interpreting the relevant statutory language, the Ninth Circuit has ruled that the obligation to produce a review arises when there is any "irreversible and irretrievable commitments of resources."[98]

A BLM-issued lease for oil and gas gives the lessee the right to drill and produce, subject to the terms of the agreement.  Any plan for drilling must be submitted through the Application for Permit to Drill ("APD") process.  Regulation of the APD process is outlined in 43 CFR § 3101.1-2, which defines what reasonable measures BLM can require.  These include relocating the proposed drilling up to 200 meters, delaying surface disturbance or drilling up to 60 days, or requiring special reclamation measures.  But generally, "the BLM cannot deny a lessee the right to drill once a lease is issued unless the action is in direct conflict with another existing law."[99]

In *Conner v. Burford*, the Ninth Circuit addressed exactly the type of BLM leases at issue here – leases with No Surface Occupancy provisions ("NSO leases") and all other leases, termed "non-NSO leases."  The court found that the NSO leases absolutely prohibited any surface disturbing activities and were more akin to a right of refusal than an actual lease for drilling.  The NSO leases therefore did not constitute an "irretrievable commitment of resources."[100]  Alteration of the NSO lease provision, however, would constitute such a commitment requiring preparation of

---

[96] 40 C.F.R. § 1502.5.

[97] *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988) (citing 42 U.S.C. § 4332(C)(v) which requires an EIS to include a statement of "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.").

[98] *Id.* at 1446.

[99] AR 00977.

[100] *Conner*, 848 F.2d at 1447-48.

16

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

an EIS.[101]  By contrast, non-NSO leases, even if subject to substantial government regulation, do

constitute an "irretrievable commitment of resources."[102]  As a result, unless the lease reserves to

the agencies an "absolute right to deny exploitation of those resources," the sale of the non-NSO

leases at step two constitutes the go or no-go point where NEPA analysis becomes necessary.[103]

Of the leases sold by BLM, two are clearly and properly categorized as NSO leases,

containing a provision preventing any surface-disturbing activities.  Under *Conner,* these were

merely rights of first refusal and did not result in an "irretrievable commitment of resources."

Regarding these two leases, no obligation to conduct NEPA analysis arose at this time.

The two other parcels do not contain NSO provisions.  The BLM points out that these

leases do contain other provisions, including Stipulation No. 1, that allow BLM to deny all surface

disturbing activities if threatened and endangered species ("T&E species") are found on the lands

during inventories, unless a lawful alternative is submitted.[104]  But although BLM correctly argues

these provisions reserve it significant regulatory power, the provisions are simply not equivalent to

the NSO provisions addressed in *Conner*.  In particular, although BLM retains authority to enforce

existing laws to protect T&E species, BLM does not retain absolute authority to preclude any

surface disturbing activities that do not protect T&E species.  As Plaintiffs correctly point out, if

NEPA analysis is postponed to the APD stage, and BLM finds that drilling will severely impact

water, air, or other non-endangered wildlife species, Stipulation No. 1 will not allow BLM to deny

drilling rights based on those impacts.  BLM may have some ability to require mitigation or

relocation of the activity, but it will not be able to unilaterally deny the permit.  While a footnote in

*Conner* notes that even NSO leases may nevertheless permit certain access to oil and gas reserves

---

[101] *See id.*

[102] *Id.* at 1448-49.

[103] *Pit River Tribe*, 469 F.3d at 782-83.

[104] AR 09383.

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

through directional drilling or well spacing, *Conner* is clear that the hallmark of a non-NSO lease that triggers NEPA review is, as here, BLM's lack of authority to unilaterally deny the permit based on any surface activity whatsover.  The sale of a non-NSO oil or gas lease therefore constitutes the "point of commitment" because the government no longer has the absolute ability to prohibit potentially significant impact on the surface environment.  BLM's own decision to undertake an EA and FONSI does little to undermine the conclusion that it triggered an obligation to conduct a NEPA analysis when it issued the non-NSO leases.  In sum, because BLM will no longer hold the full range of options for dealing with surface activities after selling the non-NSO leases, BLM was required to conduct a thorough NEPA analysis to determine whether the sale would have a substantial environmental impact.

> **2)    BLM Unreasonably Concluded That The Leases Would Have No "Significant Environmental Impact"**

As the time for NEPA analysis was triggered by the proposal for the sale of the two non-NSO leases, BLM had to analyze whether the proposal might have significant environmental impact.  BLM contends that its EA and FONSI established convincing reasons that there would be no such impact.

"Some proposed federal actions categorically require the preparation of an EIS.  If the proposed action does not categorically require the preparation of an EIS, the agency must prepare an EA to determine whether the action will have a significant effect on the environment."[105]  "If the agency finds based on a less formal and less rigorous 'environmental assessment' that the proposed actions will not significantly affect the environment, the agency can issue a finding of No Significant Impact ("FONSI") in lieu of the EIS."[106]  The FONSI must contain a "convincing

---

[105] *Kern v. United States Bureau of Land Mgmt.*, 284 F.3d 1062, 1067 (9th Cir. 2002).

[106] *Conner*, 848 F.2d at 1446 (citing 40 C.F.R. § 1508.13).

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

statement of reasons" why the project's impacts are insignificant.[107]  "The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project."[108]  Standing together, the FONSI and EA must be "sufficient to establish the reasonableness of th[e] decision not to prepare an EIS."[109]  As the court has already noted, although BLM's factual analysis in its area of expertise should be approached with substantial deference, the court must nevertheless evaluate whether these factual determinations, and the underlying logic, were premised on reasonable assumptions.[110]  Conversely, to prevail on a claim that the agency violated its statutory duty to prepare an EIS, a plaintiff need not show that significant effects will in fact occur.  It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment."[111]

In evaluating the significance of the impact of the proposed action, the agency must consider both the context of the action as well as the intensity.[112]  "Context ... delimits the scope of the agency's action, including the interests affected."[113]  "[T]he significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality."[114]  For site-specific actions, significance usually depends on

---

[107] 40 C.F.R. § 1501.4; *Blue Mountains Biodiversity Project*, 161 F.3d at 1211.

[108] *Blue Mountains Biodiversity Project,* 161 F.3d at 1212 (internal quotation marks and citation omitted).

[109] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1215 (9th Cir. 2008) (internal quotations omitted).

[110] *Cf. Ocean Advocates*, 402 F.3d at 859 (arbitrary and capricious standard involves evaluation of whether agency "articulated a rational connection between the facts found and the choice made").

[111] *Id.*

[112] 40 C.F.R. § 1508.27.

[113] *Ctr. for Biological Diversity,* 538 F.3d at 1185.

[114] 40 C.F.R. § 1508.27.

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

the impact of the action on the locale rather than the world as whole.[115]  The undisputed locale here

was the area surrounding the leases in Monterey and Fresno counties.

Intensity is determined by scrutinizing ten factors, as described in 40 C.F.R. § 1508.27:

> (1) Impacts that may be both beneficial and adverse. A significant effect may exist even
> if the Federal agency believes that on balance the effect will be beneficial.
> (2) The degree to which the proposed action affects public health or safety.
> (3) Unique characteristics of the geographic area such as proximity to historic or
> cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or
> ecologically critical areas.
> (4) The degree to which the effects on the quality of the human environment are likely
> to be highly controversial.
> (5) The degree to which the possible effects on the human environment are highly
> uncertain or involve unique or unknown risks.
> (6) The degree to which the action may establish a precedent for future actions with
> significant effects or represents a decision in principle about a future consideration.
> (7) Whether the action is related to other actions with individually insignificant but
> cumulatively significant impacts. Significance exists if it is reasonable to anticipate a
> cumulatively significant impact on the environment. Significance cannot be avoided by
> terming an action temporary or by breaking it down into small component parts.
> (8) The degree to which the action may adversely affect districts, sites, highways,
> structures, or objects listed in or eligible for listing in the National Register of Historic
> Places or may cause loss or destruction of significant scientific, cultural, or historical
> resources.
> (9) The degree to which the action may adversely affect an endangered or threatened
> species or its habitat that has been determined to be critical under the Endangered
> Species Act of 1973.
> (10) Whether the action threatens a violation of Federal, State, or local law or
> requirements imposed for the protection of the environment.

The presence of any one of these factors may be sufficient to require an EIS.[116]

NEPA requires that BLM evaluate all reasonably foreseeable environmental effects of its

actions.[117]  These include both direct effects, caused by the action and occurring at the same time

and place, and indirect effects, which are caused by the action and are either later in time or farther

---

[115] *See id.*

[116] *See Ocean Advocates*, 402 F.3d at 865; *Barnes v. U.S. Dept. of Transp.*, 655 F.3d 1124, 1140
(9th Cir. 2011); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001)
(disapproved on other grounds).

[117] *See Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983).

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

removed in distance, "but are still reasonably foreseeable."[118]  The test of whether an effect is

reasonably foreseeable is measured similarly to that of tort law's proximate cause doctrine –

whether there is a "reasonably close causal relationship" between the agency's action and the

environmental effect.[119]

Here, BLM based its analysis of the lease sale on the projection that only one well would be

drilled across the four parcels to be leased.[120]  BLM came to this conclusion by observing that in

the last 20 years, none of the lease sales in the HFO boundary have had any production wells

drilled on them.  BLM did note, however, that the lands were considered "high potential" and oil

prices are now "significantly higher" now than in the past, so more drilling might occur.  BLM

expressed doubt that exploratory wells would yield oil.  Based on this data, BLM concluded that

only one exploratory well would result from the leased area.[121]

While BLM argues that this conclusion borne out of past data was reasonable, logically this

projection fails to take into account all "reasonably foreseeable" possibilities as required by NEPA.

BLM plainly limits its analysis to one scenario – a lessee drills an exploratory well, no oil is found,

and the lessee halts all further exploration.  While this may have been reasonable in the past, the

record before the agency teaches that it was not reasonable by the time the non-NSO leases were

issued.  Even BLM itself has acknowledged that fracking activity in the United States has increased

dramatically in recent years.[122]  But rather than engaging in this reality by at least considering what

impact might result from fracking on the leased lands, whatever its ultimate conclusion, BLM

---

[118] 40 C.F.R. § 1508.8.

[119] *See Metropolitan Edison Co.*, 460 U.S. at 774.

[120] AR 01044 ("we would expect no more than one well total on all of these parcels.").

[121] *Id.* at 01046.

[122] *See id.* at 01038.

21

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

1    chose simply to ignore it, asserting that "these issues are outside the scope of this EA because they

2    are not under the authority or within the jurisdiction of the BLM."[123]  If nothing else, it is unclear

3    exactly how the issue of the environmental impact of fracking could lie outside BLM's

4    "jurisdiction" when NEPA plainly assigns all studying all environmental impacts of its own

5    decision to BLM.  Put another way, if not within BLM's jurisdiction, then whose?

6           Even so, the precedent of this Circuit makes clear that BLM was unreasonable in

7    categorically refusing to consider an effect that bears "reasonably close causal relationship" to the

8    action at issue.[124]  Past might turn out to be prologue in that future development will track the

9    limited development to date.  But evidence within its own EA shows another possibility that at

10   least bears the minimum "necessary close causal relationship" sufficient to trigger consideration in

11   the Ninth Circuit.  This evidence shows that in just the past few years fracking has been combined

12   with horizontal drilling and other modern technologies to provide access to previously unattainable

13   shale oil such as that in the four parcels of Monterey shale at issue.  According to the House Report

14   referenced by the EA, the combination of fracking and horizontal drilling has resulted in a spike in

15   natural gas production in the U.S. of 21,577 billion cubic feet in 2010, a level of production not

16   achieved since the 1970s.[125]  BLM also noted the EPA's study predicting that by 2020 shale gas

---

[123] *See id.* at 01080-81.

[124] *Ocean Advocates*, 402 F.3d at 867-68; *see also Metropolitan Edison Co.,* 460 U.S. at 773 (holding that to determine whether NEPA requires an agency to consider a particular effect, courts must "look at the relationship between that effect and the change in the physical environment caused by the major federal action at issue.").  *Cf. San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1035 (9th Cir. 2006).  BLM suggests that *San Luis Obispo* was limited to its particular circumstances, in which the court held that that it was unreasonable for the Nuclear Regulatory Commission to categorically refuse to consider terrorist attacks in reviewing an application for proposed interim spent fuel storage installation.  But nothing in the case law since *San Luis Obispo* suggests such a limited application of its standard.  *See Ctr. for Biological Diversity*, 538 F.3d at 1179.  Even economic effects may be relevant "when they are *'interrelated'* with 'natural or physical environmental effects.'"  *Geertson Seed Farms v. Johanns*, Case No. 06-01075 CRB, 2007 WL 518624, at *7 (N.D. Cal. Feb. 13, 2007) (citations omitted).

[125] *See* AR 09045.

22

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

would comprise over 20% of the total U.S. gas supply.[126]  Certainly there was significant increased

interest in oil and gas drilling in the Monterey shale, which is what led to the 2012 sale.  Based on

the evidence BLM itself observed, it was not reasonable for BLM to consider only a single

exploratory well scenario solely based on past data.[127]  This "cursory and inconsistent treatment"

was arbitrary and capricious.[128]

> BLM also asserts that because the EA was tiered to the regional management plan for the

general area encompassing the lease sale, no specific EIS for the leases was necessary.  "Tiering, or

avoiding detailed discussion by referring to another document containing the required discussion,

is expressly permitted."[129]  "A comprehensive programmatic impact statement generally obviates

the need for a subsequent site-specific or project-specific impact statement, unless new and

significant environmental impacts arise that were not previously considered."[130]  But here, the

emergence of fracking raises potential concerns that were not considered by the 2006 PRMP/FEIS.

In fact, the PRMP/FEIS makes no explicit mention of fracking at all.  BLM suggests in its papers

that the PRMP/FEIS somehow implicitly considered fracking in its RFD projection of how many

wells would be drilled on BLM lands, as fracking has been used in California for at least thirty

years.  BLM's own statements, however, that it lacked "jurisdiction" to consider the fracking that

has emerged today certainly suggests that even BLM did not believe this was true.  Even if it were

---

[126] *See id.* at 00908.

[127] *Cf. Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1026-27 (9th Cir. 2011) (applying the arbitrary and capricious standard for purposes of the Administrative Procedures Act and the Environmental Protection Act, the court found that it was not rational for the agency to rely on past data from before the "epidemic of mountain pine beetles" to predict future trends of the grizzly population).

[128] *Blue Mountains Biodiversity Project*, 161 F.3d at 1213-14.

[129] *Kern*, 284 F.3d at 1073 (citing 40 C.F.R. § 1502.20).

[130] *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994).

23

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

true, that analysis is inadequate.  The evidence before BLM showed that the scale of fracking in shale-area drilling today involves risks and concerns that were not addressed by the PRMP/FEIS' general analysis of oil and drilling development in the area.[131]  Because the PRMP/FEIS does not address these concerns that are specific to these "new and significant environmental impacts," further environmental analysis was necessary.[132]

BLM finally argues that at this stage, the exact scope and extent of drilling that will involve fracking is unknown, so NEPA analysis, if any, should be conducted when there is a site-specific proposal.  But "the basic thrust" of NEPA is to require that agencies consider the range of possible environmental effects before resources are committed and the effects are fully known.[133]  "Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'"[134]

On this record, it was unreasonable for BLM not to at least consider reasonable projections of drilling in the area that include fracking operations, or else limit its sale to leases with NSO provisions that would permit it to prohibit all surface disturbances until more specific information becomes available.

This unreasonable lack of consideration of how fracking could impact development of the disputed parcels went on to unreasonably distort BLM's assessment of at least three of the "intensity" factors in its FONSI.  First, BLM erroneously held that the leases were not highly controversial.  A proposal is highly controversial when "substantial questions are raised as to

---

[131] *See* AR 00001-00668.

[132] *Salmon River Concerned Citizens*, 32 F.3d at 1356.

[133] *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975).

[134] *Id.  See also N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1079 (9th Cir. 2011).

24

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

whether a project… may cause significant degradation" of a resource.[135]  A substantial dispute may concern the "size, nature, or effect" of the action.[136]  If evidence is raised prior to the preparation of the FONSI that "casts serious doubt upon the reasonableness of an agency's conclusions," then the burden shifts to the agency to demonstrate why those responses "do not create a public controversy."[137]

There was clearly a controversy here regarding the nature of the drilling to occur on the leases and the potential impacts drilling would impose on the nearby communities.  Monterey County objected strenuously to the lease sale, citing its water agency's opinion that fracking would put municipal water supplies at risk.  Many environmental groups and concerned citizens residing in nearby communities also protested the lease sale on the basis of fracking's potential threats to public health and safety.  Although mere opposition to the project does not in itself create a controversy, "the volume of comments from and the serious concerns raised by federal and state agencies specifically charged with protecting the environment [may] support a finding that an EIS" is necessary.[138]  BLM did not acknowledge these concerns, stating only that "[n]o anticipated effects have been identified that are scientifically controversial."[139]

In response, BLM asserts the now-familiar argument that there is no controversy because any degradation of the local environment from fracking should be discussed, if ever, when there is a site-specific proposal.  But the Ninth Circuit has specifically disapproved of this as a reason for holding off on preparing an EIS, holding that '[t]he government's inability to fully ascertain the

---

[135] *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.,* 117 F.3d 1520, 1536 (9th Cir. 1997).

[136] *Blue Mountains Biodiversity Project*, 161 F.3d at 1212.

[137] *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736.

[138] *California v. U.S. Dept. of Transp.*, 260 F. Supp. 2d 969, 973 (N.D. Cal. 2003).

[139] AR 00961.

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

1    precise extent of the effects of [the activity] is not, however, a justification for failing to estimate

2    what those effects might be before irrevocably committing to the activity."[140]

3        Second, BLM erroneously analyzed the potential effect of the leases on public health and

4    safety.  Although Plaintiffs argue a variety risks to public health and safety from fracking on the

5    leased lands, including air quality, oil spills, water contamination, and water shortages, the court

6    finds the risk of water pollution to be the most compelling and the most supported by the record.

7    Certain parcels included in the lease sale are located in close proximity to San Antonio Reservoir,

8    an important water resource for the Salinas Valley.  The lease areas are also a part of the Salinas

9    River watershed, which "play[s] an important role in recharging fresh aquifers."[141]  These

10   freshwater sources supply water for nearby communities and agriculture.[142]  As noted above,

11   Monterey County raised concerns about potential contamination.

12       The potential risk for contamination from fracking, while unknown, is not so remote or

13   speculative to be completely ignored.  Although BLM notes in its EA that "[t]o date, there is no

14   direct evidence that communities where hydraulic fracturing has been allowed have had any issues

15   with contamination of drinking water," this treatment is insufficient in light of the EA's own

16   observations of the potential dangers of contamination.  The EA referenced studies by the U.S.

17   House and the EPA noting that fracking has potential risks of contaminating nearby water supplies

18   with harmful chemicals.  Fracking liquid contains chemicals that are known to be possible

19   carcinogens, possible human health risks, or hazardous air pollutants.[143]  These risks, combined

---

[140] *Conner*, 848 F.2d at 1450.  *See also N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 974 (9th Cir. 2006) (holding that regarding a BLM sale of non-NSO leases, preparation of an EIS was "undeniably required" and should assess the general impact of drilling on the environment even while rejecting plaintiffs' arguments that the EIS should have contained more site-specific analysis).

[141] AR 01013.

[142] *See id.* at 00126-130, 01013, 01034.

[143] *See id.* at 09044.

26

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

1    with the parcels' proximity to certain important water resources, should have been properly

2    considered.

3         Third, BLM erroneously discounted the uncertainty from fracking that may be resolved by

4    further data collection. "Preparation [of an EIS] is mandated where uncertainty may be resolved by

5    further collection of data, or where collection of such data may prevent speculation on potential

6    effects."[144]  The FONSI addressed only potential impacts on protected wildlife and plant species,

7    noting that the parcels were similar to other parcels in HFO, and the same lease stipulations were

8    shown to be effective in minimizing impact.[145]  But as acknowledged in the data BLM itself

9    presented, fracking may pose risks to water used for municipalities and agriculture.  BLM never

10   collected any data particular to the region affected by the leases, instead opting to summarize

11   general data about fracking (much of it raising substantial concerns about the impact of fracking)

12   before dismissing the issue as outside of its jurisdiction.[146]

13        Ultimately, BLM argues that the effects of fracking on the parcels at issue are largely

14   unknown.  The court agrees.  But this is precisely why proper investigation was so crucial in this

---

[144] *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) (internal
quotations omitted).

[145] *See* AR 00962.

[146] Plaintiffs also argue that the proposed action may adversely affect an endangered or threatened
species or its habitat.  While it is true that the area in question serves as a habitat for several
identified endangered species, such as the California condor, blunt-nosed leopard lizard, South
Central Coast steelhead, and the San Joaquin kit fox, the RMP/FEIS and the EA both addressed
mitigation of oil drilling activity to aid preservation of these species.  The record is unclear as to
whether potential fracking operations would pose unique threats to impact endangered or
threatened species not considered by the RMP/FEIS.  Nevertheless, BLM implemented stipulations
that would adequately protect these species even with these unknowns.  Stipulation No. 1 reserves
to BLM all rights to regulate, require relocation, and even deny projects based on the presence of
T&E species.  Unlike the other concerns raised by Plaintiffs, the preservation of T&E species was
properly addressed by the lease terms.

27

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

case.  BLM's dismissal of any development scenario involving fracking as "outside of its jurisdiction"[147] simply did not provide the "hard look" at the issue that NEPA requires.

### 3)   Remedy

"[C]ourts have discretion to formulate equitable relief to remedy a NEPA violation"[148] and should aim to "approximate what would have happened had the agencies used the proper procedures" at the time of the lease sale.[149]  Possible avenues of relief include enjoining further surface-disturbing activity pending EIS analysis, or invalidating the improperly-granted leases.[150] Although Plaintiffs request that the court invalidate the lease sale, they provide no authority establishing the court's authority to do so while the lessees stand absent from this suit.  Moreover, the parties have not provided briefing as to which remedy would be more appropriate in this case, leaving the court to guess as to the equitable concerns at play here.[151]  Rather than guess at the right at the appropriate remedy, the court instead orders the parties to meet and confer and submit an appropriate judgment on or before April 15, 2013.

### B.   Mineral Leasing Act

As a separate matter, Plaintiffs also argue that the lease sale was flawed because BLM violated the substantive provisions of the MLA.  The MLA provides the following:

> *All leases of lands* containing oil or gas, made or issued under the provisions of this chapter, shall be *subject to the condition* that the lessee will, in conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas developed in the land, or the entrance of water through wells drilled by him to the oil sands or oil-bearing strata, to the destruction or injury of the oil deposits.[152]

---

[147] *See* AR 01080-81.

[148] *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1084 (9th Cir. 2010).

[149] *See id.* at 1081.

[150] *See id.*

[151] *See id.* at 1080-81 (noting that relief for a NEPA violation is subject to traditional equitable principles).

[152] 30 U.S.C. § 225 (emphasis added).

28

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

BLM has satisfied this requirement by providing in its leases terms that require the lessee to conduct operations and employ "reasonable precautions" to prevent waste:

> Sec. 4. Diligence, rate of development, unitization, and drainage – Lessee must exercise *reasonable diligence* in developing and producing, and must *prevent unnecessary damage to, loss of, or waste of leased resources.*
> Sec. 6. Conduct of operations – Lessee must conduct operations in a manner that *minimizes adverse impacts to the land, air, and water, to cultural biological visual, and other resources,* and to other land uses or users. Lessee must take *reasonable measures* deemed necessary by lessor to accomplish the intent of this section. To the extent consistent with lease rights granted, such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures…"[153]

These lease terms included in all four of the leases at issue are substantially similar to the MLA language and act to require the lessee to use reasonable measures in her activities to prevent waste of resources.

Plaintiffs nevertheless assert that BLM violated the MLA "by failing to ensure via lease terms that lessees take all reasonable precautions to prevent emissions of natural gas."[154] Plaintiffs' argument appears to be that BLM should have incorporated specific lease terms requiring lessees to take specific actions to minimize waste. For example, BLM could have required lessees to regularly replace packing rings and piston rods, requiring state-of-the-art rod-packing technology, and replacing wet seals used on compressors with dry seals.[155]

Although these technologies may certainly prevent waste and may be economically viable, as Plaintiffs suggest, the MLA cannot be read to impose a mandate for BLM to require lessees to employ certain technologies. The plain language of the MLA requires that "all leases" shall be "subject to the condition" outlined in the lease language. Put another way, the MLA requires that

---

[153] AR 09370, 09378, 09387, 09397 (emphasis added).

[154] Docket No. 28 at 44.

[155] *See id.* at 38.

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

the leases contain the language requiring the lessee to use reasonable precautions to avoid waste. Nothing in the language suggests that courts may affirmatively compel BLM to require lessees to employ certain technologies, however reasonable or economically viable.

In fact, the Supreme Court has specifically disapproved of courts directing affirmative agency action when no specific mandate exists, or the law grants the agency significant discretion in choosing the means to carry out the statute. In *Norton v. Southern Utah Wilderness Alliance,* the Supreme Court ruled that a claim challenging an agency action under Section 706(1) of the APA may proceed only "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take."[156] When the agency has discretion in implementing a statute, the court may compel the agency to enact, but cannot specify what that particular action should be.[157] The same rationale applies here. The MLA merely provides that a certain lease provision must be included. As long as BLM has satisfied that obligation, the court may not intrude on BLM's discretion by otherwise dictating what terms must be included in the lease.

## IV. CONCLUSION

Plaintiffs' motion for summary judgment is GRANTED and BLM's motion is DENIED as to the NEPA claims. Plaintiffs' motion for summary judgment is DENIED and BLM's motion is GRANTED as to the MLA claims.

IT IS SO ORDERED.

Dated: March 31, 2013

_____
PAUL S. GREWAL
United States Magistrate Judge

---

[156] 542 U.S. 55, 64 (2004) (emphasis original).

[157] *See id.*

30

Case No.: 11-6174 PSG
ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT