ROBERT G. DREHER, Acting Assistant Attorney General
ROMNEY PHILPOTT, Trial Attorney (Colo. Bar No. 35112)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044
Telephone: (202) 305-0258
Facsimile: (202) 305-0506
romney.philpott@usdoj.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

San Jose Division

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB, | ) ) ) | 5:11-cv-06174-PSG |
| Plaintiffs, | ) ) ) | |
| | ) ) | **DEFENDANTS' REMEDY BRIEF** |
| | ) ) | |
| BUREAU OF LAND MANAGEMENT and S.M.R. JEWELL, Secretary of the Interior, | ) ) ) ) ) | Hearing Date:  August 6, 2013 Time:  10:00 a.m. Judge:  Paul Grewal Courtroom 5, 4th Floor |
| Defendants. | ) ) ) ) | |

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................ 1

II.     BACKGROUND ............................................................................................ 2

        A.      Case Background ............................................................................... 2

        B.      Federal Defendants' Plans to Remedy the NEPA Defects Found by the Court ..... 3

        C.      BLM's Authority to Suspend Leases ................................................ 4

III.    ARGUMENT .................................................................................................. 5

        A.      Standard of Review........................................................................... 6

                1.      The Equitable Nature of the Remedy Question for a Violation of
                        NEPA ...................................................................................... 6

        B.      The Standard for Vacatur................................................................. 7

        C.      Vacatur of the Leases is Not Warranted ......................................... 8

                1.      Plaintiffs' Legal Arguments Overlook Equitable Nature of Vacatur ......... 8

                2.      The Deficiencies Found by the Court are Not so Serious as to Make
                        Vacatur appropriate, Particularly as the Leases may be Suspended
                        until a New Decision is made Based on further NEPA Analysis ............. 11

                3.      Vacatur will Be Disruptive and is Unnecessary to Ensure the Purposes
                        of NEPA are Satisfied ........................................................... 13

        D.      Plaintiffs are Not Entitled to Permanent Injunctive Relief .................. 19

IV.     CONCLUSION.............................................................................................. 20

DEFS.' REMEDY BRIEF

i

5:11-cv-006174-PSG

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044

# TABLE OF AUTHORITIES

## CASES

*Allied-Signal, Inc. v. Nat'l Regulatory Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ...................................................................7

*Boesche v. Udall,*
    373 U.S. 472 (1963) ...................................................................................5

*Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency,*
    688 F.3d 989 (9th Cir. 2012) .................................................7, 10, 11, 12, 13

*Camp v. Pitts,*
    411 U.S. 138 (1973) ...................................................................................6

*Colo. Envtl. Coal. v. Office of Legacy Mgmt.,*
    819 F. Supp. 2d 1193 (D. Colo. 2011) ......................................................17

*Conner v. Burford,*
    848 F.2d 1441 (9th Cir. 1988) ............................................10, 13, 15, 16, 17, 18

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) .................................................................................19

*FCC v. NextWave Personal Commc'ns,*
    537 U.S. 293 (2003) ...................................................................................9

*Fed. Election Comm'n v. Akins,*
    524 U.S. 11 (1998) .....................................................................................9

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.,*
    423 U.S. 326 (1976) ................................................................................6, 9

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ...................................................................................6

*Humane Soc'y v. Locke,*
    626 F.3d 1040 (9th Cir. 2010) ...............................................................6, 10

*Idaho Farm Bureau Fed'n v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995) ....................................6, 8, 10, 11, 12, 14

*Idaho Sporting Cong. Inc. v. Alexander,*
    222 F.3d 562 (9th Cir. 2000) .....................................................................9

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044

*In re Polar Bear Endangered Species Act Listing*,
  818 F. Supp. 2d 214 (D.D.C. 2011) ................................................................11

*Kescoli v. Babbitt*,
  101 F.3d 1304 (9th Cir. 1996) ........................................................................17

*Metcalf v. Daley*,
  214 F.3d 1135 (9th Cir.2000) ...........................................................................9

*Monsanto v. Geertson Farms*,
  130 S. Ct. 2743 (2010) ...................................................................10, 11, 19

*Mont. Wilderness Ass'n v. Fry*,
  408 F. Supp. 2d 1032 (D. Mont. 2006) .........................................................17

*N. Alaska Envtl. Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ...........................................................................2

*N. Cheyenne Tribe v. Hodel*,
  851 F.2d 1152 (9th Cir. 1988) ........................................................................18

*N. Cheyenne Tribe v. Norton*,
  503 F.3d 836 (9th Cir. 2007) ....................................................................16, 17

*Nat'l Wildlife Fed'n v. Espy*,
  45 F.3d 1337 (9th Cir. 1995) .......................................................................6, 8

*Natural Res. Def. Council v. Kempthorne*,
  539 F. Supp. 2d 1155 (E.D. Cal. 2008) .........................................................17

*Natural Res. Def. Council v. Houston*,
  146 F.3d 1118 (9th Cir. 1998) .............................................................9, 17, 18

*Nw. Coal. for Alternatives to Pesticides v. U.S. Envtl. Prot. Agency*,
  544 F.3d 1043 (9th Cir. 2008) ...........................................................................8

*Nw. Entl. Def. Ctr. v. Bonneville Power Admin.*,
  477 F.3d 668 (9th Cir. 2007) ...........................................................................9

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Dep't of the Interior*,
  No. 1:12-cv-01303-LJO-MJS, 2013 WL 923407 (E.D. Cal. 2013) ...............17

*Pac. Rivers Council v. U.S. Forest Serv.*,
  No. 2:05-cv-00953-MCE-AC, 2013 WL 1813734 (E.D. Cal. 2013) ..............20

DEFS.' REMEDY BRIEF

iii

5:11-cv-006174-PSG

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044

*Pit River Tribe v. U.S. Forest Serv.*,
        615 F.3d 1069 (9th Cir. 2010) ........................................................................1, 6

*Reed v. Salazar*,
        744 F. Supp. 2d 98 (D.D.C. 2010) ...........................................................................11

*S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*,
        620 F.3d 1227 (10th Cir. 2010) ...................................................................................4

*Sierra Club v. Penfold*,
        857 F.2d 1307 (9th Cir. 1988) ........................................................................18, 20

*Sierra Club v. Van Antwerp*,
        719 F. Supp. 2d 77 (D.D.C. 2010) ...........................................................................11

*W. Oil & Gas Ass'n v. EPA*,
        633 F.2d 803 (9th Cir. 1980) ............................................................................6, 8

*Wilbur v. Locke*,
        423 F.3d 1101 (9th Cir. 2005) ..................................................................................17

*Winter v. Natural Res. Def. Council, Inc.*,
        555 U.S. 7 (2008) ..........................................................................................................20

**STATUTES**

5 U.S.C. § 702 ...................................................................................................................6

5 U.S.C. § 706(2) ....................................................................................................6, 8, 9

30 U.S.C. §§ 181-263 .......................................................................................................2

30 U.S.C. § 209 .............................................................................................................4, 5

**REGULATIONS**

43 C.F.R. § 3103.4-4(a) ...................................................................................................5

43 C.F.R. § 3103.4-4(b) ...................................................................................................5

43 C.F.R. § 3103.4-4(d) .................................................................................................19

43 C.F.R. § 3108.3(d) ...............................................................................................5, 18

DEFS.' REMEDY BRIEF

iv

5:11-cv-006174-PSG

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044

# I.      INTRODUCTION

In this case, Plaintiffs Center for Biological Diversity ("CBD") and Sierra Club (together "Plaintiffs") challenged the Bureau of Land Management's ("BLM") sale of four oil and gas leases under the National Environmental Policy Act ("NEPA") and the Mineral Leasing Act ("MLA").   On March 31, 2013, the Court issued its order on the parties' cross-motions for summary judgment.  March 31, 2013 Order ("March 31 Order"), ECF No. 45.  Therein, the Court held that BLM violated NEPA with respect to two of the leases, which did not include "No Surface Occupancy" stipulations (hereinafter the "non-NSO Leases").  Specifically, the Court held that BLM, in preparing its Environmental Assessment ("EA") evaluating potential environmental effects of the sale of these two leases, violated NEPA by "unreasonably relying on an earlier single-well development scenario" which "did not adequately consider the development impact of hydraulic fracturing techniques popularly known as 'fracking' when used in combination with technologies such as horizontal drilling."  March 31 Order, at 2.  However, the Court recognized that "courts have discretion to formulate equitable relief to remedy a NEPA violation."  *Id.* at 28 (quoting *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1084 (9th Cir. 2010)).  The Court, in addition, questioned whether it had the authority to grant Plaintiffs' request that it invalidate the lease sale and vacate the two non-NSO leases.  *Id.*[1]

The Court's reluctance is warranted.  While Plaintiffs ask the Court to disregard its equitable discretion and mechanically vacate the leases, such a vacatur would cause needless and harmful disruption to BLM's oil and gas leasing program in California and would adversely affect the interests of third parties that were not parties to this litigation.  Further, such vacatur is not necessary to ensure that the purposes of NEPA are advanced.  BLM has already begun planning to undertake an analysis that will ensure that the leases in this case are evaluated in a manner that will address the deficiencies described in the Court's March 31 Order.  Accordingly, rather than vacate the non-NSO leases, the Court should order BLM to suspend operations and

---

[1] The Court did not find a violation with the other two leases at issue in this case, which had NSO stipulations, and therefore Plaintiffs cannot, and do not, seek any remedy with respect to those leases.

DEFS.' REMEDY BRIEF

5:11-cv-006174-PSG

1

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-0663

1  production on the leases, and remand the matter to BLM to prepare an additional analysis under

2  NEPA consistent with the Court's March 31 Order, before determining whether the leases should

3  remain effective and if so, whether their terms should be modified.

4  **II.     BACKGROUND**

5      **A.     Case Background**

6      Under the Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 181-263, as amended, BLM is

7  required to conduct quarterly competitive oil and gas lease auctions within each state whenever

8  eligible lands are available for leasing.  AR00969.  Pursuant to this authority, BLM's Hollister

9  Field Office offered approximately 2,605 acres of Federal mineral estate for competitive oil and

10  gas leasing, in response to expressions of interest submitted to BLM's California State office.

11  AR00970.  BLM prepared an EA to evaluate the proposed lease sale.  The EA tiered to an

12  environmental impact statement ("PRMP/EIS") that BLM had prepared in 2006 to evaluate its

13  land use plan for its management of public lands in the Southern Mountain Diablo Range and

14  Central Coast of California (including the lands at issue in this litigation).  *See generally* AR

15  00001.

16      BLM issued its final EA evaluating the proposed lease sale in June 2011.  Shortly

17  thereafter, BLM issued a finding of no significant impact ("FONSI"), and a Decision Record

18  announcing its decision to hold the lease sale. AR00953-58; AR01079-80.  In September 2011,

19  BLM proceeded with the lease sale, which resulted in three parcels being auctioned for a total of

20  $257,051, with another parcel later being sold for $556.50.  AR08089; AR9368.  BLM

21  subsequently issued four leases containing its standard stipulations as well as the applicable

22  special lease stipulations.  AR09368-9404.  Two of the four leases contained "No surface

23  occupancy" (or "NSO") stipulations, which prevent the lessee from using, or even occupying, the

24  surface of the leased land without additional specific approval from BLM.  AR09394, AR09404;

25  *see also N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 976 (9th Cir. 2006).  In addition, all

26  of the leases contained Special Stipulation No. 1, which made clear that BLM approval is

27  required "prior to any surface disturbance activities, or even the use of vehicles off existing roads

28  on a lease."  *See, e.g.*, AR09402.

In December 2011, Plaintiffs filed this suit against BLM and the Secretary of the Interior (together "Federal Defendants"). Plaintiffs asserted claims that Federal Defendants (1) violated NEPA because the EA failed to take the requisite "hard look" at a variety of issues; (2) violated NEPA by failing to prepare an EIS prior to holding the lease sale; and (3) violated the MLA by failing to ensure that the leases contained provisions adequately protecting the environment. *See* Am. Compl., ECF No. 5, ¶¶ 65-86. After the parties filed and briefed cross-motions for summary judgment, the Court issued its March 31 Order, resolving the parties' cross-motions. With respect to the two leases that included No Surface Occupancy restrictions, the Court held that "no obligation to conduct NEPA analysis arose at this time," and therefore there was no NEPA violation. March 31 Order at 17. With respect to the two non-NSO leases, the Court found that "it was unreasonable for BLM not to at least consider reasonable projections of drilling in the area that include fracking operations, or else limit its sale to leases with NSO provisions . . ." *Id.* at 24. The Court further determined that this "unreasonable lack of consideration . . . went on to unreasonably distort BLM's assessment of at least three of the 'intensity' factors in its FONSI," and that BLM had violated NEPA with respect to the two non-NSO leases. *Id.* Finally, the Court rejected Plaintiffs' claim under the MLA, finding that the leases issued by BLM had contained all of those provisions required under the statute.

The Court ordered the parties to confer with respect to the nature of the appropriate remedy under the circumstances. *Id.* After the parties were unable to reach agreement, the Court ordered the parties to brief the question of the appropriate remedy. ECF No. 52.

**B.    Federal Defendants' Plans to Remedy the NEPA Defects Found by the Court**

Federal Defendants have already begun planning a new NEPA analysis to address the deficiencies identified in the Court's March 31 Order, which will incorporate specific analyses to resolve the issues this Court identified in the EA and FONSI. Specifically, BLM intends to prepare an environmental impact statement ("EIS") addressing oil and gas leasing for certain federal public lands in California. Declaration of James Scrivner ("Scrivner Decl."), ¶ 4, attached hereto as Exhibit A. This EIS will evaluate the direct, indirect, and cumulative effects of potential oil and gas development that can reasonably be expected in light of current national

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-0663

1  trends, including increased use of hydraulic fracturing, in existing and emerging oil and gas plays

2  in California.  *Id.*  The EIS will also inform an evaluation of whether the resource management

3  plan ("RMP") governing the BLM lands managed by the Hollister Field Office and an update to

4  the reasonably foreseeable development scenario for those lands are appropriate.  *Id.*  In addition,

5  BLM will be preparing a baseline literature review (or "science report"), which BLM will use to

6  analyze the current state of the practice of hydraulic fracturing and other well completion

7  techniques.  *Id.* ¶ 8.  Either in the EIS, or in an additional, subsequent NEPA document, BLM

8  will prepare another evaluation of the potential environmental impacts of the sale of the two non-

9  NSO leases.  *Id.* ¶ 5.  Once BLM has undertaken this specific evaluation, it will re-examine the

10  question of whether the two non-NSO leases should have been issued, and if so, whether the

11  stipulations attached thereto are sufficient.  *Id.* ¶ 7.

12       In light of the timeline that this process may entail, BLM has offered to the lessees of the

13  two non-NSO leases the opportunity to have the leases cancelled now, and their monies

14  refunded.  *Id.* ¶ 14(g).  Both have elected to maintain their leases, and have indicated that they

15  believe suspension of the leases with remand to the agency is the appropriate remedy.  *Id.*[2]

16       **C.      BLM's Authority to Suspend Leases**

17       The MLA authorizes the Secretary of the Interior, in the interest of conservation, to direct

18  or assent "to the suspension of operations and production under any lease granted under the

19  terms of this chapter."  30 U.S.C. § 209 (emphasis added).  *See also S. Utah Wilderness Alliance*

20  *v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1239 (10th Cir. 2010)

21  (upholding BLM's decision that leases had not expired because it had suspended the leases in

22  light of litigation).  Under BLM's regulations promulgated under the MLA, a suspension of all

23

24  [2] Also of note is that BLM is in the process of promulgating regulations to address the use of
   hydraulic fracturing on federal public lands.  Scrivner Decl. ¶ 10.  The regulations, as currently
25  proposed, would (1) require operators to disclose the chemicals they use in fracturing activities;
   (2) improve assurances of well-bore integrity to verify that fluids used during fracturing
26  operations are not contaminating groundwater; and (3) confirm that operators have a water
   management plan in place for handling fluids that flow back to the surface.  *Id.*  The regulations
27  are undergoing public comment, with a current deadline for submitting comments of August 23,
   2013.  *Id.*
28

1  operations and production may be directed by BLM "in the interest of conservation of natural

2  resources." 43 C.F.R. § 3103.4-4(a).  *See also* BLM Manual No. 3160-10, at page .21B, attached

3  hereto as Exhibit B noting that preparation of environmental studies and/or "[e]nvironmental

4  litigation related to issuance of leases" provide reason to suspend all operations and production).

5  When a lease is suspended, no lease development activities are permitted because "the

6  lessee is denied all beneficial use of the lease."  BLM Manual No. 3160-10 at page .2.  *See also*

7  May 31, 1985, Office of the Solicitor Memorandum, attached as App. 2 to BLM Manual No.

8  3160-10.  Furthermore, such a suspension results in the suspension of rental and minimum

9  royalty payments due under the lease.  30 U.S.C. § 209; 43 C.F.R. § 3103.4-4(d).  It also results

10  in the tolling of the ten year lease period term during the period of the suspension.  30 U.S.C. §

11  209; 43 C.F.R. § 3103.4-4(b).  BLM further retains the authority to ultimately cancel any lease

12  (whether suspended or not) issued under the MLA if improperly issued.  43 C.F.R. § 3108.3(d).

13  *See also Boesche v. Udall*, 373 U.S. 472, 476 (1963).

14  **III.    ARGUMENT**

15  Plaintiffs assert that the presumptively appropriate remedy for a NEPA violation is for

16  this Court to vacate the EA, FONSI, and the non-NSO leases and remand "all aspects of the lease

17  sale decision to BLM."  Pls.' Remedy Br., ECF No. 55, at14.  Federal Defendants do not object

18  to vacatur of the Decision Record and FONSI and remand of the EA as applied to the non-NSO

19  leases.  However, as set forth below, vacatur of the non-NSO leases is neither the presumptive

20  nor the appropriate remedy, and Plaintiffs' request that the court vacate the non-NSO leases

21  should be denied.  Instead, the Court should order BLM to suspend operations and production on

22  the non-NSO leases and remand the EA to BLM to prepare additional analysis under NEPA

23  consistent with the Court's March 31, 2013 Order, before determining whether the leases should

24  remain in effect and if so, whether their terms should be modified.

25

26

27

28

A.      **Standard of Review**

1.      The Equitable Nature of the Remedy Question for a Violation of NEPA

When a court finds an agency action or decision to be unlawful, the law is well-settled that the proper course is to remand the action to the agency for reconsideration. *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985); *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973).  Under established principles of APA review, the Court is not to direct the outcome of agency decisions and should remand for the agency to exercise its discretion and expertise. *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976) (judicial review of agency action ordinarily requires remand to agency so that agency can exercise its discretion).

While ordinarily an agency action held to be unlawful is set aside, *see* 5 U.S.C. § 706(2), vacatur is a species of equitable relief, and courts are not mechanically obligated to vacate agency decisions that they find invalid.  *See* 5 U.S.C. § 702 (providing that the court retains discretion to deny relief on any appropriate equitable grounds).  As the Ninth Circuit explained in *Nat'l Wildlife Fed'n v. Espy*:

> Although the district court has power to do so, *it is not required to set aside every unlawful agency action*.  The court's decision to grant or deny injunctive or declaratory relief under the APA is controlled by principles of equity.

45 F.3d 1337, 1343 (9th Cir. 1995) (emphasis added).  *See also Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) (stating that a court may remand without vacatur to allow the agency action to remain in force until the action can be considered or replaced);  *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1080-81 (9th Cir. 2010) ("Our courts have long held that relief for a NEPA violation is subject to equity principles.");  *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures.");  *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980) ("[G]uided by authorities that recognize that a reviewing court has discretion to shape an equitable remedy, we leave the challenged designations in effect.").  Thus, the Court's decision as to whether to impose the remedy of vacatur is an equitable decision firmly committed to the district court's discretion.

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-0663

1

**B.      The Standard for Vacatur**

2

3      While, as noted above, the Ninth Circuit has long recognized that vacatur is an equitable

4  remedy, it recently addressed the standards that should be applied when determining whether a

5  procedurally invalid agency action should be vacated or left in place during a remand.  In *Cal.*

6  *Cmty.s Against Toxics v. U.S. Envtl. Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012), the Ninth

7  Circuit considered whether to vacate an EPA rule approving revisions to a portion of California's

8  Clean Air Act State Implementation Plan.  Emphasizing that a "flawed rule need not be vacated,"

9  the Court adopted the two-part test articulated by the D.C. Circuit in *Allied-Signal, Inc. v. Nat'l*

10  *Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993).  *Id.* at 992.  Under this test, "whether

11  agency action should be vacated depends on how serious the agency's errors are 'and the

12  disruptive consequences of an interim change that may itself be changed.'"  *Id.* (quoting *Allied-*

13  *Signal, Inc.*, 988 F.2d at 150-51).

14      In applying the *Allied-Signal* factors, the *California Communities* court made clear that in

15  addition to weighing the environmental consequences of vacatur, courts should consider

16  economic and other practical concerns.  688 F.3d at 992 ("If saving a snail warrants judicial

17  restraint, so does saving the power supply.") (internal citation omitted).  The Ninth Circuit noted

18  that vacatur of the challenged rule could delay the construction of the new Sentinel power plant

19  at issue in that case.  *Id.*  This delay would have created negative environmental impacts from the

20  increased use of diesel generators; negative economic impacts, by delaying a "billion-dollar

21  venture employing 350 workers;" and "needless and duplicative legislative effort."  *Id.*  Based on

22  these consequences, the Court remanded the rule "without vacatur so that construction of

23  Sentinel may proceed without delay."  *Id.*

24      The *California Communities* court's express consideration of environmental and practical

25  considerations weighing against vacatur is consistent with prior Ninth Circuit case law, in which

26  the court endorses the consideration of a wide variety of such concerns.  For example, the Ninth

27  Circuit considers "competing claims of injury . . . and the effect on each party [and third parties]

28  of the granting or withholding of the requested relief," *Espy*, 45 F.3d at 1343 (citation omitted),

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-0663

1    "the possibility of undesirable consequences which we cannot now predict that might result from

2    invalidation of [the unlawful decisions]," *W. Oil & Gas Ass'n*, 633 F.2d at 813, and a "desire to

3    avoid thwarting in an unnecessary way the operation of [a statute] during the time the

4    deliberative process is reenacted." *Id*.  The Ninth Circuit has also recognized that vacatur, as with

5    any other remedy, must be narrowly tailored to address specific harms. *Id*. ("Our intervention

6    into the process of environmental regulation, a process of great complexity, should be

7    accomplished with as little intrusiveness as feasible."); *Idaho Farm Bureau*, 58 F.3d at 1405–06

8    (vacatur should be denied if "a more closely tailored remedy is available").

9            **C.      Vacatur of the Leases is Not Warranted**

10                   1.      Plaintiffs' Legal Arguments Overlook Equitable Nature of Vacatur

11           Despite the overwhelming authority emphasizing the equitable and discretionary nature

12    of a court's remedy decision in a NEPA case, in their Opening Brief, Plaintiffs argue that the

13    Court should simply presume that vacatur is the appropriate remedy.  *See* Pls.' Remedy Br. at 3-

14    4.  However, consistent with the case law discussed above, even those cases cited by Plaintiffs

15    recognize the equitable nature of the court's decision.

16           For instance, Plaintiffs cite to *Nw. Coal. for Alternatives to Pesticides (NCAP) v. U.S.*

17    *Envt.l Prot. Agency*, 544 F.3d 1043, 1047 (9th Cir. 2008), for the proposition that "a court '<u>must</u>

18    set aside an agency's decision if it is arbitrary, capricious, an abuse of discretion, or otherwise

19    not in accordance with law,'" Pls.' Remedy Br. at 3 (emphasis in original).  However, the

20    language Plaintiffs quote (and add artificial emphasis to) comes from the Court's pro forma

21    description of the standard of review under the Administrative Procedure Act ("APA"), not from

22    a substantive discussion of the appropriate remedy in that case.  *See NCAP*, 544 F.3d at 1047

23    (quoting 5 U.S.C. § 706(2)(A)).  And in fact, the Ninth Circuit did not vacate the decision

24    challenged in that case.  Specifically, at issue were challenges to a Final Order issued by the EPA

25    establishing tolerances for pesticides used on foods.  *Id*. at 1045-46.  With respect to certain

26    tolerances, the Ninth Circuit found that EPA had failed to provide enough information to

27    demonstrate a rational connection between the factors EPA examined and the conclusions it

28    reached.  *Id*. at 1052.  Nonetheless, the Court did not state that it was vacating the challenged

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-0663

order, but simply remanded it to EPA for further consideration consistent with the court's

opinion, noting that on remand, EPA might be able to provide the missing analysis.  *Id.*

Plaintiffs also cite to *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir.

1998), a case in which water supply contracts had been entered into by the Bureau of

Reclamation without complying with the Endangered Species Act and NEPA, and had been

vacated by the district court as a remedy for these violations.  The Ninth Circuit, rather than

upholding the vacatur of the contracts as the appropriate "presumptive" remedy, held only that

the court's decision to rescind the contracts was <u>not an abuse of discretion</u>.  Indeed, the Ninth

Circuit expressly noted that the district court "had the discretion to preserve the contracts if the

procedural flaw could have been rectified in another way," but found that the district court had

not abused its discretion because "there is no reason to compel that result here."  *Id.  See also*

*Nw. Entl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680 (9th Cir. 2007) (noting that

Section 706(2)'s authorization to "set aside" unlawful agency action was an "equitable power").[3]

---

[3] The language cited from *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 567 (9th Cir. 2000)),  the other Ninth Circuit case relied upon by Plaintiffs to support their presumption argument was not even in the context of addressing what the appropriate remedy should be.  *See* Pls.' Remedy Br. at 3.  Indeed, while the *Idaho Sporting Congress* court noted that "agency action taken without observance of the procedure required by law will be set aside," it did so in the context of explaining why the agency had violated NEPA, namely that the agency had utilized a "supplemental information report," rather than either of the two documents (i.e., an EA or EIS) specifically recognized under NEPA's implementing regulations.  222 F.3d at 567 (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir.2000)).  Because that case was addressing whether a preliminary injunction should issue, the question of whether vacatur was appropriate was not even before the court.  Similarly, none of Plaintiffs' Supreme Court citations arose in the context of addressing what remedy was appropriate.  *See FCC v. NextWave Personal Commc'ns*, 537 U.S. 293, 295 (2003) (addressing whether § 525 of the Bankruptcy Code prohibits the FCC from revoking licenses held by a debtor in bankruptcy upon the debtor's failure to make timely payments owed to the Commission for purchase of the licenses); *Transcont. Gas Pipe Line Corp*., 423 U.S. at 331 (finding that court of appeals overstepped bounds of its reviewing authority by issuing an <u>interlocutory order</u> requiring agency to further investigate matter before the court and report back upon it, rather than relying upon administrative record); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) (addressing the redressability element of standing requirement, and noting that "[i]f a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case").

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-0663

1   Plaintiffs next, implicitly recognizing that neither the APA nor caselaw supports a

2   mechanical application of vacatur, argue that remand without vacatur is warranted only in

3   "limited circumstances."  Pls.' Remedy Br. at 4.  Again, however, the Ninth Circuit cases

4   Plaintiffs cite to corroborate the fact that the choice of remedy in a NEPA case is an equitable

5   determination.  *See Humane Soc'y*, 626 F.3d at 1053 n.7 ("In rare circumstances, <u>when we deem</u>

6   <u>it advisable</u> that the agency action remain in force until the action can be reconsidered or

7   replaced, we will remand without vacating the agency's action") (emphasis added); *Idaho Farm*

8   *Bureau*, 58 F.3d at 1405 (noting that "[o]rdinarily when a regulation is not promulgated in

9   compliance with the APA, the regulation is invalid," but then overturning the district court's

10  invalidation of the regulation on equity grounds).  Further, Plaintiffs' argument that such

11  "limited circumstances" only occur where there is a need to avoid "serious irreparable injury" is

12  flatly inconsistent with Ninth Circuit precedent.  *See Cal. Comtys.*, 688 F.3d at 992 ("If saving a

13  snail warrants judicial restraint, so does saving the power supply"); *Idaho Farm Bureau*, 58 F.3d

14  at 1405 -1406 (finding vacatur was not warranted, not just because of risk to endangered species,

15  but also because of the risk of unnecessary waste of "the significant expenditure of public

16  resources"); *Conner v. Burford*, 848 F.2d 1441, 1461 (9th Cir. 1988) (clarifying district court's

17  remedy order to <u>not</u> set aside leases in order to protect interests of lessees).

18  Finally, Plaintiffs argue that the Supreme Court in *Monsanto v. Geertson Farms*, ---U.S.--

19  -, 130 S. Ct. 2743 (2010), "clarified" that vacatur is preferred over an injunction, and further

20  argue that the *Monsanto* case somehow modifies prior Ninth Circuit case law emphasizing the

21  equitable nature of the remedy question.  *See* Pls.' Remedy Br. at 5-6.  To the contrary,

22  *Monsanto* does nothing of the sort.  In *Monsanto*, plaintiffs challenged a decision by the Animal

23  and Plant Health Inspection Service ("APHIS") to deregulate certain strains of genetically

24  engineered alfalfa (referred to as "Roundup Ready Alfalfa" or "RRA").  130 S. Ct. at 2751. The

25  district court found that APHIS violated NEPA by failing to prepare an EIS prior to issuing an

26  order in which it had completely deregulated RRA.  As remedy, the district court entered an

27  injunction prohibiting <u>any</u> partial or limited deregulation of RRA, as well as a nationwide

28  injunction against planting RRA.  In determining that the district court erred, the Supreme Court

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-0663

noted that entering an injunction was erroneous because, in the circumstances of that case, a "less drastic" remedy—"partial or complete vacatur of APHIS's deregulation decision"—would have been sufficient to redress the plaintiffs' injury.  *Id.* at 2761.  However, the Supreme Court was not expressing a "preference" for vacatur as such; rather, it was merely expressing the well-established principle that any equitable relief imposed by a court should be as narrowly-tailored as possible. *Id.*  In other words, between two remedies that equally protect a plaintiff's interests, the court should elect the "less drastic" of the two.  *Id. See also Idaho Farm Bureau*, 58 F.3d at 1405 -1406 (finding vacatur was not warranted "when a more closely tailored remedy is available.")  Accordingly, where, as here, there is an adequate remedy that is "less drastic" than vacatur, under *Monsanto*, the Court should select that remedy in exercise of its equitable discretion.[4]

Accordingly, Plaintiffs' implication that vacatur should be mechanically entered as the "presumptive" remedy is inconsistent with case law from the Ninth Circuit and Supreme Court. Rather, the question of whether vacatur should be entered should be based, as discussed above, on the equitable factors recognized by the Ninth Circuit, including the significance of BLM's error and the disruptive impact vacatur would have.  *See Cal. Comtys.*, 688 F.3d at 992.

> 2.   The Deficiencies Found by the Court are Not so Serious as to Make Vacatur appropriate, Particularly as the Leases may be Suspended until a New Decision is made Based on further NEPA Analysis

The first factor relevant to whether vacatur should be imposed looks to "the seriousness of the [agency action's] deficiencies."  *California Communities*, 688 F.3d at 992.  However, even a finding of a "significant" error is not sufficient in and of itself to impose vacatur if the other equities weigh against imposing this remedy.  *Idaho Farm Bureau*, 58 F.3d at 1405 (finding that

---

[4]Plaintiffs' argument is also problematic in that none of the decisions comprising the "post-*Monsanto* NEPA case law" referred to by Plaintiffs provide any discussion indicating that those courts agree with Plaintiffs' assumption that *Monsanto* constituted a "sea change" with respect to the presumptiveness of vacatur.  *See In re Polar Bear Endangered Species Act Listing*, 818 F. Supp. 2d 214 (D.D.C. 2011); *Reed v. Salazar*, 744 F. Supp. 2d 98 (D.D.C. 2010); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77 (D.D.C. 2010).

1    agency had committed a "significant procedural error" but electing not to vacate agency action

2    given equities weighing in favor of lesser remedy).

3            In this case, the Court found that "it was unreasonable for BLM not to at least consider

4    reasonable projections of drilling in the area that include fracking operations, or else limit its sale

5    to leases with NSO provisions . . ."  March 31 Order at 24.  The Court further determined that

6    this "unreasonable lack of consideration of how fracking could impact development of the

7    disputed parcels went on to unreasonably distort BLM's assessment of at least three of the

8    'intensity' factors in its FONSI."  *Id.*  As a result, the Court determined that BLM had violated

9    NEPA.  *Id.*

10           The analysis had shortcomings, but it was not so deficient as to be offensive to NEPA's

11   policy goals.  While BLM chose a lower development scenario than the Court deemed

12   appropriate as the basis for BLM's analysis, the analysis was nonetheless sound and would be

13   informative in many respects even as applied to a higher development scenario.  Indeed, the

14   Court recognized that BLM had, in its PRMP/EIS and in the EA, provided discussion of the

15   potential impacts of oil and gas development on surrounding air quality, water resources, wildlife

16   habitat, and special status species.[5]  March 31 Order, at 6, 7.

17           Furthermore, no development of the leases would have been authorized by BLM prior to

18   BLM undertaking a site-specific evaluation associated with the lessee's Application for a Permit

19   to Drill ("APD") of all of these potential environmental impacts.  Indeed, as the Decision Record

20   made clear, no APDs could be approved until after they were "evaluated via subsequent

21   environmental analyses in accordance with the NEPA."  AR 00955.  *See also* AR 09402 (Special

22   Stipulation No. 1, noting that "prior to any surface disturbance activities, or even the use of

23   vehicles off existing roads on a lease, BLM approval is required").  While the Court ultimately

24   found this circumstance insufficient to avoid finding a NEPA violation, the fact that there

25   necessarily would have been additional analysis prior to BLM authorizing any surface-disturbing

26

27   ---

[5] And the Court found that BLM's analysis with respect to threatened and endangered species
28   was adequate in light of a stipulation that reserved for BLM all rights to regulate projects with
     respect to threats to such species.  March 31 Order at 27 n.146.

activity mitigates the seriousness of the error found by the Court such that vacatur is not warranted.

Finally, under the Court's analysis, there would have been no NEPA violation for any of the four leases had they all included NSO stipulations. *See* Order at 17. As discussed below, suspension of operations and production on the non-NSO leases will prevent any lease development activity. As a result, ordering BLM to suspend the non-NSO leases pending additional NEPA analysis would, just as if the leases had been issued with NSO stipulations, ensure the prevention of any potential environmental impacts while BLM undertakes its additional evaluation. *Cf. Conner*, 848 F.2d at 1461 (finding that its enjoining of surface disturbing activity on leases pending additional NEPA review acted to "essentially creat[e] NSO leases out of non-NSO leases.") Under these circumstances, the seriousness of the deficiencies found by the Court is not such that vacatur is the appropriate remedy, particularly given the disruptive impacts it would have as discussed below.

            3.      Vacatur will Be Disruptive and is Unnecessary to Ensure the Purposes of
                    NEPA are Satisfied

Under the second *California Communities* factor, the evidence shows that vacatur of the leases will have "disruptive consequences." 688 F.3d at 992. In particular, vacatur of the leases will be disruptive to BLM both with respect to the leases at issue in this case and its more general oil and gas operations in the State of California. Vacatur would also be disruptive in that setting aside the leases would adversely affect the interests of third parties who have not appeared in this litigation.

Vacatur will have significant disruptive consequences to BLM, both with respect to the particular parcels at issue here, and its oil and gas leasing more generally. With respect to the first, if BLM ultimately decides leasing the relevant parcels is appropriate, BLM will need to undertake a new lease sale and yet again offer the parcels for lease. Scrivner Decl., ¶ 13. This will require BLM to undertake a variety of tasks, including among others, accepting new expressions of interest related to the parcels (and then processing and configuring them for possible sale); ensuring compliance with statutory and regulatory obligations related to cultural

1    resources; and planning and undertaking the logistics for the sale (including everything from

2    preparing sale notices to securing a venue and ensuring compliance with electronic accessibility

3    requirements).  The resulting additional cost to BLM (and ultimately to the taxpayers) is not

4    trivial: excluding all work related to undertaking environmental evaluations under NEPA, this

5    would cost, in dollar figures, an additional $56,000.  *Id.* ¶ 13(d).  Particularly under the budget

6    constraints that BLM (like all federal agencies) is facing, incurring such duplicative costs is

7    problematic, especially since doing so is not necessary, as discussed below, to preserve the

8    effectiveness of the NEPA process.  The avoidance of wasteful public expenditures is a

9    legitimate consideration with respect to the appropriateness of vacatur.  *See Idaho Farm Bureau*,

10   58 F.3d at 1405 -06 (finding vacatur was not warranted in part because "the significant

11   expenditure of public resources, including the $400,000 spent on the I[daho] S[tate] U[niversity]

12   and USGS studies, would be unnecessarily wasted if we affirm the decision to set aside the

13   listing rule when a more closely tailored remedy is available.")

14        Vacatur will also result in broad consequences for BLM's oil and gas leasing in

15   California.  If leases are subject to judicial vacatur without BLM having the opportunity to

16   determine whether procedural defects can be addressed, that will likely negatively impact the

17   "market value" of an oil and gas lease for resources on federal public land.  Scrivner Decl. ¶ 14.

18   In other words, the additional uncertainty as to the ultimate effectiveness of a BLM-issued oil

19   and gas lease caused by the imposition of vacatur in this case may reduce the amount of money

20   that lessees are willing to pay for such a lease.  Indeed, circumstantial evidence for this

21   phenomenon is readily available:  the Hollister Field Office's lease auction in September 2011

22   resulted in an average bonus bid of $97.84 per acre.  *Id.* ¶ 13(a).  In its December 2012 lease

23   auction, which occurred after this litigation had been initiated and had become known in the oil

24   and gas industry, the Hollister Field Office received only $4.21 per acre.  *Id.*  BLM suspects that

25   the existence of this litigation caused at least some of the price depression, and believes that

26   vacatur of the leases here will do so even more.  *Id.*  In addition, the possibility of having their

27   leases vacated could lead prospective lessees to focus on acquiring non-federal minerals, thereby

28   resulting in less development of federal minerals in general.  *Id.*  As a consequence, if these

1    leases are vacated, not only might BLM receive reduced bonus bids for these leases upon

2    potential re-sale—but it may result in BLM selling fewer leases in California in general (or at

3    least receiving reduced bids for such leases).  *Id.*

4           This is problematic because the monies that BLM receives from bonuses, rental and

5    royalties from oil and gas leases are ultimately paid into the U.S. Treasury, and are used to fund

6    government activities.  *Id.*  Further, the federal government is not the only government entity that

7    benefits from oil and gas development on federal public lands.  The State of California also

8    receives portions of sale bonus bids and first year rental payments, as well as approximately half

9    of all royalties from production on federal leases.  *Id.* ¶ 14(c).  The State, in turn, shares portions

10   of these funds with counties in which leases are located.  *Id.*

11          Next, vacatur would be very disruptive to the lessees of the two non-NSO leases, neither

12   of whom were made parties to this litigation.  As indicated in the Scrivner Declaration, BLM has

13   reached out to the relevant lessees, and has learned that their preference is for suspension of the

14   leases while BLM prepares an additional evaluation under NEPA.  *Id*. ¶ 14(g).  As described in

15   the declaration, vacating the leases would cause considerable disruption to the lessees'

16   investment-backed expectations.  *See id.* ¶ 14.

17          Where, as here, the interests of third party lessees are at stake, the Ninth Circuit's

18   decision in *Conner v. Burford* provides compelling guidance as to how the issue of remedy

19   should be resolved.  *Conner* dealt with a similar scenario: in that case, the court determined that

20   BLM had violated NEPA because it issued non-NSO oil and gas leases without preparing an

21   EIS.  848 F.2d at 1451.  On appeal, oil and gas lessees objected that the litigation should not

22   have been allowed to proceed in their absence under Rule 19 because the district court appeared

23   to have vacated the leases, thereby "destroying" their putative property rights.  *Id.* at 1458-59.

24   Recognizing the significance of the issue, the Ninth Circuit resolved the issue by ensuring that

25   the lease-holders' interests were protected, given their absence in the proceedings.  The Ninth

26   Circuit modified the district court's remedy order to make it clear that it was <u>not</u> invalidating the

27   leases.  *Id.* at 1460-61.  Instead, the court "enjoin[ed] the federal defendants from permitting any

28   surface-disturbing activity to occur on any of the leases until they have fully complied with

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-0663

NEPA and the ESA." *Id.* at 1466.  In order to ensure that the purposes of NEPA were upheld, the Court further ordered that "any future environmental analysis by the federal agencies shall *not* take into consideration the commitments embodied in the non-NSO leases already sold." *Id.* (emphasis in original).

By formulating this remedy, the *Conner* court found that it would "avoid the unnecessarily harsh result of completely divesting the lessees of their property rights." *Id.* at 1461 n.50.  It further found that its remedy would allow for BLM's curative NEPA process to be meaningful, while not being unduly disruptive to BLM and the non-party lessees.  The court reasoned:

> By essentially creating NSO leases out of non-NSO leases, we retain in the leaseholders many of the fundamental attributes of their contracts. As strenuously argued by both the government and the lessees, significant economic value inheres in the exclusive right to engage in oil and gas activities, should any be allowed. Once the government complies with NEPA and the ESA, it is entirely possible that it will authorize surface-disturbing activities on many of the leased tracts. Thus, although development probably will be delayed, it is conceivable that it will occur on some of the leases already sold. The legally protected interests of the lessees are barely affected until the government decides that no development and production of the oil and gas reserves will be allowed, and even then they may have claims for damages against the government.

*Id.* at 1461.

Consistent with *Conner*, other Ninth Circuit decisions have consistently indicated that a remedy short of vacatur is appropriate to remedy a NEPA violation, particularly when third-party interests are involved.  For instance, in *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 842 (9th Cir. 2007), the court found that BLM had prepared an inadequate EIS addressing development of coalbed natural gas in a resource area.  Noting that "a NEPA violation is subject to traditional standards in equity for injunctive relief and does not require an automatic blanket injunction against all development," the Ninth Circuit not only declined to vacate BLM's underlying approvals, but also approved an injunction which allowed some development to proceed while BLM undertook additional NEPA analysis.  *Id.  See also Houston*, 146 F.3d at 1129 (noting that courts have "the discretion to <u>preserve the contracts</u> if the procedural flaw could have been

DEFS.' REMEDY BRIEF

16

5:11-cv-006174-PSG

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-0663

1   rectified in another way") (emphasis added).  District courts addressing similar circumstances

2   have also elected to require suspension of leases rather than vacatur.  *See Mont. Wilderness Ass'n*

3   *v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006) (electing to suspend, rather than rescind,

4   leases issued in violation of NEPA, the National Historic Preservation Act, and ESA as doing so

5   would "suspend all activity detrimental to the environment pending BLM's compliance with the

6   law. That way, the environmental impact of gas leasing is evaluated by the entity best suited to

7   conduct such an assessment, which is not the Court but the agency itself."); *Colo. Envtl. Coal. v.*

8   *Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1224 (D. Colo. 2011) (staying leases issued

9   under management plan that had inadequate EA and FONSI).

10      Indeed, there is some question of whether, if the leases are to be vacated (and therefore

11   interests of the third party lessees to be significantly impacted), Plaintiffs were not obligated to

12   ensure that the lessees were parties to the case.  *See Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th

13   Cir. 1996) (noting that, even under the public rights exception to the rule against litigating a

14   claim in the absence of indispensible parties, "although the litigation may adversely affect the

15   absent parties' interests, the litigation must not 'destroy the legal entitlements of the absent

16   parties'") (quoting *Conner*, 848 F.2d at 1459); *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S.*

17   *Dep't of the Interior*, --- F. Supp. 2d ---, 2013 WL 923407, 21 (E.D. Cal. 2013) (finding

18   Plaintiffs' agreement to "limit significantly" the available remedies by their insistence that they

19   "do not seek to invalidate the interim [water delivery] contracts,"  but only to obtain "prospective

20   injunctive relief that would only affect the future conduct of the administrative process," allowed

21   application of the public rights exception to the joinder rules); *Natural Res. Def. Council v.*

22   *Kempthorne*, 539 F. Supp. 2d 1155, 1185 (E.D. Cal. 2008) (quoting *Wilbur v. Locke*, 423 F.3d

23   1101, 1113 (9th Cir. 2005)) (finding that to the extent plaintiffs' claim under the ESA sought to

24   enjoin the Bureau of Reclamation from performing under water delivery contracts with absent

25   parties, the case could not proceed without their joinder).

26      Ultimately, this potential problem is easily circumvented because the Court can avoid this

27   impact on the third-party lessees (and BLM) while still ensuring that the purposes of NEPA are

28   upheld.  With respect to the latter, as discussed above, BLM has already begun undertaking a

1    process which will result in the re-evaluation of the potential environmental consequences of

2    issuing the non-NSO leases.  At the conclusion of this process, BLM will reconsider whether the

3    leases should remain should remain effective and if so, whether their terms should be modified.

4    If BLM determines that the leases should not remain effective in light of its re-evaluation, it will

5    cancel the leases and refund the lessees their money.  43 C.F.R. § 3108.3(d); Scrivner Decl. ¶

6    14(e).  And while Plaintiffs argue that this could result in only "post hoc assessments of a done

7    deal," (Pls.' Remedy Br. at 10) (quoting *Houston*, 146 F.3d at 1129), the Ninth Circuit has

8    determined that any such risk can be successfully avoided by expressly instructing the agency to

9    ignore the prior transactions.  *See N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir.

10   1988) ("We see no reason to suppose that the Secretary will feel greater commitment to the

11   original project if the leases are not voided but held in abeyance until a new evaluation is made,

12   especially as the injunction will now specifically direct the Secretary not to consider prior

13   investments by the lessees when he reconsiders the lease sale"); *Conner*, 848 F.2d at 1461

14   (including in the order that "any future environmental analysis by the federal agencies shall *not*

15   take in to consideration the commitments embodied in the non-NSO leases already sold.")

16   (emphasis in original).  Indeed, consistent with Ninth Circuit authority, the Court is required to

17   assume that BLM will comply with the law and its order.  *See Sierra Club v. Penfold*, 857 F. 2d

18   1307, 1319 (9th Cir. 1988).  Thus, an order from the Court that BLM suspend the leases, and

19   then, upon completion of additional environmental review consistent with the March 31 Order,

20   reconsider issuance of the leases (including whether to include any additional stipulations) will

21   ensure that the purposes of NEPA be fulfilled.

22          In conclusion, by ordering BLM to suspend operations and production on the non-NSO

23   leases and to undertake additional analysis prior to re-evaluating whether the leases should

24   remain in effect, the Court can craft an effective remedy that ensures the purposes of NEPA are

25   satisfied, while avoiding unnecessary disruptive impacts to BLM and the third-party lessees.  *See*

26   *Conner*, 848 F.2d at 1461 n.50.  Accordingly, Federal Defendants respectively request that the

27   Court issue the Proposed Order attached hereto as Exhibit C.

28

1

**D.      Plaintiffs are Not Entitled to Permanent Injunctive Relief**

2        As an alternate remedy, Plaintiffs propose that the Court issue a "permanent injunction

3  enjoining all oil and gas activities on the unlawfully issued leases until BLM complies with

4  NEPA." Pls.' Remedy Br. at 10.  However, if the Court orders BLM to suspend the two non-

5  NSO leases, that will provide Plaintiffs the same relief that they seek from a permanent

6  injunction.  Indeed, for that reason, Plaintiffs are not entitled to a permanent injunction, because

7  they cannot demonstrate that they face irreparable injury, or that other remedies at law—namely

8  declaratory relief—are inadequate.

9        A permanent injunction does not automatically issue, nor is it presumptively proper, upon

10 a finding of a NEPA violation. *See Monsanto*, 130 S. Ct. at 2756–57.  Instead, "the traditional

11 four-factor test applies when a plaintiff seeks a permanent injunction to remedy a NEPA

12 violation." *Id*. at 2756. Under that test, a plaintiff must demonstrate: "(1) that it has suffered an

13 irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate

14 to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

15 and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

16 disserved by a permanent injunction." *Id.* (quoting *eBay Inc. v. MercExchange, L.L C.*, 547 U.S.

17 388, 391 (2006)).

18        As discussed above, once BLM suspends operations and production on an oil and gas

19 lease, "the lessee is denied all beneficial use of the lease," and "[a]ctivities designed to benefit

20 the lease (operations or production may not be commenced or continued on the lease while the

21 lease is so suspended."  BLM Manual No. 3160-10 at page .2.  *See also* 43 C.F.R. § 3103.4-4(d)

22 (authorizing authorized officer to direct a suspension of all operations and production); May 31,

23 1985 Office of the Solicitor Memorandum, attached as App. 2 to BLM Manual No. 3160-10.

24 Beneficial use of the lease includes "construction of access roads on the leased land, site

25 preparation, well repair, drilling or similar activity."  BLM Manual No. 3160-10, Glossary.  As a

26 result, there is no need for the Court to issue an order "enjoining all oil and gas activities on the

27 unlawfully-issued Monterey leases until such time as BLM complies with the Court's orders on

28 remand."  *See* Pls.' Remedy Br. at 14.  Unless and until BLM decides—after it has prepared an

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-0663

additional evaluation of the potential environmental effects—that the leases should remain in effect, there is no possibility that Plaintiffs will be harmed in any of the ways they identify in their brief.  No development of the leases can occur while they are suspended, and BLM cannot decide whether to lift the suspension of the leases until <u>after</u> it has undertaken an evaluation of the potential environmental consequences of the issuance of the leases consistent with the Court's March 31 Order.  And, Plaintiffs will have the opportunity—just as any other member of the public—to comment on BLM's evaluation to ensure their views are before the agency.[6]

Failure to show that irreparable harm is "likely" is fatal to a request for injunctive relief. *See Winter v. Natural Res. Defense Council, Inc*., 555 U.S. 7, 22 (2008) (plaintiff "seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction") (emphasis in original); *Pac. Rivers Council v. U.S. Forest Serv.*, --- F. Supp. 2d ---,  2013 WL 1813734, *10 (E.D. Cal. 2013) (finding that, even in light of NEPA violation, organization's failure to identify specific project that will harm members "falls well short of the concrete injury to the plaintiff needed to justify the extraordinary remedy of injunctive relief").  Because lease suspension will act automatically to prevent any of the activities Plaintiffs wish to enjoin, Plaintiffs cannot demonstrate that irreparable harm is likely absent an injunction.  Accordingly, the Court should reject Plaintiffs' request for the injunction they seek as well.

## IV.   <u>CONCLUSION</u>

As demonstrated above, the law is well-established that relief for a NEPA violation is subject to equity principles, and that vacatur of agency action should not be entered if its

---

[6] In the event this Court were to issue an injunction, it should be noted that Plaintiffs' injunction request appears to contemplate an injunction that would terminate automatically upon BLM's preparation of a NEPA document that BLM determines satisfies its obligations under the Court's March 31 order.  Pls.' Remedy Br. at 14 (arguing court should issue an injunction enjoining "all oil and gas activities under the unlawfully-issued Monterey leases until such time as BLM complies with the Court's orders on remand").  While Defendants maintain that no injunction is merited here, such an endpoint for the requested injunction would be consistent with the Ninth Circuit's instruction that the Court is required to assume BLM will comply with the law and its order.  *See Penfold*, 857 F. 2d at 1319.

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-0663

1  disruptive consequences can be avoided by a lesser, but still effective remedy.  Here, the Court

2  can avoid the disruptive consequences of vacating the two non-NSO leases, and ensure that the

3  purposes of NEPA are being fulfilled, by ordering BLM to issue a suspension of operations and

4  production on the leases and to re-examine whether the leases should remain in effect after BLM

5  has undertaken additional analysis of the impacts of their issuance consistent with the Court's

6  March 31 Order.  Further, because such suspension will itself prevent BLM from approving any

7  further development activity on the leases, a permanent injunction is not warranted.

8  Accordingly, Federal Defendants respectfully request that the Court issue an order consistent

9  with their proposed order attached hereto.

10

11  Dated:  June 25, 2013                              Respectfully Submitted,

12
                                                    ROBERT G. DREHER, Acting Assistant Attorney
13                                                  General

14                                                     /s/ Romney S. Philpott
15                                                  ROMNEY S. PHILPOTT, Trial Attorney
                                                    Colo. Bar No. 35112
16                                                  U.S. Department of Justice
                                                    Environment & Natural Resources Division
17                                                  Natural Resources Section

18

19                                                  Of Counsel

20
                                                    Erica Niebauer
21                                                  Wendy Dorman
                                                    Office of the Solicitor
22                                                  Department of the Interior

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

San Jose Division

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB, | ) ) ) | 5:11-cv-06174-PSG |
| Plaintiffs, | ) ) | **Certificate of Service** |
| vs. | ) ) | |
| BUREAU OF LAND MANAGEMENT and KEN SALAZAR, Secretary of Interior, | ) ) ) | |
| Defendants. | ) ) | |

    I hereby certify that on June 25, I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system, which will send notification of such to the attorneys of record:

Brendan R. Cummings
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Email: bcummings@biologicaldiversity.org

David Robert Hobstetter
Center for Biological Diversity
351 California Street
Suite 600
San Francisco, CA 94104
Email: dhobstetter@biologicaldiversity.org

Nathan D. Matthews
Sierra Club
85 2nd Street
Second Floor
San Francisco, CA 94105
Email: nathan.matthews@sierraclub.org


                                                    _/s/ Romney Philpott_
                                                    ROMNEY PHILPOTT

22